**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 15 |
| | : | |
| Angiotech Pharmaceuticals, Inc., et al.[1] | : | Case No. 11-__________(____) |
| | : | |
| | : | Joint Administration Pending |
| Debtors in a Foreign Proceeding. | : | |

**DECLARATION OF TODD MARTIN IN SUPPORT OF: (I) VERIFIED PETITIONS UNDER CHAPTER 15; (II) MOTION FOR JOINT ADMINISTRATION; (III) MOTION FOR PROVISIONAL AND FINAL RELIEF IN AID OF CANADIAN PROCEEDING; AND (IV) MOTION TO ESTABLISH CERTAIN NOTICE PROCEDURES IN CONNECTION WITH FILING OF VERIFIED PETITIONS UNDER CHAPTER 15**

I, Todd Martin, declare as follows:

I am a Senior Vice President with Alvarez & Marsal Canada Inc. ("**Alvarez**"), the court-appointed monitor and authorized foreign representative (the "**Monitor**") of the above-captioned debtors (collectively, the "**Debtors**") in a proceeding (the "**Canadian Proceeding**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), pending before the Supreme Court of British Columbia (the "**Canadian Court**"). I am fully authorized to act on behalf of the Monitor.

---

1 The last four digits of the United States Tax Identification Number or Canadian Business Number of the Debtors, as applicable, follow in parentheses: (i) 0741693 B.C. Ltd. (1270); (ii) Afmedica, Inc. (3293); (iii) American Medical Instruments Holdings, Inc. (1114); (iv) Angiotech America, Inc. (4001); (v) Angiotech BioCoatings Corp. (8560); (vi) Angiotech Delaware, Inc. (6401); (vii) Angiotech Florida Holdings, Inc. (9389); (viii) Angiotech International Holdings, Corp. (2274); (ix) Angiotech Pharmaceuticals, Inc. (6269); (x) Angiotech Pharmaceuticals (US), Inc. (9490); (xi) B.G. Sulzle, Inc. (4551); (xii) Manan Medical Products, Inc. (3265); (xiii) Medical Device Technologies, Inc. (3996); (xiv) NeuColl, Inc. (8863); (xv) Quill Medical, Inc. (7914); (xvi) Surgical Specialties Corporation (9848); and (xvii) Surgical Specialties Puerto Rico, Inc. The Debtors' executive headquarters' addresses are 1618 Station Street, Vancouver, BC A1 V6A 1B6, Canada, and 1633 Westlake Avenue North, Suite 400, Seattle, Washington 98109.

On January 28, 2011, the Canadian Court entered an order (the "**Initial Order**"), attached hereto as Exhibit A, commencing the Canadian Proceeding and, among other things, appointing Alvarez as the Monitor and authorizing the filing of these chapter 15 cases (the "**Chapter 15 Cases**"). A copy of the affidavit of K. Thomas Bailey, an officer of the Debtors, submitted to the Canadian Court in support of the Initial Order (the "**CCAA Affidavit**") is attached hereto as Exhibit B. A copy of the Pre-Filing Report of the Proposed Monitor submitted by the Monitor to the Canadian Court in support of the Initial Order (the "Pre-Filing Report") is attached hereto as Exhibit C.

I submit this Declaration in support of: (a) the verified petitions (the "**Chapter 15 Petitions**") of the Debtors filed pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"); (b) the motion seeking joint administration of the Chapter 15 Cases (the "**Joint Administrative Motion**"); (c) the motion for provisional and final relief in aid of the Canadian proceeding (the "**Recognition Motion**"); and (d) the motion to establish certain notice procedures in connection with the filing of the Chapter 15 Petitions and related pleadings (the "**Notice Motion**").

I am an individual over the age of eighteen and, if called upon, could testify to all matters set forth in this Declaration. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by members of the Debtors' management and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein.

All references to currency in this Declaration are in United States dollars, unless otherwise noted.

## BACKGROUND

### A. The Debtors' History, Operations and Corporate Structure[2]

Angiotech is a specialty pharmaceutical and medical device company that develops, manufactures and markets innovative technologies with acute and surgical applications. Angiotech's primary business objective is to develop medical products that reduce the side effects of surgical procedures, improve surgical outcomes, shorten hospital stays or improve and simplify surgical techniques. To date, Angiotech's products have been used to improve the surgical outcomes of patients worldwide. In almost two decades of operations, Angiotech has developed its competitive strength in the industry through both the development of proprietary medical technologies and strategic acquisitions that have diversified Angiotech's product base and technical expertise.

Until January 13, 2011, the Common Shares of Angiotech Pharmaceuticals, Inc. ("**ANPI**"), the ultimate parent of the other Debtors and their non-Debtor affiliates, were publicly traded on the NASDAQ under the symbol "ANPI", however, ANPI's stock was de-listed from the NASDAQ because it traded below the required price of $1.00 over a prolonged period in time in contravention of NASDAQ's listing rules. ANPI's Common Shares are also listed on the Toronto Stock Exchange (the "**TSX**") under the trading symbol "ANP". On January 28, 2011, ANPI received a notice stating that the TSX is reviewing the eligibility for continued listing on TSX of ANPI's securities pursuant to Part VII of The Toronto Stock Exchange Company

---

2 An organizational chart showing the corporate structure of the Debtors and their non-Debtor affiliates (collectively "**Angiotech**") is attached as Exhibit C hereto.

Manual. Specifically, the TSX is reviewing ANPI with respect to the continued listing requirements relating to insolvency or bankruptcy proceedings and financial condition and/or operating results. In addition, the ANPI Common Shares have been suspended from trading on the TSX until further notice from the TSX.

ANPI has authorized share capital of 200,000,000 common shares, and its stock is now trading over-the-counter on the OTCQB under the symbol ANPI. As of September 30, 2010, ANPI had 85,176,449 common shares outstanding. ANPI is also authorized to issue 50,000,000 preferred shares, none of which are issued and outstanding as of today.

The other Debtors include all of Angiotech's active Canadian and U.S. subsidiaries that are obligors with respect to the Subordinated Notes and the Floating Rate Notes (each as defined below). Angiotech's businesses in the CCAA and chapter 15 proceedings include: (i) the Canadian business, which is the Pharmaceutical Technologies segment; and (ii) the North American portion of Angiotech's Medical Products business.

ANPI's principal subsidiary in the United States is Angiotech Pharmaceuticals (US), Inc. ("**Angiotech Washington**"), which is a wholly-owned subsidiary of ANPI's Canadian subsidiary, Angiotech International Holdings, Corp., and is incorporated under the laws of the state of Washington. Angiotech Washington's head office is located in Seattle, Washington, and it is the direct or indirect parent of all of ANPI's subsidiaries in the United States and Puerto Rico. All of the non-Canadian Debtors have assets in Canada, namely funds on deposit in bank accounts located in Vancouver, British Columbia.

The Debtors also have non-Debtor affiliates in Europe and a small number of other foreign jurisdictions (collectively, "**Angiotech Europe**"). Angiotech Europe is part of Angiotech's Medical Products segment and engages in sales, distribution and manufacturing.

Angiotech's European and other foreign subsidiaries and inactive subsidiaries are not included in the CCAA or chapter 15 filings. Given that the Angiotech Europe entities, with one exception, are not obligated with respect to the debt that will be restructured in the Canadian Proceeding, such entities are not expected to be seeking insolvency protection in any jurisdiction in the immediate future.

The center of the Debtors' enterprise and management is in Vancouver, British Columbia, Canada. All of the Debtors' principal corporate, management, banking, and strategic functions are undertaken in Canada. Specifically:

(a) the operations of Angiotech are directed from Angiotech's head office in Canada;

(b) all of the Debtors report to ANPI;

(c) corporate governance for Angiotech is directed from Canada;

(d) most strategic and major operating decisions and key policy decisions for the Debtors are made by Angiotech staff located in Vancouver;

(e) Angiotech's tax, treasury and cash management functions are managed from Vancouver and local plant finance staff report to senior finance management in Vancouver;

(f) Angiotech's human resources functions are administered from Vancouver and all local human resources staff report into Vancouver;

(g) primary research and development functions including new product conceptions and development, regulatory and clinical development, medical affairs and quality control are directed from and carried out in Vancouver;

(h) Angiotech's information technology and systems are directed from Vancouver;

(i) plant management and senior staff of Angiotech regularly attend meetings in Vancouver;

(j) all public company reporting and investor relations are directed from Vancouver;

(k) Angiotech's chief executive officer (the "**CEO**") is based in Vancouver and, in addition to the senior management referenced above, all sales, manufacturing, operations and legal staff report to the CEO;

(l) ANPI (the ultimate parent company of all of the Debtors, organized under the laws of British Columbia) is the issuer of the Floating Rate Notes (as defined below) and the Subordinated Notes (as defined below), together comprising approximately $575 million in outstanding principal liability, and of which all of the Debtors are guarantors; and

(m) each of the Debtors have assets in Canada, and each of the non-Canadian Debtors has a bank account at the Royal Bank of Canada in Vancouver containing $1,000 on deposit.

Accordingly, Vancouver, British Columbia, Canada is the nerve center of Angiotech's management, and the heart of its business and operations. Specifically, the Debtors' centralized cash management system is implemented from Vancouver, and the Debtors rely on such system for their operational needs. Indeed, to properly function and operate, the non-Canadian Debtors are dependent upon the Canadian Debtors' current financial and operational management structure, and would be unable to operate independently.

Principally in order to finance certain acquisitions, on March 23, 2006, ANPI completed an offering of $250 million 7.75% senior subordinated notes due 2014 (the "**Subordinated Notes**") and entered into a $425 million senior secured credit facility, which included a $350 million term facility maturing in 2013 and a $75 million revolving credit facility (the "**Credit Suisse Credit Facility**"). On December 11, 2006, ANPI issued $325 million of senior floating rate notes due 2013 that bear interest annually at LIBOR (reset quarterly) plus 3.75% (the "**Floating Rate Notes**").[3] The proceeds from the issuance of the Floating Rate Notes were used to pay down the principal amount of $325 million that remained outstanding under the Credit Suisse Credit Facility, which was terminated at that time. Pursuant to the terms of the

---

3 Angiotech intends to pursue a separate transaction contemporaneous with, but outside of, the Canadian Proceeding in which ANPI would offer to exchange the existing Floating Rate Notes for new floating rate notes to be secured by a second lien over the property, assets and undertaking of the Debtors. On October 29, 2010, Angiotech entered into a support agreement (the "**FRN Support Agreement**") with respect to such exchange.

applicable note indenture, the Subordinated Notes are contractually subordinated to the Floating Rate Notes notwithstanding the fact that they are both unsecured obligations of ANPI and otherwise rank *pari passu.* Each of the Debtors is a guarantor under the Subordinated Notes. In addition, most of the Debtors are party to a senior secured credit agreement, dated February 27, 2009, by and among ANPI, certain of the Debtors and certain non-Debtor affiliates, as borrowers, and Wells Fargo Foothill LLC, as sole arranger, administrative agent and lender (as amended, the "**Prepetition Credit Agreement**").

## B. Events Leading Up to the CCAA and Chapter 15 Filings

I understand that Angiotech's original acquisition strategy contemplated that Angiotech would use excess cash flow from royalty revenues to reduce long-term debt by approximately $300 million over a period of three years. Over the last three years, however, the Debtors have experienced significant and sooner than expected declines in royalty revenues and profits in the Pharmaceutical Technologies segment that have not been materially offset by profits in other business areas. This has made it increasingly difficult for Angiotech to service and pay down its long-term debt and has negatively and materially impacted the Debtors' liquidity and operating results.

Since early 2008, Angiotech has taken a number of steps to address its balance sheet and liquidity challenges and to compensate for declining royalty revenues, including retaining Blackstone Advisory Services, L.P., a leading financial advisory firm with strong experience in restructuring transactions. However, despite certain cost savings achieved and other initiatives pursued, Angiotech's general financial position did not improve in 2009 or 2010.

On July 29, 2010, a committee comprised of all of the independent members of the board of directors of Angiotech (the "**Board of Directors**") was formed to, among other

things, explore and consider strategic restructuring or other debt reduction alternatives available to Angiotech. After considering various alternatives, the Board of Directors concluded that a recapitalization transaction with the holders of Angiotech's Subordinated Notes (the "**Subordinated Noteholders**") offered significantly more value than other options, and greater potential to deliver a long-term solution to Angiotech and its stakeholders.

. On October 29, 2010, the Debtors entered into a recapitalization support agreement (as amended, the "**Recapitalization Support Agreement**") with the holders of 73% of the Subordinated Notes (the Subordinated Noteholders that have executed the Recapitalization Support Agreement are referred to herein as "**Consenting Noteholders**"), setting forth a recapitalization transaction (the "**Recapitalization Transaction**"), which contemplates cancellation of the Subordinated Notes in exchange for new common shares in ANPI. As of the date hereof, holders of 84% of the Subordinated Notes have agreed to be bound by the Recapitalization Support Agreement. If implemented, the Recapitalization Transaction will eliminate in excess of $250 million of indebtedness relating to the Subordinated Notes and will provide significant improvements to Angiotech's credit ratios, liquidity and financial flexibility.

. The Senior Management and the Board of Directors of Angiotech determined that in light of Angiotech's liquidity position and operational restructuring needs, it would be in the best interests of Angiotech to effectuate the Recapitalization Transaction through a plan of compromise or arrangement under the CCAA, with ancillary chapter 15 cases in the United States. Significantly, pursuant to the Recapitalization Support Agreement, the Consenting Noteholders agreed with this approach and have agreed to vote their respective Subordinated Notes in favor of any plan of compromise or arrangement under the CCAA that is proposed for implementation of the Recapitalization Transaction.

The protections offered by the CCAA and chapter 15 of the Bankruptcy Code will enable the Debtors to continue to operate on a going concern basis while working towards the implementation of the Recapitalization Transaction in the Canadian Proceeding. The Debtors are optimistic that the Recapitalization Transaction, among other initiatives, will have the effect of dramatically improving their long-term financial prospects while preserving value and permitting them to continue to operate as going concerns during and beyond the restructuring process.

## CHAPTER 15 RELIEF REQUESTED

### A. Motion for Joint Administration

Joint administration is warranted in these cases. The Debtors are affiliated entities with closely related financial affairs and business operations, and joint administration will ease the administrative burden on the parties. I anticipate that the various notices, applications, motions, other pleadings, hearings and orders in these cases will affect each of the Debtors. The failure to administer these cases jointly would result in duplicative pleadings and service. Such unnecessary duplication would impose avoidable expenses on all parties.

Joint administration will permit this court to use a single docket for the jointly-administered cases and combine notices to creditors and other parties in interest of the Debtors. Joint administration will protect parties-in-interest by ensuring that they will be appropriately apprised of all matters. Accordingly, I believe entry of an order granting the relief requested in the Joint Administration Motion is in the best interests of the Debtors and all parties in interest.

### B. Motion for Provisional and Final Relief in Aid of Canadian Proceeding

. The Monitor has also filed, concurrently herewith, the Recognition Motion, seeking provisional and final relief in aid of the Canadian Proceeding and the Initial Order. As set forth in the Recognition Motion, this Court should recognize the CCAA Proceeding as a "foreign main proceeding," as defined in section 1502(4) of the Bankruptcy Code. The Bankruptcy Code provides that a foreign proceeding is a "foreign main proceeding" if it is pending in the country where the debtor has its "center of its main interests." See 11 U.S.C. § 1517(b)(l).

. The Debtors' "center of main interest" is clearly in Vancouver, British Columbia, Canada. As set forth more explicitly above, all of the Debtors' principal corporate, management, banking, and strategic functions are undertaken in Canada, and the Canadian and United States operations are entirely integrated. In addition, the Debtors' centralized cash management system is managed from Vancouver, and all of the Debtors are dependent on such system, as well as other managerial oversight, to meet their operational needs.

. As such, it is my belief that Vancouver is the Debtors' center of main interests, and, accordingly, the Canadian Proceeding should be recognized by the Court as a foreign main proceeding.

. Also requested in the Recognition Motion is a request to apply sections 362 and 365(e) of the Bankruptcy Code on an interim basis until the hearing on recognition takes place. As explained more fully in the Recognition Motion, absent such preliminary relief pending the Court's determinations with respect to recognition of the Canadian Proceeding as a "foreign main proceeding," U.S. creditors — and, specifically, noteholders that are not party to the Recapitalization Support Agreement or FRN Support Agreement — may seek a tactical advantage through unilateral action, including acceleration or efforts to commence litigation,

attachment or other legal process in whatever U.S. jurisdiction a creditor may choose. As the success of the Canadian Proceeding depends on the Debtors' ability to adopt a unified plan covering the claims of all creditors, the threat of disruption of the reorganization process as well as the legal cost of defending such actions may have a severe and adverse impact on any chance of a successful reorganization in the Canadian Proceeding, causing irreparable harm to the Debtors and other interested parties.

In addition, certain contracts with U.S. creditors include provisions for automatic termination which may be triggered by either the filing of the Canadian Proceeding or these Chapter 15 Cases. Termination of these contracts would have similar detrimental effect on the Debtors' reorganization efforts and must therefore be prevented by application of section 365(e) of the Bankruptcy Code. Accordingly, it is my belief that granting the provisional relief requested in the Recognition Motion is necessary for the successful reorganization of the Debtors, and clearly in the Debtors' and their creditors' best interests.

The Recognition Motion also seeks approval of the Debtors' postpetition credit facility. In order to properly fund the Debtors' continued operations, as well as the Canadian Proceeding and the Chapter 15 Cases, the Debtors and their advisors engaged in multi-party, arms-length negotiations with significant parties in interest (as set forth in more detail in the CCAA Affidavit) and made a good-faith business decision to enter into an agreement with the lender under their Prepetition Credit Agreement, now known as Wells Fargo Capital Finance, LLC (collectively with any other postpetition lenders under the DIP Facility, the "**DIP Lender**") to provide the Debtors with a postpetition credit facility (the "**DIP Facility**") of up to $28 million.

. I believe the terms of the DIP Facility are reasonable under the circumstances. Despite the Debtors' efforts, they were unable to obtain alternative postpetition financing on more favorable terms than those approved by the Canadian Court. In addition, the Debtors' centralized cash management system is structured to allow the Debtors to transfer funds among Debtor entities and non-Debtor affiliates, a structure on which the U.S. Debtors and other subsidiaries rely in order to maintain proper funding and liquidity. The terms of the DIP Facility allow for this structure to stay in place, thereby ensuring access to funds for intercompany advances as needed among the Debtors. Accordingly, I believe that approval of the DIP Facility in accordance with the Initial Order is in the best interests of the Debtors and all parties in interest.

. As set forth above and in the CCAA Affidavit, the Debtors' pressing liquidity needs require that the Debtors obtain the DIP Facility. However, the DIP Lender has conditioned availability thereunder upon this Court's grant of 364(e) protections to such facility.[4] Accordingly, the Monitor has requested that this Court, pursuant to sections 105(a) and 1521(a)(7) of the Bankruptcy Code, afford the DIP Lender with the protections provided for in section 364(e) of the Bankruptcy Code. I have been informed that without the Court's application of section 364(e) to the Chapter 15 Cases, the DIP Lender will be unwilling to provide access to the DIP Facility, and the Debtors' inability to access the DIP Facility would lead to a deterioration of value and could significantly decrease recoveries for the creditors.

---

[4] In addition to section 364(e) protection, the DIP Lender has conditioned the Debtors' access to the DIP Facility upon this Court's recognition and application in full of the Initial Order, which provides, in relevant part, that any obligations incurred as a result of the DIP Facility "do not and will not constitute preferences, fraudulent conveyances or transfers, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law."

The Debtors seek to give effect to the Initial Order in the United States and to obtain recognition of the CCAA stay of proceedings and debtor-in-possession financing arrangements to protect their United States assets and operations. The Debtors require immediate protection in the United States, consistent with the relief provided for in the Initial Order, to prevent suppliers, creditors, and other stakeholders from taking steps to disrupt the Debtors' operations, potentially deplete their estates to the detriment of all stakeholders, and irreparably jeopardize the Debtors' ongoing efforts to restructure.

In short, the failure to protect the Debtors' U.S. assets and secure the DIP Facility will irreparably harm the Debtors and deplete their resources, thereby limiting Angiotech's ability to maximize the assets available, on an equitable basis, for all creditors of the Debtors. The proposed relief will ease these concerns and allow for the orderly administration of the Debtors' affairs and equitable resolution of the Debtors' liabilities with supervision by the Canadian Court. A stay of actions against the Debtors and protection against automatic termination of contracts will not only preserve the Debtors' assets for the benefit of their creditors, but also allow Angiotech to devote its full attention to effectively and efficiently administering the Canadian Proceeding.

Accordingly, based on the foregoing, I urge the Court to grant the relief requested in the Recognition Motion, as I believe such relief to be vital to a successful restructuring of the Debtors, and in the best interests of the Debtors and their creditors generally.

## C. Motion to Establish Certain Notice Procedures in Connection with Filing of Verified Petitions Under Chapter 15

The Monitor has also filed the Notice Motion, requesting this Court to enter an order specifying the form and manner of service of notice (the "**Recognition Notice**") of: (a)

the filing of the Chapter 15 Petitions and certain related pleadings, including the Recognition Motion; (b) this Court's entry of the order (the "**Provisional Relief Order**") staying any collection activity by creditors against the Debtors' assets located in the United States on an interim basis; (c) the deadline (the "**Recognition Objection Deadline**") to object to this Court's entry of the order (the "**Recognition Order**") after notice and a hearing (i) granting recognition of the Canadian Proceeding as a foreign main proceeding under section 1517 of the Bankruptcy Code, (ii) enforcing the Initial Order on a permanent basis in the United States, and (iii) granting certain protections to the DIP Lender; and (d) the hearing (the "**Recognition Hearing**") for this Court to consider the Chapter 15 Petitions and entry of the Recognition Order.

. The Debtors have numerous creditors, potential creditors, and other parties in interest, all of which need to be provided with notice of the Provisional Relief Order (once entered), the proposed Recognition Order, the Recognition Objection Deadline and the Recognition Hearing. Under the facts and circumstances of the Chapter 15 Cases, it is my belief that service of the Recognition Notice in the manner proposed in the Notice Motion will provide the Debtors' various parties in interest due and sufficient notice and service of such matters and any associated objection deadline and hearing dates.

. Furthermore, the Recognition Notice provides multiple efficient ways for any party receiving such notice to obtain copies of pleadings filed in these cases, as it provides a website address and email address that can be used to obtain such documents. At the same time, it does not burden the Monitor or the Debtors with the significant costs necessarily attendant to copying and mailing the various documents associated with the Recognition Notice to the entire matrix of putative creditors and other parties.

Based on the foregoing, I believe that the relief requested in the Debtors' ancillary Chapter 15 Cases is well-justified, necessary to a successful reorganization of the Debtors, and in the best interests of the Debtors and their creditors, and should be granted in full.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Vancouver, British Columbia, Canada
January 30, 2011

Alvarez & Marsal Canada Inc.
By: Todd Martin
Title: Senior Vice President