# EXHIBIT B

*This is the 1st affidavit*
*of K. Thomas Bailey in this case*
*and was made on January 28, 2011*

**No. ___________**
**Vancouver Registry**

**IN THE SUPREME COURT OF BRITISH COLUMBIA**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND**

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF ANGIOTECH PHARMACEUTICALS, INC. AND THE OTHER PETITIONERS LISTED ON SCHEDULE "A"**

**PETITIONERS**

**AFFIDAVIT OF K. THOMAS BAILEY**
**(Sworn January 28, 2011)**

I, K. Thomas Bailey, of the City of Mercer Island, in the State of Washington, United States of America, the Chief Financial Officer of the Petitioner, Angiotech Pharmaceuticals, Inc. ("**Angiotech**"), MAKE OATH AND SAY:

1. This Affidavit is made in support of a Petition by Angiotech and certain of its direct and indirect subsidiaries listed on Schedule "A" (collectively, the "**Petitioners**") for relief under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**").

2. I am the Chief Financial Officer of Angiotech, which is a British Columbia corporation. I am also a director and officer of all of the entities comprising Angiotech U.S. (as defined herein). As such, I have personal knowledge of the matters deposed to herein. Where I have relied upon other sources for information, I have specifically referred to such sources and I believe them to be true. In preparing this Affidavit, I have also consulted with other members of Angiotech's senior management team (the "**Senior Management**").

3. Angiotech is a specialty pharmaceutical and medical device company and is the direct or indirect parent company of 41 Canadian and foreign subsidiaries including the other Petitioners. References herein to the "Angiotech Companies" are references to the global enterprise as a whole. References herein to an "Angiotech Company" are references to a single entity within the Angiotech Companies. The three Petitioners incorporated in Canada are referred to as "Angiotech Canada". The fourteen Petitioners incorporated in the United States and other foreign jurisdictions are referred to as "Angiotech U.S.".

4. The Petitioners are currently facing a number of challenges that have led to their insolvency and have made it impossible for them to continue going concern operations without the protections provided by the CCAA. These challenges include, among other things:

(a) significant declines in liquidity at Angiotech Canada caused primarily by material declines in royalty revenues; and

(b) aggregate long-term liabilities in excess of US$585 million with associated annual interest expenses of approximately US$33 million for the year ended December 31, 2010.

5. The Petitioners have been engaged in extensive negotiations with certain of their stakeholders in an effort to address these challenges. These negotiations have culminated in an agreement with the holders of approximately 84% of Angiotech's Subordinated Notes (as defined below) on the terms of a Recapitalization Transaction (as defined below) in which all of the Petitioners' obligations to the Subordinated Noteholders (as defined below) would be cancelled in exchange for equity in the recapitalized Angiotech. The Petitioners' obligations under the Floating Rate Notes and the Wells Fargo Credit Agreement (each as defined below) would remain intact and unaffected under the Recapitalization Transaction.

6. As a condition precedent to the Recapitalization Transaction, it is contemplated that the Floating Rate Notes would be exchanged for new floating rate notes that have certain enhanced terms and covenants in favour of the Floating Rate Noteholders (as defined below), including the granting of a second lien over the Petitioners' assets and undertaking and the amendment of certain of the Petitioners' covenants relating to debt and definitions pertaining to

liens and changes of control. To date, holders of approximately 53% of the Floating Rate Notes have agreed to support and participate in the FRN Exchange Offer (as defined below).

7. Having regard to their financial circumstances, the Petitioners have determined that it is necessary to seek protection under the CCAA in order to preserve enterprise value and continue going concern operations while seeking to implement the Recapitalization Transaction. The Petitioners also intend to pursue certain operational restructuring initiatives while under CCAA protection, including the repudiation and compromise of certain contracts and obligations. Any such operational restructuring initiatives will be undertaken for the purpose of further enhancing the Angiotech Companies' long-term financial health, liquidity and competitiveness.

8. The Recapitalization Transaction, if implemented, would enable the Angiotech Companies to recapitalize their balance sheet and continue their business as a financially sound industry competitor. The Recapitalization Transaction will benefit the Petitioners' stakeholders by eliminating in excess of US$250 million of debt owed to the Subordinated Noteholders, improving Angiotech's credit ratios, reducing Angiotech's annual interest expense by approximately US$19 million, reducing the current strain on Angiotech's liquidity position and enabling the Angiotech Companies to continue their important work in the medical device industry. The Recapitalization Transaction will also enable Angiotech to continue going concern operations, thereby preserving the employment of a substantial percentage of the Angiotech Companies' approximately 1,450 employees.

9. As described in further detail below, the Petitioners have exhausted their out-of-court restructuring options and seek this relief on an urgent basis.

10. The Petitioners are proposing that the companies comprising Angiotech U.S. be included in this proceeding in order to deal with the guarantees provided by Angiotech U.S. with respect to the Subordinated Notes. The Petitioners will also be considering certain other restructuring initiatives with respect to Angiotech U.S. It is otherwise the Petitioners' intention that Angiotech U.S. would continue to operate on a business as usual basis during this proceeding, including by payment of its trade and employee obligations, whether such obligations are incurred before or after the date of the commencement of this CCAA proceeding.

11. It is currently contemplated that this CCAA proceeding will be the primary court-supervised restructuring of the Angiotech Companies. Because a number of the Petitioners are foreign entities with operations and assets in the United States, and because Angiotech U.S. are guarantors of the obligations under the Subordinated Notes that are being compromised as part of the Recapitalization Transaction, the Petitioners also seek authorization for Alvarez & Marsal Canada Inc. ("**A&M**"), the proposed Monitor, to apply for recognition of this proposed CCAA proceeding as "Foreign Main Proceedings" under Chapter 15 of the United States Bankruptcy Code ("**Chapter 15**") as soon as practicable.

## Overview and the Recapitalization Transaction

12. Angiotech is a specialty pharmaceutical and medical device company that develops and markets innovative technologies for acute and surgical applications. The Angiotech Companies currently operate in two business segments: medical products and pharmaceutical technologies. The medical products segment ("**Medical Products**") develops, manufactures and markets a wide range of single-use specialty medical products and medical device components that are either (i) sold by the Angiotech Companies to end users or (ii) sold or licensed by the Angiotech Companies to other third-party medical products manufacturers. The pharmaceutical technologies segment ("**Pharmaceutical Technologies**") is engaged primarily in establishing product development and marketing collaborations with major medical device, pharmaceutical or biomaterials companies and generates its revenues principally through collecting royalties from corporate partners that are responsible for marketing and selling such licensed products to end-users.

13. As of December 31, 2010, the Angiotech Companies employed the full-time equivalent ("**FTE**") of approximately 1,450 employees around the world. Of that number, approximately 110 FTE employees are employed by Angiotech in British Columbia. Angiotech does not have employees in any other Canadian jurisdiction (with the exception of one employee in Quebec).

14. All of Angiotech Canada's revenue is derived from royalties from the Pharmaceutical Technologies segment. In contrast, Angiotech U.S. has a broader revenue base derived primarily from direct sales in the Medical Products segment. At present, Angiotech Canada is losing money, whereas Angiotech U.S. is experiencing positive overall operating

results. At the same time, all of the Petitioners are currently at risk because Angiotech U.S. are guarantors of Angiotech's substantial debt obligations described below.

15. Angiotech's early history and operations focussed almost entirely on the development of its Pharmaceutical Technologies segment. Over the course of the last five years, the Angiotech Companies made a number of strategic acquisitions with the objective of diversifying their sources of revenue and earnings potential. These acquisitions resulted in the creation of what is now Angiotech's Medical Products segment and involved Angiotech incurring significant long-term debt. The most significant of these acquisitions were:

(a) on March 23, 2006, through its subsidiary Angiotech Pharmaceuticals (US), Inc. ("**Angiotech Washington**"), the acquisition of 100% of the equity of American Medical Instruments Holdings, Inc. ("**AMI**") for US$788 million; and

(b) on June 26, 2006, through its subsidiary Angiotech Washington, the acquisition of 100% of the equity of Quill Medical, Inc. ("**QMI**") for US$40 million plus potential future contingent payments.

16. Principally in order to finance these and other acquisitions, on March 23, 2006, Angiotech completed an offering of US$250 million 7.75% senior subordinated notes due 2014 (the "**Subordinated Notes**") and entered into a US$425 million senior secured credit facility, which included a US$350 million term facility maturing in 2013 and a US$75 million revolving credit facility (the "**Credit Suisse Credit Facility**"). On December 11, 2006, Angiotech issued US$325 million of senior floating rate notes due 2013 that bear interest annually at LIBOR (reset quarterly) plus 3.75% (the "**Floating Rate Notes**"). The proceeds from the issuance of the Floating Rate Notes were used to pay down the principal amount of US$325 million that remained outstanding under the Credit Suisse Credit Facility, which was terminated at that time. Pursuant to the terms of the Subordinated Note Indenture (as defined below), the Subordinated Notes are contractually subordinated to the Floating Rate Notes notwithstanding the fact that they are both unsecured obligations of Angiotech and otherwise rank *pari passu*. The other Petitioners are guarantors of the Subordinated Notes and the Floating Rate Notes.

17. Angiotech's original acquisition strategy contemplated that Angiotech would use excess cash flow from royalty revenues to reduce its long-term debt by approximately US$300

million over a period of three years. Over the last three years, however, the Angiotech Companies have experienced significant and sooner than expected declines in royalty revenues and profits in the Pharmaceutical Technologies segment that have not been materially offset by profits in other business areas. This has made it increasingly difficult for Angiotech to service and pay down its long-term debt and has negatively and materially impacted Angiotech Canada's liquidity and operating results.

18. Since early 2008, Angiotech has attempted to address its balance sheet and liquidity challenges and compensate for declining royalty revenues. Approximately two and a half years ago, Angiotech announced a proposed refinancing transaction that would have reduced its debt obligations by up to US$300 million. Angiotech was unable to consummate the proposed transaction due to, among other things, protracted negotiations with shareholders that coincided with the rapid decline in the financial markets in the fall of 2008. As a result, Angiotech was forced to explore other cost-cutting and business restructuring alternatives. In September 2008, Angiotech announced a company-wide cost reduction initiative that included the closure of a manufacturing facility and employee headcount reductions. Around the same time, Angiotech retained Blackstone Advisory Services, L.P. ("**Blackstone**"), which is a leading financial advisory firm with strong experience in restructuring transactions, to conduct a review of strategic alternatives with an emphasis on options that would facilitate a restructuring of Angiotech's long-term debt and balance sheet.

19. Despite the cost savings achieved and other initiatives pursued, the Angiotech Companies' consolidated financial position did not improve in 2009 or 2010. In particular, royalty revenues, profits and available liquidity, most notably at Angiotech Canada, continued to decline more rapidly than expected, largely negating the cost savings from the initiatives implemented in 2008 and 2009.

20. On July 6, 2010, Angiotech fell out of compliance with the listing rules for the NASDAQ Global Select Market ("**NASDAQ**") (where its stock was listed under the symbol ANPI) because the bid price for Angiotech's publicly traded common shares closed below the required minimum of US$1.00 for 30 consecutive business days. Subsequently, on January 13, 2011, Angiotech's stock was de-listed from the NASDAQ. Angiotech's common shares are still trading on the Toronto Stock Exchange (the "**TSX**") under the symbol "ANP". A copy of the

press release announcing the de-listing is attached as Exhibit "A" to this Affidavit. As of January 13, 2011, ANPI is being traded over-the-counter on the OTC Bulletin Board (also known as "OTCQB").

21. On July 29, 2010, a committee (the "**Independent Committee**") comprised of all of the independent members of the board of directors of Angiotech (the "**Board of Directors**") was formed to, among other things, explore and consider strategic restructuring or other debt reduction alternatives available to Angiotech. After considering various alternatives, the Independent Committee recommended that Angiotech focus its efforts on (i) a debt-to-equity recapitalization transaction with the holders of Angiotech's Subordinated Notes (the "**Subordinated Noteholders**") and (ii) a potential transaction in which certain of the products from Angiotech's Medical Products segment with higher growth potential, but that were then generating operating losses, would be transferred into a new entity to be capitalized by outside investors (the "**Proprietary Transaction**").

22. In early September 2010, the Board of Directors further considered the status of the available restructuring alternatives discussed above. After considering the material elements of each potential transaction, the Board of Directors concluded that a recapitalization transaction with the Subordinated Noteholders offered significantly more value than the Proprietary Transaction and had greater potential to deliver a long-term solution to Angiotech and its stakeholders.

23. Around the same time, Blackstone and Angiotech updated their review of Angiotech's capital position and requirements and concluded, among other things, that payment of an interest obligation of approximately US$9.7 million due in respect of the Subordinated Notes on October 1, 2010 (the "**October Interest Payment**") would create a significant short-term liquidity problem for Angiotech.

24. Angiotech did not make the October Interest Payment. A copy of the press release announcing the decision to defer the October Interest Payment is attached as Exhibit "B" to this Affidavit. Under the terms of the applicable note indenture (the "**Subordinated Note Indenture**"), Angiotech had a 30-day grace period (subject to extension at the direction of a majority of the Subordinated Noteholders) from the date that the October Interest Payment was due to make the required interest payment to the Subordinated Noteholders before Angiotech

was formally in default under the Subordinated Note Indenture. Any such event of default would permit the holders of 25% or more of the aggregate outstanding principal amount of the Subordinated Notes to accelerate all obligations owed under the Subordinated Notes.

25. The Petitioners would not have the ability to satisfy the obligations owing in respect of the Subordinated Notes, which total in excess of US$250 million, if immediate repayment of such obligations were demanded. As described in greater detail below, any such default would potentially cause a cascading acceleration of the Petitioners' other long-term debt obligations under the Floating Rate Notes and the Wells Fargo Credit Agreement (as defined below). These long-term debt obligations, together with the amounts owing under the Subordinated Notes, presently total US$595 million (including the missed October Interest Payment). The Petitioners' inability to honour their obligations under the Subordinated Notes therefore jeopardizes the future viability of the Angiotech Companies.

26. In order to address the potential defaults caused by the failure to make the October Interest Payment – and as part of a larger effort to improve Angiotech's balance sheet – the Petitioners and certain of the Subordinated Noteholders engaged in negotiations regarding the terms of a consensual going-concern recapitalization of the Petitioners that would address the obligations relating to the Subordinated Notes. In late October 2010, the parties to these negotiations agreed on terms for a recapitalization transaction (the "**Recapitalization Transaction**") that provides for a compromise of the Subordinated Notes. The Floating Rate Notes and the Wells Fargo Credit Agreement would remain unaffected under the Recapitalization Transaction.

27. On October 29, 2010, the Petitioners entered into a recapitalization support agreement (as amended, the "**Recapitalization Support Agreement**") with the holders of approximately 73% of the Subordinated Notes that contemplates the cancellation of the Subordinated Notes in exchange for new common shares in Angiotech (the "**New Common Shares**"). Those holders of 73% of the Subordinated Notes that executed the Recapitalization Support Agreement on October 29, 2010 and are represented by Goodmans LLP are referred to herein as "Consenting Noteholders". If implemented, the Recapitalization Transaction will eliminate in excess of US$250 million of indebtedness relating to the Subordinated Notes and will provide significant improvements to Angiotech's credit ratios, liquidity and financial

flexibility. As of the date of this Affidavit, holders of 84% of the Subordinated Notes have executed the Recapitalization Support Agreement. A copy of the related press release dated October 29, 2010 is attached as Exhibit "C" to this Affidavit.

28. The Recapitalization Support Agreement contemplates that Angiotech would first make good faith efforts to pursue the Recapitalization Transaction by way of an exchange offer (the "**Exchange Offer**") that would not involve a court proceeding. The Recapitalization Support Agreement further provides that if the Exchange Offer could not be implemented, Angiotech would (i) seek a continuance from British Columbia to the *Canada Business Corporations Act* (Canada) R.S., 1985, c. C-44 (the "**CBCA**"); and (ii) pursue the completion of the Recapitalization Transaction through a plan of arrangement under the CBCA (the "**CBCA Arrangement**"). If the holders of Angiotech's common shares (the "**Existing Shareholders**") did not vote to approve the Recapitalization Transaction either through the Exchange Offer or the CBCA Arrangement, or if the Petitioners and the required majority of signatory Subordinated Noteholders otherwise mutually agreed in writing, Angiotech was to implement the Recapitalization Transaction pursuant to an alternative transaction that might include a plan of compromise or arrangement under the CCAA.

29. As described in greater detail below, Angiotech's Senior Management and Board of Directors have duly considered the various restructuring options available to Angiotech. The Board of Directors has been regularly apprised by Angiotech's Senior Management and advisors of developments in respect of the Recapitalization Transaction. After considering the risks of attempting to proceed first by way of Exchange Offer or CBCA Arrangement, Senior Management and the Board of Directors concluded that in light of Angiotech's difficult liquidity position and operational restructuring needs, it is in the best interests of the Petitioners to effectuate the Recapitalization Transaction through the flexibility provided by a plan of compromise or arrangement under the CCAA. The Consenting Noteholders, which hold a sufficient percentage of the aggregate principal amount of Subordinated Notes to provide effective consent pursuant to the terms of the Recapitalization Support Agreement, have consented to this approach. The protections offered by the CCAA would enable the Petitioners to continue to operate on a going concern basis while working towards the implementation of the Recapitalization Transaction and pursuing other operational restructuring initiatives.

30. If the Recapitalization Transaction is consummated pursuant to a plan of compromise or arrangement under the CCAA, upon implementation, among other things:

(a) Angiotech's existing common shares (the "**Common Shares**") would be cancelled without compensation for the Existing Shareholders;

(b) Subordinated Noteholders would receive at least 92.5% of the New Common Shares, subject to dilution for other affected claims;

(c) the Subordinated Noteholders that elected to execute the Recapitalization Support Agreement prior to November 30, 2010 (the "**Consent Date Noteholders**") would receive, as additional consideration, 3.5% of the New Common Shares, subject to dilution for other affected claims; and

(d) certain key employees designated and participating in a management incentive plan (the "**MIP**") would receive 4% of the New Common Shares, subject to dilution for other affected claims, together with options to acquire 6% of the New Common Shares on a fully diluted basis, both of which New Common Shares and options to acquire New Common Shares vest in thirds on the first, second and third anniversaries of the date that the plan is implemented.

31. Significantly, pursuant to the Recapitalization Support Agreement, the Consenting Noteholders have agreed to vote their respective Subordinated Notes in favour any plan of compromise or arrangement under the CCAA that is proposed for implementation of the Recapitalization Transaction.

32. The Recapitalization Support Agreement was amended four times to, among other things, extend the deadlines for initiating the Recapitalization Transaction. Pursuant to the third amendment dated as of January 11, 2011, the Recapitalization Transaction must be commenced on or before January 28, 2011. In addition, the Subordinated Note Indenture was amended four times by supplemental indentures that extended the grace period applicable to the October Interest Payment. The grace period is currently scheduled to expire on April 30, 2011. Copies of the related press releases are collectively attached as Exhibit "D" to this Affidavit.

33. The Petitioners intend to pursue a separate transaction contemporaneous with but outside of this CCAA proceeding in which Angiotech would offer to exchange the existing Floating Rate Notes for new floating rate notes (the "**New Floating Rate Notes**") to be secured by a second lien over the property, assets and undertaking of the Petitioners. On October 29, 2010, Angiotech entered into a support agreement (the "**FRN Support Agreement**") with holders of approximately 51% of the Floating Rate Notes pursuant to which such holders agreed to support and participate in such a transaction. The FRN Support Agreement requires the signatory Floating Rate Noteholders to waive any cross-default under the Floating Rate Note Indenture (as defined below) that would result from the Petitioners' failure to make the October Interest Payment on the Subordinated Notes before the expiry of the grace period. To date, holders of 53% of the Floating Rate Notes have executed the FRN Support Agreement. The exchange of existing Floating Rate Notes for New Floating Rate Notes is referred to herein as the "FRN Exchange Offer".

34. It is intended that the FRN Exchange Offer would occur separately from the Recapitalization Transaction and that the Floating Rate Noteholders would be unaffected by the implementation of the Recapitalization Transaction. The deadline for initiating the FRN Exchange Offer has been extended four times pursuant to amendments to the FRN Support Agreement. The completion of the FRN Exchange Offer is a condition precedent to implementation of the Recapitalization Transaction. The fourth amendment to the Recapitalization Support Agreement and the fourth amendment to the FRN Support Agreement both provide that the FRN Exchange Offer must be initiated by February 7, 2011.

35. Angiotech's liquidity position continued to worsen through November and December 2010 because of further declines in royalty revenues in the Pharmaceutical Technologies segment. Also, certain of the Petitioners became embroiled in two significant and costly litigation matters in the United States, only one of which has been settled to date. In addition, the need to seek repeated extensions of the grace period under the Subordinated Note Indenture, public acknowledgements of liquidity concerns and delays in implementing the Recapitalization Transaction have collectively caused uncertainty among employees, customers and suppliers and have led to further instability in the Angiotech Companies' business. In particular, certain of Angiotech's most significant customers and suppliers have expressed

concerns regarding the Angiotech Companies' continued ability to supply product. Angiotech's Chief Medical Officer resigned in January.

36. As Angiotech worked to implement the Recapitalization Transaction, it became increasingly doubtful that the Exchange Offer or the CBCA Arrangement could be successfully implemented. In particular, it was determined that there were certain legal impediments and potentially other business impediments to completing the Exchange Offer or the CBCA Arrangement as contemplated, including extensions to certain statutory timeframes required to complete such a transaction that Angiotech could no longer afford to pursue given its liquidity requirements. Although Angiotech has been able to obtain the support of the holders of 84% of the Subordinated Notes, it remains short of the Minimum Exchange Offer Threshold of 98%. It also became clear to Senior Management and Blackstone that although the Recapitalization Transaction would materially improve Angiotech's balance sheet, Angiotech Canada would also require certain operational restructuring initiatives that could only be efficiently implemented in a CCAA proceeding. In addition, a CCAA proceeding could provide the certainty, stability and breathing space that might not otherwise be available in a CBCA proceeding. As a result, Senior Management and the Board of Directors determined that Angiotech should not pursue the Exchange Offer or the CBCA Arrangement and should take steps to seek to implement the Recapitalization Transaction in a CCAA proceeding. The Consenting Noteholders have consented to this approach.

37. The Petitioners must commence the Recapitalization Transaction by January 28, 2011 or the Subordinated Noteholders that executed the Recapitalization Support Agreement will be able to terminate their support for the Recapitalization Transaction. Further, the grace period applicable to the October Interest Payment expires on April 30, 2011. At that time, the Petitioners will be in default under the Subordinated Note Indenture and the Subordinated Noteholders will be in a position to demand repayment of all amounts owing in respect of the Subordinated Notes.

38. Angiotech needs to advance the Recapitalization Transaction without further delay in order to preserve enterprise value for the benefit of the Angiotech Companies and their stakeholders. But for the DIP Facility described below, approval of which is being sought in connection with the Petitioners' CCAA application, Angiotech would also be close to exhausting

its available cash. For these reasons, Senior Management and the Board of Directors, after due consideration of the options for the restructuring of the Angiotech Companies, have determined that the Petitioners should seek protection under the CCAA so that they may implement the Recapitalization Transaction and pursue other operational restructuring initiatives as quickly and efficiently as possible. The Consenting Noteholders have consented to the implementation of the Recapitalization Transaction pursuant to a plan of arrangement under the CCAA. Absent the protections afforded by the CCAA, the Petitioners' financial situation will continue to erode, thereby threatening the Petitioners' ability to continue going concern operations.

39. Subject to certain conditions including the granting of the requested Initial Order, Wells Fargo has agreed to provide the Petitioners with an interim financing facility (the "**DIP Facility**") of up to approximately US$25 million. The DIP Facility is intended to provide the Petitioners with adequate liquidity to satisfy their working capital requirements and complete the Recapitalization Transaction as part of this CCAA proceeding.

40. The Petitioners are optimistic that the Recapitalization Transaction and the operational restructuring initiatives will have the effect of dramatically improving their long-term financial prospects while preserving value and permitting them to continue to operate as going concerns during and beyond the period of creditor protection.

41. Accordingly, and for the reasons set out herein, the Petitioners are insolvent because they cannot satisfy their obligations under the Subordinated Notes or their other long-term debt obligations to the extent that cross-defaults are triggered by an event of default under the Subordinated Notes. A restructuring of the Petitioners' long-term debt and balance sheets is urgently required and should be pursued in order to preserve enterprise value and permit the Petitioners to continue to operate as going concerns. In my view, subject to the granting by this Court of the relief requested, the resulting stay of proceedings will provide the Petitioners with the critical breathing space required to implement the Recapitalization Transaction with minimal disruptions to their current business operations. This, in turn, will help to protect the interests of many Angiotech stakeholders, including employees, suppliers, customers, and the patients whose lives could be saved or improved by Angiotech products.

# Corporate Structure of the Angiotech Companies

## *Corporate Structure*

### Angiotech

42. Angiotech is the principal Canadian operating company of the Angiotech Companies and was originally incorporated in British Columbia on October 12, 1989 as Holwest Industries Ltd. under the predecessor legislation to the *Business Corporations Act* (British Columbia), S.B.C. 2002, c. 57. The company subsequently changed its name to Angiogenesis Technologies, Inc. on January 6, 1993 and, later, to its current name, Angiotech Pharmaceuticals, Inc., on September 6, 1996. Angiotech is the ultimate parent company of 40 direct and indirect subsidiaries. A copy of a corporate chart of the Angiotech Companies is attached as Exhibit "E" to this Affidavit.

43. The Common Shares of Angiotech are publicly traded on the TSX under the trading symbol "ANP". Until January 13, 2011, Angiotech's Common Shares were also publicly traded on the NASDAQ under the symbol "ANPI". As noted previously, Angiotech's stock was de-listed from the NASDAQ because it traded below the required price of US$1.00 over a prolonged period in time in contravention of NASQAQ's listing rules. Angiotech's stock is now trading over-the-counter on the OTCQB under the symbol ANPI.

44. Angiotech has authorized share capital of 200,000,000 common shares. As of September 30, 2010, Angiotech had 85,176,449 Common Shares outstanding. Angiotech is also authorized to issue 50,000,000 preferred shares, none of which are issued and outstanding as of today's date.

45. As of September 30, 2010, Angiotech had also reserved 13,937,756 Common Shares for issuance under its stock option plan (the "**2006 Stock Option Plan**"). Of those shares, 9,627,582 shares are subject to outstanding options. No shares are currently reserved for issuance upon exercise of outstanding warrants. It is proposed that all of the existing stock options, warrants, the 2006 Stock Option Plan and Angiotech's shareholder rights plan (the "**Shareholder Rights Plan Agreement**") will be cancelled on the date that any CCAA plan of compromise or arrangement is implemented.

### The Other Petitioners

46. The other Petitioners include all of Angiotech's active Canadian and U.S. subsidiaries and, in particular, those subsidiaries that are guarantors under the Subordinated Notes (with the exception of Surgical Specialties U.K. Holdings Ltd. which is not a Petitioner). Each of the Petitioners is also a party to the Recapitalization Support Agreement. Angiotech's businesses that are included in this CCAA proceeding include: (i) the Canadian business, which is the Pharmaceutical Technologies segment; and (ii) the North American portion of Angiotech's Medical Products business.

47. Angiotech's principal subsidiary in the United States is Angiotech Washington, which is a wholly-owned subsidiary of Angiotech's Canadian subsidiary Angiotech International Holdings and is incorporated under the laws of the state of Washington. Angiotech Washington's head office is located in Seattle, Washington. Angiotech Washington is the direct or indirect parent of all of Angiotech's subsidiaries in the United States and Puerto Rico. All of the non-Canadian Petitioners (i.e. Angiotech U.S.) have assets in Canada, namely funds on deposit in bank accounts located in Vancouver, British Columbia.

48. The Angiotech Companies also have operations in Europe and a small number of other foreign jurisdictions (collectively, "**Angiotech Europe**"). Angiotech Europe is part of Angiotech's Medical Products segment and engages in sales, distribution and manufacturing. Angiotech's European and other foreign subsidiaries and inactive subsidiaries that are not guarantors of the Subordinated Notes are not included in this filing and are not expected to be seeking insolvency protection in any jurisdiction in the immediate future.

## Jurisdiction of the Proceeding

49. Angiotech's head office is located in Vancouver, British Columbia. Angiotech is the issuer of the Subordinated Notes and the Floating Rate Notes, both of which are guaranteed by all of the other Petitioners, whether Canadian or non-Canadian. Certain of the Angiotech U.S. Petitioners are borrowers under the Wells Fargo Credit Facility (as defined below), which is guaranteed by the other Petitioners and secured by all of the Petitioners' present and after-acquired assets and undertaking.

50. The Petitioners are part of a consolidated business comprising various research, manufacturing and sales facilities and offices in Canada and the United States and are

operationally and functionally integrated in many respects. As described in greater detail below, their center of main interest (or "COMI") is Canada. The Petitioners operate under centralized Senior Management and are subject to combined cash management and accounting functions, all of which are directed from Angiotech's head office in Vancouver. Virtually all ordinary course meetings of the Board of Directors take place in Vancouver, and all strategic and key operating and policy decisions are made by Angiotech staff located in Vancouver. Angiotech's Chief Executive Officer is based in Vancouver, and all of the Angiotech Companies report to Angiotech Canada. Although my family and I maintain our primarily residence in Washington State, I also maintain a residence in Vancouver. My residence in Vancouver facilitates the carrying out of my functions as Chief Financial Advisor and member of Senior Management from Angiotech's head office in Vancouver.

51. It is therefore most expedient and efficient that the recapitalization of the Subordinated Notes and the treatment of related debt obligations be implemented through one reorganization proceeding that is overseen and directed by the Court in Canada, which is the parent company's home jurisdiction and the nerve centre of the Petitioners' management, business and operations. Angiotech U.S. is included in this proceeding to deal with the guarantees under Angiotech's Subordinated Notes.

52. It is currently anticipated that Angiotech U.S. will continue to operate on a business as usual basis, although the Petitioners will also be considering certain other limited restructuring initiatives with respect to Angiotech U.S. It is further anticipated that Angiotech U.S. will continue to pay its trade and employee obligations in the ordinary course, whether incurred prior to or after the commencement of the proposed proceeding.

## Angiotech's Business Operations

53. Angiotech is a specialty pharmaceutical and medical device company that develops, manufactures and markets innovative technologies with acute and surgical applications. Angiotech's primary business objective is to develop medical products that reduce the side effects of surgical procedures, improve surgical outcomes, shorten hospital stays or improve and simplify surgical techniques. To date, Angiotech's products have been used to improve the surgical outcomes of patients worldwide. In almost two decades of operations, the Angiotech Companies have developed their competitive strength in the industry through both the

development of proprietary medical technologies and strategic acquisitions that have diversified the Angiotech Companies' product base and technical expertise.

54. Angiotech began operations in 1992, and an early focus of its research was in the development of technologies to reduce complications resulting from certain minimally invasive procedures for the treatment of coronary artery disease. Angiotech was particularly involved in the development of medical technologies that targeted and prevented the formation of scar tissue in arteries after vascular surgeries.

55. Angiotech's pioneering research led to the key discovery that an existing drug known as paclitaxel (which is a chemotherapy drug sold under the trademark "TAXOL" that is now used to treat breast, colon and lung cancers) blocked an important cellular pathway involved in scar formation and tissue growth. From this research, Angiotech developed a technology that enabled the creation of stents that slowly released paclitaxel to block cell proliferation and prevent scar formation. Angiotech has developed, licensed and acquired a broad intellectual property portfolio relating to its proprietary paclitaxel technology and has over 200 related Canadian, U.S. and foreign-equivalent patents and patent applications. In addition, Angiotech has access to a large portfolio (through license or ownership) of over 1,500 Canadian, U.S. and foreign-equivalent patents and patent applications relating to various other drugs, drug classes, medical devices and other technologies.

56. After patenting the technology, Angiotech entered into a licensing agreement dated July 9, 1997 with Boston Scientific Corporation ("**BSC**") and Cook Incorporated ("**Cook**") (as amended, the "**BSC/Cook License Agreement**"). The BSC/Cook License Agreement granted both BSC and Cook rights to develop and market stents using Angiotech's technology. Angiotech is entitled to receive royalties from BSC and Cook from all worldwide sales of products using technologies licensed under the BSC/Cook License Agreement. In 2002, BSC launched a product called the "TAXUS" stent, which has generated virtually all of Angiotech's royalty revenues to date.

57. Subsequent to the launch of TAXUS by BSC, Angiotech completed a number of acquisitions that led to the creation of the Medical Products segment. Today, the Angiotech Companies have operations in Canada, the United States, Puerto Rico and a number of

jurisdictions outside of North America. The Angiotech Companies' business operations can be loosely grouped by geography:

(a) Canada, and in particular British Columbia, is the headquarters of the Angiotech Companies' Senior Management and the centre of the Angiotech Companies' Pharmaceutical Technologies segment and research operations and is where the substantial majority of Angiotech's team of scientists works to discover and develop proprietary technologies and products; and

(b) the Angiotech Companies' Medical Products segment operates in the U.S., Europe and the other jurisdictions where Angiotech has operations and is principally involved in the development, manufacture, marketing and sale of more than 5,000 product types.

## *Business Segments*

58. The Angiotech Companies have two main business segments: Medical Products and Pharmaceutical Technologies.

### Medical Products

59. The Medical Products segment manufactures and markets a wide range of single-use specialty medical products and medical device components that are sold directly by the Angiotech Companies to hospital and physician customers, other medical products distributors or third-party medical products manufacturers. Many of Angiotech's medical products are made using proprietary manufacturing processes or are patent-protected.

60. Medical Products produces two main product lines: (i) proprietary medical products ("**Proprietary Medical Products**"), which are marketed and sold by a direct sales group, and (ii) base medical products ("**Base Medical Products**"), which include more mature product lines and are supported by a smaller group of direct sales personnel and a network of independent sales representatives and medical product distributors.

61. The Angiotech Companies' Proprietary Medical Products include, or have included in previous periods, "Quill SRS", "SKATER Drainage Catheters", "Option IVC Filter", "HemoStream Dialysis Catheter", "BioPince Full Core Biopsy Devices", and "5-FU-Eluting

Medical Device Product Candidates". The Angiotech Companies invest more resources in the marketing and sales of Proprietary Medical Products because they may have greater potential for revenue growth as compared to Angiotech's overall product portfolio.

62. The Base Medical Products line includes soft tissue biopsy products, surgical blades (marketed under the "SharpPoint" and "SharpGuard" brands, which are used primarily in cataract or other ophthalmic surgery where very small incisions are required), traditional surgical wound closure products (sold primarily under the "SharpPoint" and "Look" brand names), and a wide range of medical device components. Sales of Base Medical Products tend to exhibit greater volatility or slower growth when compared to sales of Proprietary Medical Products. This is particularly the case with sales of Base Medical Products to third-party medical device manufacturers, who tend to be affected by general economic conditions.

## Pharmaceutical Technologies

63. The Pharmaceutical Technologies segment is focused primarily on developing partnerships and licensing arrangements with third-party medical device, pharmaceutical or biomaterials companies. The majority of the Pharmaceutical Techologies segment's revenues are in the form of royalties from third-party partners (such as BSC or Cook) that develop, market and sell medical and pharmaceutical products that were developed using licensed Angiotech technologies.

*TAXUS Paclitaxel-Eluting Coronary Stents*

*64.* The significant majority of the revenues in the Pharmaceutical Technologies segment are from royalties derived from sales by BSC of "TAXUS" drug-eluting coronary stent systems (stents used to treat blockages of blood vessels in the heart).

*Zilver-PTX Paclitaxel-Eluting Peripheral Vascular Stents*

65. Also pursuant to the BSC/Cook License Agreement, Cook licenses Angiotech's proprietary technology for use in the development of stent applications outside the heart and has developed the "Zilver-PTX" peripheral stent system. Angiotech is entitled to receive royalty payments from world-wide commercial sales of the Zilver-PTX stent. The Zilver-PTX stent is currently being sold by Cook in the European Union, and Angiotech has received a small amount

of royalty revenue from related sales. Clinical trials continue to show promising results, and U.S. regulatory authorities are currently considering Cook's application for approval of sales of the Zilver-PTX stent in the U.S.

## *Research and Product Development*

66. Research and product development has historically been a significant component of Angiotech's business and requires substantial and continuous funding. In addition to researchers and engineers, the Angiotech Companies employ a number of individuals with expertise in medical engineering, analytical chemistry, polymer formulations, clinical development, medical affairs, regulatory affairs and quality control. The majority of the Angiotech Companies' research efforts are concentrated at Angiotech's British Columbia research facilities.

67. At any given point in time, the Angiotech Companies and their research partners, which can include university, corporate or other partners or technology licensors, may be evaluating several new product candidates incorporating Angiotech's proprietary technologies. At present, a number of potential products are in various stages of development, and some are in clinical trials in human subjects.

68. The Angiotech Companies also maintain several pre-clinical or research stage programs and conduct various product and process improvement initiatives related to the Angiotech Companies' currently marketed products and manufacturing facilities.

69. The Angiotech Companies' recent financial difficulties have impaired their ability to move forward with new product candidates across all stages of development. In all cases, funding for product development has been restricted because of limited liquidity. The Petitioners are hopeful that the financial stability provided if the requested relief is granted may enable the Angiotech Companies to maintain or resume certain of their product development efforts.

## *Manufacturing*

70. The Angiotech Companies have manufacturing operations at seven locations in the United States, Europe and Puerto Rico. The Angiotech Companies have diverse manufacturing capabilities that include polymer handling and extrusion, metals, plastics, textiles and packaging and assembly. The manufacturing facilities are also capable of employing certain

biomaterials and coating technologies, including dedicated resources and technology to process and manufacture certain types of drug-eluting medical devices.

## *Sales and Marketing*

71. The Angiotech Companies market and sell their Proprietary Medical Products through a specialty direct sales organization currently comprising approximately 70 individuals. The Angiotech Companies employ a small group of direct sales representatives and a larger group of independent sales representatives and medical products distributors in the case of its Base Medical Products.

72. The Angiotech Companies' Proprietary Medical Products direct sales team works primarily with hospital-based physician customers and alternate site health care providers such as ambulatory surgery centres and urgent care centres. The Angiotech Companies' Base Medical Products sales team targets hospital customers, alternate site health care providers, physician and dental offices and other third party medical products manufacturers or distributors. Angiotech's primary goal in its Base Medical Products business is to maintain market share and revenue levels for its various product lines, most of which are later in their life cycles.

## *Material Acquisitions*

73. Angiotech supports its product development and commercialization activities with selective acquisitions of proprietary technologies and companies that complement its business. The most significant and most recent of these acquisitions are described below. Angiotech has also made other minor acquisitions as part of the development of its Medical Products business.

### Quill Medical, Inc.

74. On June 26, 2006, Angiotech acquired 100% of QMI, through Angiotech Washington, for US$40 million in cash plus potential future contingent payments. Pursuant to the related merger and acquisition agreement (the "**Quill Merger Agreement**"), future payments are largely contingent upon the achievement of significant incremental revenue growth over a five year period ending June 2011, subject to certain conditions. Through this acquisition, Angiotech owns the rights, in all possible fields of use, to develop and market applications of the Quill proprietary "self-anchoring" suture technology, including in a variety of general and specialty surgical and aesthetic surgical applications. In January 2007, Angiotech launched the

first of these new products, the Quill Self-Retaining System for various wound closure and tissue approximation applications in general and aesthetic surgery.

75. As described in greater detail below, in October 2010, QSR Holdings Inc. ("**QSR**"), as the representative for certain former shareholders of QMI, commenced the QSR Litigation (as defined below) in the United States alleging, among other things, breach of certain terms of the Quill Merger Agreement. On January 27, 2011, the parties settled the QSR Litigation and all other matters relating to the Quill Merger Agreement pursuant to a settlement agreement, the general terms of which are set out below.

### American Medical Instruments Holdings, Inc.

76. On March 23, 2006, Angiotech, through Angiotech Washington, completed the AMI acquisition for consideration totalling US$788 million. AMI was a leading manufacturer of specialty, single-use medical devices for the interventional radiology, tumour biopsy, vascular surgery, general surgery, aesthetic surgery and ophthalmology markets. AMI, which is now an indirect subsidiary of Angiotech, generates substantial revenue from sales of its broad product line and from selected products manufactured for other medical device company customers and is the entity from which the majority of the Medical Products segment's revenue is derived.

## *Regulatory Environment*

### Regulation of Angiotech's Products

77. The medical products industry is heavily regulated in every jurisdiction in which the Angiotech Companies have operations and sales. The Medical Devices Bureau of the Therapeutic Products Directorate, Health Canada is the Canadian federal regulator responsible for licensing medical devices in accordance with the *Food and Drugs Act and Regulations* (Canada) and the *Medical Devices Regulations* (Canada). The Food and Drug Administration (the "**FDA**") is the main U.S. federal regulator of the industry. In some cases, Angiotech's technologies combine pharmacological compounds with medical devices and biomaterials and, as a result, may be subject to both drug and device regulations depending upon the categorization of the commercial product or potential product candidate. The Angiotech Companies' products must also comply with state and foreign regulatory requirements.

78. The Angiotech Companies' ultimate success is highly dependent upon regulatory approval of their products and technologies. The Angiotech Companies have significant operations and sales in Canada, the United States, the European Union and other countries. If Angiotech is found to be non-compliant with applicable regulations, Health Canada and the FDA have the ability to halt clinical trials, force recalls of drugs from distribution or withdraw approval of a new drug application.

### Environmental Regulation

79. The Angiotech Companies' businesses are also subject to federal, provincial, state and local environmental laws and regulations (the "**Environmental Laws**") governing, among other things, air emissions, wastewater discharges, workplace health and safety as well as the use, handling, storage and disposal of hazardous materials and remediation of contamination associated with the release of these materials at or from the Angiotech Companies' facilities or off-site disposal locations. Many of the Angiotech Companies' manufacturing processes involve the use and subsequent regulated disposal of hazardous materials whose inadvertent release in violation of applicable laws and regulations could expose Angiotech to significant fines and liabilities. As a result, Angiotech has instituted and continues to develop processes that assist it in complying with such Environmental Laws.

## Financial Position of the Angiotech Companies[1]

80. The Angiotech Companies report their financial results on a consolidated basis. The Angiotech Companies released their interim consolidated financial statements for the three and nine months ended September 30, 2010 ("**Q3 2010**") (with comparables for the same period in fiscal 2009) on November 9, 2010 (the "**Q3 2010 Report**"). A copy of the Q3 2010 Report is attached as Exhibit "F" to this Affidavit. A copy of the audited consolidated financial statements for the Angiotech Companies for the fiscal year ended December 31, 2009 is attached as Exhibit "G" to this Affidavit.

[1] Unless otherwise noted, all references to the Angiotech financial position and obligations are denominated in United States dollars.

## *Assets*

81. As at September 30, 2010, the Angiotech Companies had total consolidated assets with a net book value of $326,800,000 (decreased from $372,068,000 as at December 31, 2009). This included consolidated current assets of $109,486,000 and consolidated non-current assets of $217,314,000.

### Current Assets

82. As at September 30, 2010, the Angiotech Companies' consolidated current assets consisted of the following:

- Cash and cash equivalents - $ 25,566,000
- Short-term Investments - $5,746,000
- Accounts receivable - $31,046,000
- Income Taxes Receivable - $1,657,000
- Inventories - $38,010,000
- Other Current Assets - $3,487,000
- Deferred Income Taxes - $3,974,000

### Intangible Non-Current Assets

83. The Angiotech Companies have significant intangible assets. As at September 30, 2010, the net book value of the Angiotech Companies' consolidated intangible assets totalled $151,104,000 and consisted of the following:

- Acquired Technologies - $61,871,000
- Customer Relationships - $61,761,000
- In-licensed Technologies - $20,275,000
- Trade Names and Other - $7,197,000

## Other Non-Current Assets

84. As at September 30, 2010, the Angiotech Companies' other non-current assets consisted of the following:

- Assets Held for Sale - $2,300,000
- Property, Plant and Equipment - $50,538,000
- Deferred Financing Costs - $9,510,000
- Other Assets - $1,737,000
- Deferred Income Taxes - $2,125,000

85. The Angiotech Companies own and lease 23 facilities in Canada, the United States, Puerto Rico and Europe, five of which are owned and 18 of which are leased. Of the 23 facilities, twelve are primarily used to manufacture and distribute medical devices or materials for medical device products and the remainder are primarily used for sales, research, development and administrative activities. Collectively, these facilities have over 500,000 square feet of modern technical manufacturing, research and administrative operations. In addition to these 23 facilities, Angiotech owns two properties, one in Syracuse, NY and the other in Vancouver, B.C., that are currently non-operational and are held as available for sale. Attached as Exhibit "H" hereto are summaries of the real properties owned and leased by the Angiotech Companies.

86. Angiotech's head office in Vancouver is leased pursuant to the False Creek Research Park Lease dated as of September 10, 2001, as amended (the "**Head Lease**"). The original Head Lease was for a term of ten years, which has been extended such that it now expires on July 31, 2019. Pursuant to the Head Lease, Angiotech is not permitted to assign or sublet the headlease without the prior written consent of the landlord. Pursuant to the second amending agreement to the Head Lease, prior to making any such assignment or sublease, the transferee of the Head Lease and the landlord must entered into a written agreement providing that (i) the transferee agrees to be bound by all of Angiotech's obligations under the Head Lease; and (ii) Angiotech confirms that it is not released from any obligations under the Head Lease for the remainder of its term. Angiotech is permitted to assign the Head Lease to an affiliate as part

of an internal corporate reorganization upon notice to (but without the consent of) the landlord. A copy of the Head Lease (without schedules) and the second amending agreement are collectively attached as Exhibit "I" to this Affidavit. It is a condition precedent of the Recapitalization Transaction that the Head Lease be amended or otherwise addressed on terms satisfactory to the Subordinated Noteholders who signed the Recapitalization Support Agreement.

## *Liabilities*

87. As at September 30, 2010, the Angiotech Companies had total consolidated liabilities of $682,468,000. These liabilities consisted of consolidated current liabilities of $60,300,000 and consolidated non-current liabilities of $622,168,000.

### Current Liabilities

88. As at September 30, 2010, the Angiotech Companies' consolidated current liabilities included the following:

- Accounts payable and Accrued liabilities - $44,593,000
- Income taxes payable - $4,901,000
- Interest Payable on Long-Term Debt - $10,806,000

### Non-Current Liabilities

89. As at September 30, 2010, the Angiotech Companies' consolidated non-current liabilities consisted of the following:

- Deferred Leasehold Inducement - $4,335,000
- Deferred Income Taxes - $38,355,000
- Other Tax Liability - $3,385,000
- Long Term Debt - $575,000,000
- Other Liabilities - $1,093,000

Although the US$575 million owing in respect of long-term debt is categorized as a non-current liability, an acceleration of the Subordinated Notes could result in all long-term debt becoming immediately due and payable.

## *Revenue*

90. Notwithstanding the fact that the Angiotech Companies reported their highest ever third quarter product sales in the Medical Products segment, the Petitioners' overall revenues continued to sharply decline. Specifically, royalty revenue in the Pharmaceutical Technologies segment was approximately $7.1 million for the three months ended September 30, 2010 (representing a decline of 51% from the third quarter of 2009). This pattern of declining royalty revenue is consistent with the past several quarters, and is primarily as a result of significantly lower sales of TAXUS by BSC. Because royalties are Angiotech Canada's sole significant source of revenue, this decline has contributed materially to Angiotech Canada's worsening liquidity position.

91. On a consolidated basis, certain of the Angiotech Companies' financial metrics have improved since the third quarter of 2009. Revenue for Angiotech's Proprietary Medical Products was $17.3 million (an increase of 16%) and revenue for Angiotech's Base Medical Products was $34.5 million (an increase of 2%) for the three-month period ended September 30, 2010.

92. Because of the decline in royalty revenue, however, Angiotech's total consolidated revenues declined by 7% overall during third quarter of 2010 as compared to the same period in 2009.

93. For the nine months ended September 30, 2010, the Angiotech Companies reported a consolidated net loss of approximately $39,269,000, or a loss of $0.46 per share, compared to a consolidated net loss of $7,235,000 or $0.08 per share, for the same period in fiscal 2009.

## *Indebtedness*

94. As at September 30, 2010, Angiotech had long-term indebtedness (excluding accrued and unpaid interest) totalling US$575 million:

| Description of Debt | Maturity (fiscal year) | Principal Outstanding |
|---|---|---|
| Floating Rate Notes | December 1, 2013 | $325 million |
| Subordinated Notes | April 1, 2014 | $250 million |
| Wells Fargo Credit Facility | February 27, 2013 | Approximately $2 million (letters of credit only) |

The amount outstanding under the Wells Fargo Credit Facility has since increased to approximately US$13 million (which includes approximately US$3 million in letters of credit).

## Subordinated Notes

95. On March 23, 2006, Angiotech completed an offering of the Subordinated Notes in a private placement transaction pursuant to the Subordinated Note Indenture, dated March 23, 2006, between Angiotech, the guarantors and Wells Fargo, as Trustee. A copy of the Subordinated Note Indenture is attached as Exhibit "J" to this Affidavit. The net proceeds from the sale of the Subordinated Notes were used in part to finance the acquisition of AMI. The Subordinated Notes and related guarantees are unsecured and subordinated to senior indebtedness, including the Floating Rate Notes. The guarantees provided by the guarantors of the Subordinated Notes are unconditional, joint and several. The Subordinated Notes bear interest at 7.75% annually payable in arrears on April 1 and October 1 of each year through to maturity. All of the guarantors under the Subordinated Notes (with the exception of Surgical Specialties UK Holdings Ltd.) are Petitioners in this CCAA application.

96. As set out above, Angiotech did not make the October Interest Payment due on October 1, 2010. The next interest payment in the amount of approximately US$9.7 million is due on April 1, 2011.

97. As described in greater detail below, the basis for the Recapitalization Transaction is the Recapitalization Support Agreement between the Petitioners and the holders of 84% of the Subordinated Notes. If consummated, the Recapitalization Transaction will result in the cancellation of the Subordinated Notes and the Subordinated Note Indenture and the reduction of Angiotech's total indebtedness by more than US$250 million.

98. The Subordinated Note Indenture has been amended four times as part of the effort to advance the Recapitalization Transaction. Each of the supplemental indentures, among other things, extended the grace period for payment of the October Interest Payment. The grace period is now scheduled to expire on April 30, 2011. Copies of the four supplemental indentures are collectively attached as Exhibit "K" to this Affidavit.

## Floating Rate Notes

99. On December 11, 2006, Angiotech issued the Floating Rate Notes (defined above) pursuant to an indenture dated December 11, 2006 between Angiotech, each of the guarantors (which include all of the other Petitioners), and Wells Fargo, as trustee (the "**Floating Rate Note Indenture**"). A copy of the Floating Rate Note Indenture is attached as Exhibit "L" to this Affidavit. As discussed above, the proceeds from the issuance of the Floating Rate Notes were used in part to repay the amounts owed under the Credit Suisse Credit Facility. The Floating Rate Notes are unsecured senior obligations of Angiotech, and rank equally in right of payment to all of Angiotech's existing and future senior subordinated indebtedness (although the Subordinated Notes are contractually subordinated to the Floating Rate Notes pursuant to the terms of the Subordinated Note Indenture). The guarantees provided by the guarantors under the Floating Rate Note Indenture are unconditional, joint and several.

100. The Floating Rate Notes bear interest at an annual rate of LIBOR, which is reset quarterly, plus 3.75%. The effective interest rate on the Floating Rate Notes for the year ended December 31, 2010 was 4.1%. Interest is payable quarterly in arrears on March 1, June 1, September 1, and December 1 of each year through to maturity. On December 1, 2010, Angiotech made an interest payment in the amount of US$3.325 million that was owed in respect of the Floating Rate Notes.

101. The Petitioners' failure to make the October Interest Payment on the Subordinated Notes before the expiry of the grace period under the Subordinated Note Indenture or an

acceleration of the Subordinated Notes could cause an event of default under the Floating Rate Note Indenture. The occurrence of such an event of default would enable the holders of 25% of the Floating Rate Notes to accelerate all amounts owing under the Floating Rate Notes.

102. As described in greater detail below, to date, holders of approximately 53% of the Floating Rate Notes have executed the FRN Support Agreement. The FRN Support Agreement provides that the signatory Floating Rate Noteholders will waive any cross-default under the Floating Rate Note Indenture caused by the failure to make the October Interest Payment before the expiry of the grace period. The FRN Support Agreement does not expressly provide for the waiver of an event of default caused by the acceleration of the Subordinated Notes. However, Angiotech has been advised by Goodmans LLP, counsel for the Consenting Noteholders, that (i) Goodmans LLP also represents those holders of 53% of the Floating Rate Notes that have executed the FRN Support Agreement and (ii) such Floating Rate Noteholders have advised that they also intend to waive any cross-default under the Floating Rate Note Indenture that might be caused by an acceleration of the Subordinated Notes.

103. As noted previously, it is Angiotech's intention that the Floating Rate Notes be kept intact in this CCAA proceeding and unaffected by the Plan (as defined below). Angiotech is therefore seeking Court authorization to make interest payments pursuant to the terms of the Floating Rate Note Indenture during this proceeding. It is intended that the Floating Rate Notes will be kept whole pending the Petitioners' emergence from CCAA protection in order to allow the Recapitalization Transaction to be effectuated.

## Wells Fargo Credit Facility

104. As noted above, the Petitioners are also parties to the senior secured credit agreement dated February 27, 2009 between Angiotech, as parent, certain of Angiotech's U.S. subsidiaries, as borrowers, and Wells Fargo Foothill LLC (now Wells Fargo Capital Finance, LLC or "**Wells Fargo**"), as sole arranger, administrative agent and lender (as amended, the "**Wells Fargo Credit Agreement**"). Those Petitioners that are not borrowers under the Wells Fargo Credit Agreement have guaranteed the other Petitioners' obligations thereunder.

105. The Wells Fargo Credit Facility provides the borrowers thereunder with liquidity for working capital and general corporate purposes. Angiotech is not a borrower under the Wells Fargo Credit Facility. Availability under the Wells Fargo Credit Facility was originally capped at

US$25 million. Pursuant to the Fourth Amendment (defined below), availability under the Wells Fargo Credit Facility was increased to up to US$35 million (subject to availability pursuant to a borrowing base formula).

106. The Wells Fargo Credit Facility is secured by first-priority liens in all of the Petitioners' present or future property, assets or interests in property or assets of any kind, wherever located (collectively, the "**Collateral**"). Wells Fargo has security over the Collateral pursuant to a general security agreement dated as of February 27, 2009 (the "**General Security Agreement**") and other security documents. A copy of the General Security Agreement is attached as Exhibit "M" to this Affidavit.

107. The amount available for borrowing under the Wells Fargo Credit Facility is subject to a borrowing base formula linked to the value of certain of the Angiotech Companies' finished goods inventory and accounts receivable. Borrowing availability under the Wells Fargo Credit Facility therefore fluctuates from month to month.

108. Any borrowings outstanding under the Wells Fargo Credit Facility bear interest at rates ranging from LIBOR plus 3.25% to LIBOR plus 3.50%, with a minimum base LIBOR rate of 2.25%.

109. In order to address any defaults caused by the failure to make the October Interest Payment and prevent the termination of the Wells Fargo Credit Facility, on September 30, 2010, Angiotech and the borrowers and guarantors under the Wells Fargo Credit Facility entered into a forbearance agreement with Wells Fargo (the "**Wells Fargo Forbearance Agreement**"). Pursuant to the terms of the Wells Fargo Forbearance Agreement, as amended, Wells Fargo agreed, subject to certain terms and conditions, to forbear from exercising its remedies in connection with the failure to make the October Interest Payment and to continue to provide commitments in connection with the Wells Fargo Credit Facility. A copy of the Wells Fargo Forbearance Agreement is attached as Exhibit "N" to this Affidavit.

110. It was a condition precedent to implementation of the Recapitalization Transaction that the borrowers under the Wells Fargo Credit Facility obtain access to additional liquidity. Accordingly, the Wells Fargo Credit Agreement and the Wells Fargo Forbearance Agreement were amended on November 4, 2010 to (i) provide the borrowers with increased

liquidity up to a maximum amount of US$35 million; and (ii) add additional assets to the borrowing base to allow the borrowers immediate access to up to US$25 million. The forbearance period under the Wells Fargo Forbearance Agreement, as amended, began on October 31, 2010 and ends on the earlier of (i) the occurrence of an Event of Default, as defined under the Wells Fargo Credit Agreement, (ii) a Material Adverse Change, as defined under the Wells Fargo Credit Agreement, or (iii) April 30, 2011. Subject to Angiotech's compliance with certain terms, Wells Fargo also agreed to forbear from exercising its remedies in connection with the failure to make the October Interest Payment. A copy of the Amended and Restated Forbearance Agreement is attached as Exhibit "O" to this Affidavit.

111. The amount currently outstanding under the Wells Fargo Credit Facility is approximately US$13 million (including approximately $3 million in letters of credit) and the interest rate under the facility was 5.75% per annum as of December 31, 2010.

112. As discussed below, once the Petitioners are able to draw on the DIP Facility, they intend to use receipts from operations to pay down the outstanding pre-filing obligations under the Wells Fargo Credit Facility. The Petitioners will not have the ability to draw on the Wells Fargo Credit Facility after the commencement of this proceeding.

## Employees

113. The Angiotech Companies are led by a highly experienced team of management and technical personnel with extensive experience across the specialty pharmaceutical and medical device industries.

114. As of December 31, 2010, the Angiotech Companies employed approximately 1,450 employees in their worldwide operations, including approximately 1,050 in manufacturing, 110 in Research and Development, 180 in sales and marketing and 110 in administration. Approximately 110 of the Angiotech Companies' worldwide employees are employed in Vancouver, British Columbia. In addition, Angiotech has contractual arrangements with scientists at various research and academic institutions, none of whom are directly compensated by Angiotech or its subsidiaries and none of whom are considered Angiotech "employees".

115. The Petitioners have no unionized employees.

116. Angiotech's monthly payroll obligation (including salary, benefit and applicable withholding taxes) in respect of its Canadian employees is approximately $900,000.

### *Employee Compensation*

117. The Angiotech Companies' employees are currently compensated through a number of different programs. In addition to base salary, certain employees are eligible for the following cash and non-cash incentives:

(a) *Annual Bonus Program*: The Angiotech Companies' Annual Bonus Program provides performance-based cash incentives to all Angiotech employees that do not otherwise participate in Angiotech's sales incentive programs;

(b) *Sales Incentive Program*: The Angiotech Companies' Sales Incentive Program provides performance-based cash incentives to employees involved in the direct selling side of Angiotech's business and is based on sales results. No employee participates in both the Annual Bonus Program and the Sales Incentive Program, and no Canadian employees participate in the Sales Incentive Program; and

(c) *Long-term Incentive Program/Stock Option Plans*: the Angiotech Companies' long-term incentive programs provide for discretionary grants of stock options and tandem stock appreciation rights to executives and key employees based on position, performance and contribution to the company. The Stock Option Plans include the American Medical Instrument Stock Option Plan, which was assumed by Angiotech when it acquired AMI;

118. The Angiotech Companies intend to continue their Annual Bonus Program and Sales Incentive Program and will be seeking authorization to make such payments in the Initial Order. It is intended that all stock option plans and outstanding options and warrants will be cancelled upon implementation of the Recapitalization Transaction.

## Pension and Benefit Plans

119. In Canada, Angiotech contributes to the Registered Retirement Savings Plans ("**RRSPs**") of its employees in an amount equal to 5% of base salary up to the maximum contribution allowed by the Canada Revenue Agency.

120. Angiotech U.S. offers a voluntary 401k program (the "**401k Program**") that provides for matching contributions to individual retirement savings plans. Under the 401k Program, Angiotech offers a 100% match on the first 3% of the employee's contribution and a 50% match up to a total maximum contribution of 4% of the employee's annual salary.

121. The Petitioners intend to continue to make contributions to their employees' RRSPs and pursuant to the 401k Program throughout the course of this proceeding.

122. The Petitioners do not sponsor registered pension plans for any of their employees.

123. The Angiotech Companies provide benefits to all of their employees. Benefits provided at Angiotech's expense include: (i) medical and extended health care insurance; (ii) dental insurance; (iii) vision care insurance; (iv) employee and dependent life insurance; (v) accidental death & dismemberment insurance; and (vi) short and long-term disability insurance.

124. Angiotech's executives are also eligible to participate in an executive perquisite program. The program allows executives to be reimbursed up to a maximum of $15,000 per year for expenses associated with car leases, financial planning, tax advice and preparation, and health-related services.

## Intercompany Management and Services Arrangements

125. As noted above, the Angiotech Companies are highly integrated in many respects and share certain critical business functions. The Angiotech Companies' Senior Management works from Angiotech's head office in Vancouver and directs both day-to-day and higher level strategic functions for the Angiotech Companies. The cash management system of the Angiotech Companies is also managed from Angiotech's head office in Vancouver. All of the Angiotech Companies, including Angiotech U.S., benefit directly from each of the critical business functions provided to their entities by Angiotech's head office in Vancouver.

126. There is no formal inter-company management agreement between the various Angiotech Companies and no formal cost-recovery system is in place. As a result, Angiotech Canada has not been historically compensated by the other Angiotech Companies for general and

administrative, research and development and support services provided to the other Angiotech Companies.

127. Angiotech Canada also regularly bears costs for the benefit of all of the Angiotech Companies, including legal fees, insurance premiums, public company fees and other similar amounts for which it historically has not been compensated. From time to time, Angiotech Canada also pays certain discrete expenses on behalf of its subsidiaries for which it historically has not been reimbursed.

## Intercompany Transfers and Funding

128. In the ordinary course of business, the Angiotech Companies have historically and customarily transferred funds between entities, both to accommodate the Angiotech Companies' various foreign exchange requirements and for working capital and general corporate purposes. The Angiotech Companies have also transferred funds at various times to settle intercompany debts. The treasury department (the "**Treasury Department**") in Vancouver initiates, manages and monitors such intercompany transfers.

129. As a result of current liquidity challenges caused by the declines in revenue at Angiotech Canada, and because Angiotech Canada has been paying increased costs on behalf of the other Angiotech Companies in connection with the recent restructuring efforts, it is expected that Angiotech Canada's funding needs will continue to be fulfilled in part by Angiotech U.S. and Angiotech Europe (through Angiotech U.S.) for the foreseeable future. Angiotech Canada is currently indebted to Angiotech U.S. in the amount of approximately US$24.6 million. Senior Management expects that Angiotech Canada will require funding from Angiotech U.S. or other third party sources in the amount of approximately US$14.6 million over the next three months.

## Cash Management

130. Due to the inter-connectedness of the Angiotech Companies, and in order to increase operational and financial efficiencies, Angiotech employs a complex, centralized cash management system (the "**Angiotech Cash Management System**") to deal with cash management, costs, inter-company payments and allocation of revenues.

131. In the ordinary course of business, the Treasury Department, which is located at Angiotech's head office in Vancouver, British Columbia, manages and monitors the Angiotech

Cash Management System for the Angiotech Companies. The Angiotech Companies maintain bank accounts at nine different financial institutions in Canada, the U.S. and Europe.

132. The Angiotech Cash Management System consists of 71 accounts in total, comprised of:

(a) 19 accounts in Canada (the "**Petitioners' Canadian Accounts**");

(b) 13 accounts in the U.S. (the "**Petitioners' U.S. Accounts**");

(c) 37 accounts in Europe (the "**European Accounts**"); and

(d) two accounts in Puerto Rico.

133. On January 21, 2011, each of the companies comprising Angiotech U.S. opened a bank account at the Royal Bank of Canada in Vancouver, British Columbia into which $1,000 was deposited. As of the date of this Affidavit, each of the companies comprising Angiotech U.S. continues to maintain such funds on deposit.

134. These accounts are held in various currencies represented by: 16 Canadian dollar accounts; 27 U.S. dollar accounts; 13 Euro accounts; and 15 other European currency denominated accounts.

135. The Petitioners' Canadian Accounts are maintained on a cash management system established at the Royal Bank of Canada. The Petitioners' U.S. Accounts are maintained on cash management systems established at Wells Fargo and Bank of America. The European Accounts are maintained on cash management systems primarily at the Royal Bank of Scotland and the Danske Bank Group.

136. The Angiotech Cash Management System is managed by the Treasury Department in conjunction with the local entity financial controllers' departments. On a daily basis, the Treasury Department reviews account activity, including any inter-entity transfers and bank account balances. Cash requirements in each of the operating entities are assessed by the Treasury Department through the review and monitoring of the accounts payable systems and the weekly cash flow forecasts at the entity level.

137. By establishing the Angiotech Cash Management System and by centralizing control over their cash management arrangements, the Angiotech Companies are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds (including any inter-entity transfers and payments) and maintain control over the administration of various bank accounts required to effect the collection, disbursement and movement of cash. The Angiotech Cash Management System is essential to the orderly management of the Angiotech Companies' business affairs. In the view of Senior Management, a significant change to the current system would be seriously disruptive to normal day to day operations. Accordingly, the Petitioners intend to maintain the Angiotech Cash Management System, as modified pursuant to the DIP Facility (as defined below) throughout the course of this CCAA proceeding.

## The Urgent Need for Relief

### Decrease in Royalty Revenues

138. In the past three years, Angiotech Canada has experienced dramatic declines in revenues attributable primarily to decreases in royalties relating to BSC's sales of TAXUS stents. Royalty revenues for the three-month period ended September 30 declined from approximately $14.5 million in 2009 to $7.1 million in 2010. On an annual basis, royalty revenues at each year-end have been steadily falling as well. Royalty revenue at Angiotech Canada was approximately $117 million in 2007, $92 million in 2008, and $62 million in 2009. For the nine months ended September 30, 2010, Angiotech recorded royalty revenue of only approximately $28.3 million. These more rapid than expected declines in royalty revenues have made it increasingly difficult for Angiotech to service its significant debt. The declines in royalty revenue have also created uncertainty in respect of the Angiotech Companies' business that, together with troubled financial markets and poor economic conditions over the last two years, have undermined Angiotech's efforts to address its liquidity problems.

139. Although Angiotech has a number of promising products currently in development, as of yet it has not been able to replace the lost revenues and operating cash flow associated with royalties received from BSC's sales of the TAXUS stents.

## Angiotech's Debt Obligations

140. Strategic acquisitions have been a key component of the Angiotech Companies' core business strategy. Angiotech's most significant acquisitions were completed in part through Angiotech's incurrence of debt, and Angiotech's ability to repay and service that debt load has been significantly impaired by the significant and more rapid than expected declines in royalty revenues at the Canadian entity level, among other factors. In the last three years, Angiotech has been required to dedicate an increasing and substantial portion of its cash flow to making interest payments under the Subordinated Notes and the Floating Rate Notes. Unfortunately, as royalty revenues have declined, these interest payments have diverted substantial funds away from research, product development, sales and marketing and other critical business development activities.

141. Angiotech's substantial indebtedness also limits the Angiotech Companies' ability to plan for or react to changes in its business and the industry. It also increases the Angiotech Companies' vulnerability to general adverse economic and industry conditions and has severely limited Angiotech's ability to obtain alternative financing for debt reduction, working capital, capital expenditures, acquisitions, general corporate and other purposes. Finally, it places the Angiotech Companies at a disadvantage relative to their competitors, most of which have less indebtedness or greater access to financing.

## Instability and Uncertainty

142. Over the course of the last several years, Angiotech has faced mounting challenges relating to leverage and liquidity that it has not been able to address through proposed financing, divestiture or out-of-court recapitalization transactions. Since late 2008 and more significantly since July 2010, Angiotech has publicly acknowledged these challenges through press releases and in its quarterly financial statements and other public disclosure.

143. In spite of significant efforts and the support of the holders of a significant majority of the Subordinated Notes, Angiotech was not able to implement the Recapitalization Transaction within the timeframe originally contemplated in the Recapitalization Support Agreement. Angiotech has therefore been forced to request extensions to the grace period applicable to the October Interest Payment, as well as extensions to certain of the deadlines under the Recapitalization Support Agreement, the FRN Support Agreement and the Wells Fargo

Forbearance Agreement. While allowing the Petitioners the necessary time to negotiate the arrangements and documents necessary to implement the Recapitalization Transaction as part of this CCAA proceeding, these extensions have created uncertainty in the marketplace and within Angiotech. As the launch of the Recapitalization Transaction continued to be delayed, Angiotech's customers, employees and suppliers have become increasingly concerned about Angiotech's ability to effectuate the Recapitalization Transaction. Certain senior employees, including Angiotech's Chief Medical Officer, have recently resigned. Senior Management has also expressed concerns regarding Angiotech's ability to sustain adequate liquidity to fulfill current business objectives without commencing a CCAA process that will ultimately lead to the implementation of the Recapitalization Transaction.

## Significant U.S. Litigation

144. Angiotech's difficult financial position was further threatened by two significant litigation matters that were recently launched against Angiotech and/or certain of its U.S. subsidiaries. First, on October 1, 2010, QSR, as the representative for the former stockholders of QMI (the "**Quill Creditors**"), commenced an arbitration (the "**Quill Arbitration**") before the American Arbitration Association (the "**AAA**") in the U.S. naming Angiotech, Angiotech Washington and QMI as respondents (collectively, the "**Angiotech Respondents**"). QSR alleged that the Angiotech Respondents failed to satisfy certain obligations under the Quill Merger Agreement and sought monetary damages or a one-year extension of certain earn-out periods under the merger agreement. The Angiotech Respondents successfully petitioned to transfer venue to Vancouver, British Columbia before ultimately settling the Quill Arbitration.

145. On October 1, 2010, Angiotech, Angiotech Washington and QMI (the "**Angiotech Defendants**") commenced an action in respect of a related action (the "**QSR Action**" and, together with the Quill Arbitration, the "**Quill Litigation**") commenced by QSR in U.S. federal court in North Carolina. The complaint alleged, among other things, that the Angiotech Defendants breached certain contractual obligations under the Quill Merger Agreement, made certain misrepresentations during the negotiations over the Quill Merger Agreement and tortiously interfered with the performance of the Quill Merger Agreement.

146. On January 27, 2011, Angiotech, Angiotech Washington and QMI reached an agreement with QSR to settle the Quill Litigation. Pursuant to the settlement agreement (the

"**QSR Settlement Agreement**"), Angiotech Washington will pay to QSR a total of US$6 million (the "**Settlement Amount**") in exchange for the dismissal of the QSR Arbitration and the QSR Action on a with prejudice basis and a comprehensive waiver, release and surrender of all claims by QSR and individual affiliates against Angiotech, Angiotech Washington, QMI and all of their affiliates, among other related parties. The other Petitioners have guaranteed Angiotech Washington's obligation to make payment of the Settlement Amount. Unless earlier payment is made or triggered pursuant to the terms of the QSR Settlement Agreement, the Settlement Amount will be made in instalments, with: (a) US$2 million payable on the earlier of (i) 10 days after implementation of the Recapitalization Transaction (the "**Implementation Date**") and (ii) May 31, 2011; and (b) US$4 million to be paid over a 24-month period in 24 monthly instalments of $166,667, which monthly instalments will commence on the earlier of (i) 30 days after the Implementation Date and (ii) July 31, 2011. Prepayment of the full Settlement Amount before the date that is twelve months after the Implementation Date would entitle Angiotech Washington to a discount of US$300,000 on the then-outstanding portion of the Settlement Amount.

147. Although the Quill Litigation has been settled, its existence had created unexpected and additional instability and uncertainty on top of the Angiotech Companies' existing challenges.

148. The Angiotech Companies have also become involved in an arbitration (the "**Rex Arbitration**") with Rex Medical L.P. ("**Rex**") over a license, supply, marketing and distribution agreement (the "**Rex Agreement**") dated March 13, 2008 between Angiotech Washington and Rex. On November 24, 2010, Rex initiated the Rex Arbitration against Angiotech Washington seeking, among other things, damages relating to an alleged breach of the terms of the Rex Agreement. The Rex Arbitration is currently in a very early stage, and no arbitration panel has been constituted.

149. Since March 2008, when Angiotech Washington and Rex first entered into the Rex Agreement, Angiotech has sold a product called the Option Retrievable Inferior Vena Cava Filter ("**Option**") pursuant to the terms of the Rex Agreement, at most or all points in time at a significant financial loss to Angiotech. The Rex Arbitration was commenced shortly after

Angiotech Washington informed Rex on November 11, 2010 that it intended to cease sales of Option.

150. On November 19, 2010 and December 2, 2010, respectively, Rex sought and obtained, over Angiotech Washington's objections, a temporary restraining order and a preliminary injunction in aid of arbitration (the "**Preliminary Injunction**") from the United States District Court for the Southern District of New York. The Preliminary Injunction restrains Angiotech Washington from ceasing to perform its obligations under the Rex Agreement for 180 days (i.e. May 12, 2011) or until the arbitration is concluded. On January 24, 2011, Rex delivered a notice of termination with respect to the Rex Agreement based on the alleged breaches by Angiotech as described above. Pursuant to its terms, the Rex Agreement terminates 90 days from the notice of termination, which is April 24, 2011.

151. The Rex Arbitration and Preliminary Injunction have led to the incurrence of additional costs (including, as a result of being judicially compelled to continue sales of Option, the incurrence of an additional sales-based milestone payment under the Rex Agreement) and have caused further instability for the Angiotech Companies while they are attempting to pursue the Recapitalization Transaction. Angiotech and Rex have been engaged in active discussions, however no settlement has been reached as of yet.

## Restructuring Efforts to Date

152. The Petitioners are currently facing financial difficulties because they lack adequate liquidity to satisfy their long-term debt obligations. Angiotech's Senior Management has considered and pursued a wide variety of cost-reduction, financing and cash generation alternatives in an effort to address these short and long-term liquidity issues. Blackstone was hired in October 2008 as part of these efforts.

153. Angiotech's intention in 2006, after incurring substantial debt in connection with the acquisitions of AMI and QMI, was to use excess cash from its royalty revenue to reduce its total debt by approximately US$300 million over a period of approximately three years. As a result of the earlier than expected decline in royalty revenues that began in the third quarter of 2006, Angiotech was unable to reduce its debt as originally planned. Angiotech therefore

solicited and pursued a wide variety of alternative cost-reduction, restructuring, financing and strategic alternatives. These initiatives included:

(a) in December 2006, the replacement of the Credit Suisse Credit Facility with the Floating Rate Notes, which transaction was concluded to provide Angiotech with greater financial flexibility and therefore provide Angiotech with additional time and options to reduce its debt;

(b) the pursuit of an ultimately unsuccessful US$300 million refinancing transaction that was identified and negotiated from January 2007 and ultimately announced in June 2008. The transaction was ultimately never concluded as a result of protracted negotiations with shareholders over transaction structure that extended from June 2008 into October 2008 and the financial crisis. If completed, the proposed transaction would have reduced Angiotech's debt obligations by up to US$300 million;

(c) significant cost reductions that were undertaken in September 2008, in part because Angiotech was unable to complete the above-referenced re-financing transaction. Such cost reductions were pursued in an effort to allow Angiotech additional time to pursue alternative debt refinancing and restructuring options;

(d) attempts to monetize or securitize the royalty stream derived from BSC's sales of TAXUS, including potentially selling the royalty stream to BSC or to other investors, which attempts were ultimately abandoned after analysis suggested that any cash generated would not offset the impact of the royalty revenue lost after any such transaction and therefore would not have improved Angiotech's credit profile and liquidity;

(e) formal and informal discussions with strategic investors over the acquisition of certain of the Angiotech Companies' products and products in development, which discussions were never able to generate transaction terms with sufficient benefits for the Angiotech Companies; and

(f) formal and informal discussions with financial and strategic investors over the possible acquisition of parts or all of the Angiotech Companies' business, which

discussions were ultimately abandoned after a determination that Angiotech's significant long-term debt obligations would impede the completion of any such transaction.

154. Of the above-referenced initiatives, only the issuance of the Floating Rate Notes was completed. Unfortunately, none of the other restructuring or refinancing alternatives was able to materialize on terms that would provide the Angiotech Companies with the short or medium-term liquidity relief that they required.

## Recent Restructuring Alternatives Considered

155. In or around May 2010, Senior Management, the Board of Directors and Blackstone concluded that it was critical that Angiotech identify a definitive and timely restructuring transaction that would reduce the pressure on Angiotech's liquidity position and de-leverage Angiotech's balance sheet. The two most reasonable remaining alternatives were the proposed recapitalization transaction and the Proprietary Transaction. In June and July of 2010, Blackstone updated its due diligence on the Angiotech Companies' business and worked with Senior Management to prepare for negotiations with certain of Angiotech's debtholders. Blackstone also evaluated Angiotech's long-term business plan and future growth opportunities and assessed Angiotech's current capital structure.

156. As part of this process, Blackstone assembled a data room and developed an extensive list of investment funds that might provide new capital or financing or that might facilitate the restructuring of Angiotech's debt. Blackstone developed an executive summary of the Angiotech Companies' business and helped Angiotech to negotiate non-disclosure agreements ("**NDAs**") in order to facilitate diligence by interested investors. As part of that process, Blackstone approached over fifteen financial and strategic parties about the possibility of facilitating the restructuring of Angiotech's debt and/or making new capital investments in Angiotech.

157. Concurrent with this process, and as previously described, Angiotech was also pursuing its other remaining restructuring alternative, the Proprietary Transaction. In connection with that process, Blackstone and Angiotech held discussions with a number of life sciences-focussed venture capital firms and negotiated and signed NDAs with several venture capital firms regarding the Proprietary Transaction.

158. As noted previously, on July 29, 2010 the Independent Committee was formally formed for the purpose of, among other things, considering the available restructuring alternatives. Since that time, the Independent Committee has been diligently working with Blackstone and the Petitioners' other advisors to identify and develop final alternatives for restructuring the Angiotech Companies' debt obligations.

159. In or around July 2010, certain of the Subordinated Noteholders retained Houlihan, Lokey, Howard & Zukin Capital Inc. as their financial advisor and initiated discussions with Angiotech regarding a possible recapitalization involving an exchange or compromise of the Subordinated Notes. The individual Subordinated Noteholders participating in such discussions each signed NDAs.

160. Draft term sheets were exchanged in respect of both the proposed recapitalization and the Proprietary Transaction.

161. The Board of Directors were regularly updated by Senior Management on the status of negotiations over the recapitalization and the Proprietary Transaction. As noted previously, in mid-September 2010 a determination was made by the Board of Directors to focus attention on what ultimately became the Recapitalization Transaction. After considering the available alternatives, the Board of Directors concluded that a recapitalization involving a compromise of the Subordinated Notes offered significantly more value, carried substantially less risk and had greater potential to deliver a long-term solution to Angiotech and its stakeholders.

## *The Recapitalization Support Agreement*

162. The Recapitalization Support Agreement contains the material terms for the Recapitalization Transaction. As of the date of this Affidavit, the holders of approximately 84% of the aggregate principal amount of outstanding Subordinated Notes have executed the Recapitalization Support Agreement. A copy of the Recapitalization Support Agreement is attached as Exhibit "P" to this Affidavit.

163. The Recapitalization Support Agreement provides that any approvals or consents required by the Recapitalization Support Agreement must be granted by the signatory holders of not less than a majority of the aggregate principal amount of Subordinated Notes. As noted

above, the Consenting Noteholders include the holders of 73% of the Subordinated Notes that executed the Recapitalization Support Agreement on October 29, 2010. Consent by the Consenting Noteholders is therefore effective for purposes of any matter requiring the agreement, consent, waiver or approval of the Subordinated Noteholders that are parties to the Recapitalization Support Agreement.

164. Under the Recapitalization Support Agreement, the signatory Subordinated Noteholders agreed, among other things: (i) to grant a 30-day extension to the grace period applicable to the payment of interest due under the Subordinated Notes that otherwise originally would have expired on October 30, 2010 (and which grace period was subsequently extended to 60, 90, 120 and, most recently, 165 days); and (ii) as long as the Recapitalization Support Agreement is in effect, to forbear from exercising any remedies in connection with defaults under the Subordinated Note Indenture.

165. The Recapitalization Support Agreement contemplates that Angiotech would seek to implement the Recapitalization Transaction by way of an Exchange Offer to be initiated on or before November 29, 2010 (which date was extended three times such that Angiotech is now required to commence the Recapitalization Transaction, whether by Exchange Offer or otherwise, before January 28, 2011). In the Exchange Offer, Subordinated Noteholders would receive their *pro rata* shares of 90% of the New Common Shares, Consent Date Noteholders would receive their *pro rata* shares of an additional 3.5% of the New Common Shares and Existing Shareholders would receive their *pro rata* shares of 2.5% of the New Common Shares. The remaining 4% of New Common Shares, plus options to acquire additional New Common Shares, would be allocated in accordance with the MIP. All of such entitlements would be subject to dilution for the claims of other affected creditors.

166. In order to complete the Exchange Offer, certain conditions had to be satisfied, including consent to the transaction by the holders of 98% of the Subordinated Notes (the "**Minimum Exchange Offer Threshold**") and the approval of the Recapitalization Transaction by a majority of Existing Shareholders at a meeting of Existing Shareholders called for that purpose (the "**Shareholder Condition**"). If the Minimum Exchange Offer Threshold was not achieved on or before January 7, 2011 (subsequently extended three times, ultimately to February 28, 2011) (or if the signatory Subordinated Noteholders determined in good faith that

the Minimum Exchange Offer Threshold could not reasonably be expected to be met or Angiotech and the Consenting Noteholders otherwise agreed in writing), Angiotech was to: (i) continue Angiotech from British Columbia to the CBCA; and (ii) pursue the CBCA Arrangement. The CBCA Arrangement would have the effect of binding all Subordinated Noteholders to the Recapitalization Transaction if the plan under the CBCA was approved by Subordinated Noteholders representing two-thirds of the aggregate principal amount of Subordinated Notes outstanding and a majority of Existing Shareholders.

167. The Recapitalization Support Agreement further provided that if the Shareholder Condition was not achieved on or before January 7, 2011 (subsequently extended three times, ultimately to February 28, 2011), or if the signatory Subordinated Noteholders otherwise agreed in writing, Angiotech was to pursue the Recapitalization Transaction through an alternative transaction, including by way of a plan of compromise or arrangement under the CCAA (the "**Alternative Recapitalization Transaction**"). As specifically noted in the Recapitalization Support Agreement, under the Alternative Recapitalization Transaction, the Subordinated Noteholders would receive at least all consideration otherwise allocated to them in the Exchange Offer or the CBCA Arrangement, plus all consideration allocated to the Existing Shareholders. In the event that the Recapitalization Transaction ultimately had to be implemented by way of plan of compromise or arrangement under the CCAA, the Recapitalization Support Agreement specifically noted that all Common Shares would be cancelled without any payment or compensation whatsoever to Existing Shareholders. The Recapitalization Support Agreement further provides that if the Recapitalization Transaction is implemented by way of CCAA plan, such plan must be approved by the Court and be in full force and effect prior to April 6, 2011. The Recapitalization Support Agreement requires that all steps contemplated by the plan be consummated prior to April 30, 2011.

168. The Petitioners intend to implement the Recapitalization Transaction through a plan of compromise or arrangement under the CCAA (the "**Plan**"). It is intended that the Plan will effectuate a compromise of the claims of the Subordinated Noteholders and certain other affected creditors in order to reduce Angiotech's debt, improve Angiotech's liquidity position and enable Angiotech to continue going concern operations while protecting substantial employment. The Recapitalization Support Agreement provides that upon Plan implementation:

(a) all Existing Shares will be cancelled and the Existing Shareholders would receive no compensation;

(b) Angiotech's Shareholder Rights Plan Agreement would be rescinded and terminated and each associated right will be cancelled and terminated without compensation;

(c) all existing options and warrants would be cancelled;

(d) all Subordinated Notes, and associated guarantee obligations of the Petitioners in respect thereof, would be irrevocably, finally and fully settled and extinguished in exchange for the issuance to: (i) each Subordinated Noteholder of its *pro rata* share of 92.5% of the New Common Shares; and (ii) each Consent Date Noteholder of its *pro rata* share of 3.5% of the New Common Shares, all of which New Common Shares are subject to dilution for other affected claims;

(e) all Subordinated Notes and the Subordinated Note Indenture would be irrevocably and finally cancelled and eliminated;

(f) the key employee incentive plan (the "**KEIP**") would be adopted by Angiotech and payments made thereunder; and

(g) the MIP will be adopted by Angiotech and grants of New Common Shares (subject to dilution for other affected claims) and options to acquire New Common Shares would be made thereunder.

169. Significantly, it is intended that the Floating Rate Notes and the Wells Fargo Credit Facility would not be affected by the Plan.

170. The Petitioners have been working diligently with their advisors to prepare a Plan to present to their Affected Creditors. A copy of the Plan will be filed with this Honourable Court once it has been finalized, and the draft Initial Order provides that the Plan shall be filed before February 15, 2011. As required by the Recapitalization Support Agreement, the Petitioners also intend to seek an Order establishing a claims procedure on or before February 15, 2010.

171. The Recapitalization Support Agreement was amended on November 29, 2010, December 15, 2010 and January 11, 2011 to, among other things, extend the deadlines for launch of the Recapitalization Transaction and satisfaction of the Minimum Exchange Offer Threshold and Shareholder Condition. Copies of the first three amendments to the Recapitalization Support Agreement are collectively attached as Exhibit "Q" to this Affidavit.

172. The Recapitalization Support Agreement was most recently amended on January 27, 2011 to, among other things, facilitate the initiation of an Alternative Recapitalization Transaction and provide the Consenting Noteholders with certain consent rights in respect to orders, related motion materials and general matters pertaining to the proposed CCAA proceeding. The fourth amendment to the Recapitalization Support Agreement also provides the Consenting Noteholders' consent to the Petitioners' commencement of an Alternative Recapitalization Transaction. A copy of the fourth amendment to the Recapitalization Support Agreement is attached as Exhibit "R" to this Affidavit.

173. As noted previously, Angiotech faced certain challenges that would have made it difficult, if not impossible, to complete the Exchange Offer or a CBCA Arrangement within a timeframe required to avoid a serious liquidity crisis. In view of its liquidity position, Angiotech also could not afford the financial impact of any further extensions to the Recapitalization Support Agreement to the extent that they would have been approved by the Consenting Noteholders. As of the date of this Affidavit, Angiotech would have to obtain the support of the holders of an additional 14% of the Subordinated Notes in order to satisfy the Minimum Exchange Offer Threshold. Finally, Senior Management and Angiotech's financial advisors have concluded that the Angiotech Companies require an operational restructuring that will be more efficiently and effectively accomplished through a CCAA proceeding than through the CBCA Arrangement. As required by the Recapitalization Support Agreement, the Petitioners have obtained the consent of the Consenting Noteholders to pursue the proposed course of action.

## *The FRN Support Agreement*

174. As noted previously, the acceleration of the Subordinated Notes would constitute an event of default under the Floating Rate Note Indenture. However, because any cross-defaults in respect of the Floating Rate Notes can be addressed through a compromise of the Subordinated Notes, it is not necessary to address the Petitioners' obligations under the Floating

Rate Notes through the Plan. Instead, it is contemplated that the Petitioners will pursue the FRN Exchange Offer in accordance with the terms of the Floating Rate Note Indenture outside of this CCAA proceeding.

175. On October 29, 2010, the Petitioners and the holders of approximately 51% of the Floating Rate Notes entered into the FRN Support Agreement, which provides that such holders will support and participate in the FRN Exchange Offer. The Floating Rate Noteholders that have executed the FRN Support Agreement are also Consenting Noteholders. The New Floating Rate Notes are to be issued on substantially the same terms as the existing Floating Rate Notes, although certain enhancements will be made to the Floating Rate Note Indenture in favour of the Floating Rate Noteholders upon implementation of the FRN Exchange Offer, including the granting of a second lien over the Petitioners' assets and undertaking and the amendment of certain of the Petitioners' covenants relating to debt and definitions pertaining to liens and changes of control. A copy of the FRN Support Agreement is attached as Exhibit "S" to this Affidavit.

176. The FRN Support Agreement was amended on November 29, 2010, December 15, 2010, January 11, 2010 and January 27, 2011 to, among other things, extend certain of the deadlines under the FRN Support Agreement to accord with time extensions in the Recapitalization Support Agreement. Pursuant to the FRN Support Agreement and the Recapitalization Support Agreement, the Petitioners are required to initiate the FRN Exchange Offer on or before February 7, 2011. The Petitioners seek approval in the draft Initial Order to take steps to initiate and implement the FRN Exchange Offer while under CCAA protection. Copies of the four amendments to the FRN Support Agreement are collectively attached as Exhibit "T" to this Affidavit.

177. Angiotech has been in communication with various significant holders of Floating Rate Notes that are not parties to the FRN Support Agreement. Angiotech has also been in communication with a significant holder of Subordinated Notes that is not a Consenting Noteholder. These communications have been responsive to inquiries made by such holders as to the current situation at Angiotech and the status of the Recapitalization Transaction.

178. The Recapitalization Support Agreement provides that the Recapitalization Transaction is conditional upon the completion of the transactions contemplated by the FRN

Support Agreement. In addition, the implementation of the FRN Exchange Offer is contingent upon the reasonable satisfaction of certain terms in the Recapitalization Support Agreement, including the implementation of the Recapitalization Transaction. Because the Petitioners intend to leave the Floating Rate Notes unaffected in the Plan, Angiotech is seeking Court authorization to continue to make interest payments under the Floating Rate Notes throughout the course of this CCAA proceeding.

## Relief Sought

179. Over the course of the past several months, the Angiotech Companies have made good faith efforts to pursue the Recapitalization Transaction outside of an insolvency proceeding. During that time, Angiotech's liquidity position has continued to significantly deteriorate. As noted above, there is too much uncertainty, there are too many legal and business impediments, and Angiotech does not have the available liquidity required to finance the extensions that would be required to implement the Recapitalization Transaction through the Exchange Offer or the CBCA Arrangement. The Petitioners also require an operational restructuring that will be most efficiently implemented under CCAA protection.

180. The deadline for initiating the Recapitalization Transaction under the Recapitalization Support Agreement will expire on January 28, 2011. Unless the Petitioners immediately commence a CCAA proceeding and initiate the Recapitalization Transaction, the Subordinated Noteholders will be able to terminate the Recapitalization Support Agreement and the recapitalization of the Petitioners will be put in jeopardy. Without a restructuring of their obligations under the Subordinated Notes, the Petitioners would face default under the Subordinated Note Indenture and an inability to satisfy their other long-term debt obligations. The Petitioners, individually or collectively, do not currently have the ability to satisfy the related obligations if demands are made on such obligations. The Petitioners are therefore insolvent. The relief described below, and other relief as set forth in the draft Initial Order, are therefore requested on an urgent basis.

### *Stay of Proceedings*

181. The Petitioners are concerned that, in light of declining revenues and the current liquidity challenges at Angiotech Canada, an uncontrolled material adverse change to the Petitioners' business could precipitate further erosion in enterprise value to the detriment of all

stakeholders. The Petitioners therefore urgently require a stay of proceedings and other protections provided by the CCAA so that they may restructure their affairs and to pursue the implementation of the Recapitalization Transaction through a Plan. In particular, the Petitioners require a stay of proceedings to prevent the Subordinated Noteholders from making demands under the Subordinated Note Indenture. Such demand would likely result in the cessation of going concern operations for the Petitioners absent a stay of proceedings. The Petitioners are requesting an initial stay of proceedings until February 15, 2011.

## *The Monitor*

182. On or around August 17, 2010, A&M was retained by Angiotech to provide advice on its restructuring options with a view to acting as Monitor in CCAA proceedings should such proceedings be necessary. In the course of fulfilling its mandate, A&M has become intimately familiar with the Angiotech business and its current financial exigencies. Although A&M has assisted Angiotech as an insolvency consultant by providing advice with respect to the restructuring alternatives available to Angiotech, A&M has always been aware of the potential of a CCAA filing and I am advised by A&M that it has maintained its independence so that it can properly execute its duties as Monitor. A&M has also been involved in discussions with respect to the Recapitalization Transaction and is familiar with the events leading to the commencement of this CCAA proceeding. Subject to Court approval, A&M has consented to act as the monitor (the "**Monitor**") of the Petitioners in this CCAA proceeding and in my view it is a fit and proper organization to do so.

183. I am advised that A&M intends to file a pre-filing report with this Honourable Court in conjunction with the Petitioners' request for relief under the CCAA.

## *Interim Financing*

184. Because of their current liquidity challenges, and as demonstrated in the Cash Flow Forecast (as defined and described below), the Petitioners require interim financing to implement the Recapitalization Transaction and other restructuring initiatives. Subject to certain terms and conditions, Wells Fargo has agreed to act as DIP lender (the "**DIP Lender**") and provide an interim financing facility (the "**DIP Facility**") of approximately US$25 million. The Petitioners have agreed to pay Wells Fargo US$500,000 as well as certain servicing, audit,

appraisal and valuation fees on or as of the date that the DIP Facility becomes effective, as applicable.

185. The Petitioners and Wells Fargo have agreed to the material terms pursuant to which the DIP Facility will be made available, however the actual DIP Credit Agreement is still being finalized. I have instructed my counsel to bring the most up to date version of the DIP Credit Agreement to Court. The Petitioners will file a copy of the executed DIP Credit Agreement with this Honourable Court as soon as practicable and will advise the Court at that time as to any material deviations from the form of DIP Credit Agreement that will be brought to Court as part of the application for an Initial Order.

186. Over the past several weeks, Angiotech, with the assistance of Blackstone, has solicited and considered alternative interim financing sources and arrangements. Specifically, Blackstone contacted approximately ten potential sources of interim financing that had entered into NDAs in the fall of 2010 in connection with earlier discussions regarding Angiotech's financial situation. After discussions with these parties over general terms and structure, Blackstone and Senior Management ultimately concluded that the Wells Fargo DIP Facility was likely to provide the Petitioners with the required financing on the best available terms and with the least disruption to operations and the restructuring. Among other things, Wells Fargo has agreed to advance funds to the Petitioners under the DIP Facility at the same interest rate applicable to the Wells Fargo Credit Facility (LIBOR plus 3.75%), which is substantially lower than the interest rates being discussed with the other potential financing sources. In addition, because of its history with Angiotech, Wells Fargo is very familiar with the Petitioners' business and financial profile and the general terms of the Recapitalization Transaction. Further, as Wells Fargo is a provider of cash management services, the DIP Facility will be easier to implement than one provided by a new lender.

187. The terms of funding under the DIP Facility are substantially similar to the terms of funding under the Wells Fargo Credit Facility, subject to certain changes to the underlying credit agreement to reflect the Petitioners' filing for protection under the CCAA.

188. It is a condition precedent to the availability of the DIP Facility that: (i) the Initial Order be in form and substance satisfactory to Wells Fargo, including in respect of the granting of the DIP Lender's Charge (as defined below); and (ii) the Petitioners' foreign representative

must have obtained a final order from the court in the United States pursuant to Chapter 15 that, among other things, recognizes this proceeding as a "Foreign Main Proceeding" and enforces the terms of the proposed Initial Order. The Petitioners will not be able to draw on the DIP Facility until, among other things, a final recognition order is made in the United States.

189. As noted previously, the Petitioners' current liquidity challenges are most acute at Angiotech Canada. The DIP Credit Agreement will permit the borrowers thereunder (which borrowers do not include Angiotech Canada) to transfer funds drawn on the DIP Facility to Angiotech Canada to satisfy Angiotech Canada's working capital and other liquidity requirements during this proceeding. Absent the ability to make inter-company transfers of funds, the Petitioners would not be able to finance their operations at Angiotech Canada or pursue the Recapitalization Transaction.

190. The DIP Facility is proposed to be secured by a Court-ordered security interest, lien and charge (the "**DIP Lender's Charge**") on all of the present and future assets, property and undertaking of the Petitioners (the "**Property**") that will secure all post-filing advances. The DIP Lender's Charge is to have priority over all other security interests, charges and liens other than the Administration Charge (as defined below) up to an amount of $1.5 million and the Directors' Charge (as defined below) up to an amount of $1 million. The DIP Lender's Charge will not secure any obligation that exists before the Initial Order is made.

191. In accordance with the requirements of the DIP Credit Agreement, the Petitioners will use cash flow from business operations to pay down or cash collateralize pre-filing obligations outstanding under the Wells Fargo Credit Facility. The borrowers under the DIP Facility will make draws to fund, among other things, their working capital requirements and the implementation of the Recapitalization Transaction. The DIP Credit Agreement expressly provides that the Petitioners may not use any advances under the DIP Facility to repay any indebtedness outstanding prior to the date of the commencement of this proceeding.

192. The Petitioners propose that the Monitor will provide oversight and assistance and will report to the Court in respect of the Petitioners' actual results relative to Cash Flow Forecast during this proceeding. Existing accounting procedures will provide the Monitor with the ability to track the flow of funds among the various Petitioners. As discussed below, it is proposed that

inter-company charges be created in order to ensure that no creditor is prejudiced by any inter-company transfer during the pendency of this proceeding.

193. As described in further detail below, the Cash Flow Forecast projects that the Petitioners' cash on hand will be reduced to $19.2 million by February 25, 2011. This is not a sufficient cushion for an enterprise of this magnitude. Therefore, the Petitioners are seeking approval of the proposed DIP Facility to accommodate their anticipated liquidity requirements during this CCAA proceeding. The proposed DIP Facility will provide additional assurances to the Petitioners' creditors and other stakeholders that the Petitioners will be able to continue going concern operations while pursuing the implementation of the Recapitalization Transaction pursuant to the Plan.

194. Because the proposed DIP Facility is being provided by Wells Fargo, and Wells Fargo is the Petitioners' senior secured creditor, the Petitioners are of the view that there will be no material prejudice to any of their existing creditors.

## *Administration Charge*

195. In connection with its appointment, it is contemplated that the Monitor, along with its Canadian and U.S. counsel, Canadian and U.S. counsel to the Petitioners, the financial advisor to the Petitioners, counsel and the financial advisor to the Independent Committee and counsel and the financial advisor to the Consenting Noteholders will be granted a Court-ordered charge on the Property as security for their respective fees and disbursements relating to services rendered in respect of the Petitioners up to a maximum amount of $2,500,000.

## *Director and Officer Protections*

196. A successful restructuring of the Petitioners will not be possible without the continued participation of Angiotech's Board of Directors, the directors of the other Petitioners, Senior Management and certain other officers and employees of the Petitioners. In particular, Senior Management has significant experience and expertise in the medical products and pharmaceutical technologies fields, which are extremely specialized businesses. This specialized experience is critical to Angiotech's success going forward as well as to Angiotech's relationships with suppliers, employees and other stakeholders. These relationships and contributions cannot be easily replicated or replaced.

197. I am advised by David Gruber of Farris, Vaughn, Wills & Murphy LLP, counsel for the Petitioners, and I believe, that in certain circumstances, directors of British Columbia corporations can be held personally liable for certain of a company's obligations to the federal and provincial governments during an insolvency proceeding, including with respect to payroll remittances, harmonized sales tax, sales tax, goods and services taxes, withholding taxes and workers' compensation remittances. Further, I am similarly advised that it may be possible for the directors of a British Columbia corporation to be held personally liable for a company's holiday pay obligations to its employees. The Directors of the Petitioners have worked with independent counsel and Senior Management in an attempt to quantify these potential liabilities.

198. Angiotech maintains directors' and officers' liability insurance (the "**D&O Insurance**") for the Directors and Officers of the Angiotech Companies. The current D&O Insurance policy provides US$40 million in coverage plus US$10 million in excess coverage for a total of US$50 million in coverage. The D&O Insurance policy currently expires on October 31, 2011. In addition, there are also contractual indemnities which have been given by the Petitioners to their Directors. On a cessation of going concern operations, the Petitioners may not have sufficient funds to satisfy those indemnities should the Directors be found responsible for the full amount of the potential directors' liabilities.

199. The Directors of the Petitioners have indicated that, in light of the potential for significant personal liability, they are not willing to continue their service and involvement in the proposed restructuring unless the Initial Order grants a charge on the Property as security for the Petitioners' obligation to indemnify the Directors and Officers in respect of the potential liabilities outlined above. The Petitioners propose that the charge in favour of the Directors and Officers of the Petitioners be in the amount of $2,000,000 (the "**Directors' Charge**"). The Petitioners believe that the amount of the Directors' Charge is fair and reasonable in the circumstances.

200. The Directors' Charge is necessary to ensure the continued participation of the Directors and Officers in the Petitioners' restructuring.

## *Intercompany Charges*

201. Angiotech Canada is currently funded primarily by way of inter-company advances from Angiotech U.S. Because Angiotech Canada are not borrowers under the DIP

Facility, the Petitioners need to be able to continue this practice post-filing in order to continue going concern operations with minimal disruption to customers and suppliers. These inter-company transfers are permitted under the DIP Facility.

202. Wells Fargo has agreed to act as DIP Lender and to advance funds to certain of the Petitioners as part of this CCAA proceeding under the structure of the existing Wells Fargo Credit Facility (notwithstanding that the Petitioners will not have access to the Wells Fargo Credit Facility from the filing date onward). Funds to finance this CCAA proceeding will therefore be drawn by those Angiotech U.S. entities that are borrowers under the DIP Credit Agreement and then transferred to Angiotech Canada as required. In order to protect the creditors of Petitioners that make inter-company advances during this proceeding, the Petitioners and the Monitor will track all inter-company payments and advances.

203. It is a condition of the Wells Fargo DIP Facility that Wells Fargo be granted a charge on the Property. As an extension of this, the Petitioners are asking the Court to authorize two inter-company charges on the Property as security for inter-company transfers made during this proceeding:

(a) the U.S. Inter-Company Charge, which will secure advances made in the amount up to net amounts transferred by Angiotech U.S. to Angiotech Canada after the commencement of this proceeding and actually outstanding; and

(b) the Canadian Inter-Company Charge, which will secure advances made in the amount up to net amounts transferred by Angiotech Canada to Angiotech U.S. after the commencement of this proceeding and actually outstanding.

204. It is proposed that the U.S. Inter-company Charge and the Canadian Inter-Company Charge (collectively, the "Inter-Company Charges") would rank equally and as set out in the draft Initial Order. As noted above, the Inter-Company Charges will provide creditors with comfort that no creditor will be.prejudiced by an inter-company transfer.

## *Ranking of the Charges*

205. It is proposed that the respective priorities of the charges on the Angiotech Property to be created by the Initial Order be as follows:

(a) Administration Charge (up to $1.5 million);

(b) Directors' Charge (up to $1 million);

(c) Any liens or security interests securing the obligations under the Wells Fargo Credit Agreement (the "**Existing Security**");

(d) DIP Lender's Charge;

(e) Inter-company Charges;

(f) Administration Charge (up to $1 million); and

(g) Directors' Charge (up to $1 million).

206. It is proposed that the requested charges on the Angiotech Property that are granted pursuant to the Initial Order will not rank in priority to validly perfected purchase money security interests in favour of secured creditors and valid and enforceable statutory encumbrances in favour of any entity that is a secured creditor. To the best of my knowledge, secured creditors that are likely to be affected by the proposed charges contemplated by the draft Initial Order have been given notice of this CCAA proceeding.

## *Cash Flow Forecast*

207. The Petitioners, with the assistance of the proposed Monitor, have prepared a 13-week cash flow forecast (the "**Cash Flow Forecast**") as required by the CCAA. A copy of the Cash Flow Forecast is attached as Exhibit "U".

208. As set out in the Cash Flow Forecast, the Petitioners' principal uses of cash during the next thirteen weeks will consist of the payment of ongoing costs of day-to-day operations, interest under the Floating Rate Notes, interest, costs and repayments under the Wells Fargo Credit Facility and the DIP Facility, and professional fees and disbursements in connection with these CCAA proceedings.

209. As of January 23, 2011, the Petitioners had $31.6 million available cash on hand. The Petitioners' Cash Flow Forecast projects that, subject to obtaining the relief outlined herein, and subject to the conversion of the Wells Fargo Credit Facility to the DIP Facility, the

Petitioners will have sufficient cash to continue to fund their operating costs and the proposed Recapitalization Transaction as part of this CCAA proceeding.

## Payments during this CCAA Proceeding

210. During the course of this CCAA proceeding, the Petitioners intend to make payments for goods and services supplied post-filing in the ordinary course as set out in the cash flow projections described above and as permitted by the Initial Order.

211. As discussed above, employees of the Petitioners are compensated in various ways, including by way of salaries, commissions and cash bonuses. It is contemplated in the cash flow projections that salaries, commissions, bonuses and outstanding employee expenses will be paid or reimbursed in the ordinary course, whether such obligations are incurred pre- or post-filing, and that compensation programs for active employees (other than stock-based compensation programs) will continue in the ordinary course post-filing.

### *Payments in respect of Pre-Filing Obligations*

212. In addition, the Petitioners are proposing in the draft Initial Order that they be authorized, with the consent of the Monitor, but not required, to make certain payments, including payments owing in arrears, to third parties that provide goods or services to the Petitioners' businesses.

213. The Petitioners are particularly concerned about the need to preserve their ongoing relationships with certain specialized suppliers in the pharmaceutical and medical products fields so as to ensure they have the materials necessary to fulfill customer orders. Although Angiotech expects that its key suppliers will honour their contractual commitments as long as all post-filing payments are made in the ordinary course, in order to ensure continued supply, the Petitioners are seeking in the draft Initial Order to be entitled but not required to make payment in respect of pre-filing obligations with the consent of the Monitor.

214. The Petitioners are also concerned with preserving the ability to protect their worldwide intellectual property, including by making payments in respect of services provided by patent agents, patent lawyers and other related professionals and fees charged by regulatory or licensing bodies that oversee patents and intellectual property in the jurisdictions where the

Angiotech Companies have or are in the process of obtaining patents or patent-equivalents in respect of their products. Angiotech therefore seeks authorization but not direction to make payments in respect of fees or pre-filing services provided in connection with the registration or maintenance of Angiotech patents or patent-equivalents worldwide.

215. As noted previously, Angiotech U.S. are included in this proceeding in order to deal with the guarantee obligations under the Subordinated Notes, which will be extinguished upon implementation of the Recapitalization Transaction, and certain other limited obligations. Angiotech U.S. are experiencing positive results from operations overall, and it is otherwise intended that their business will continue to operate in the ordinary course. The Petitioners have therefore included a provision in the draft Initial Order authorizing Angiotech U.S., subject to certain conditions including availability under the DIP Facility, to make payments to creditors, suppliers, employees, taxing authorities and other persons in respect of obligations incurred prior to or after the filing date.

## *Corporate Card Program*

216. Angiotech has a corporate credit card program (the "**Amex Credit Card Program**") in which certain executives and employees are reimbursed for certain expenses incurred using corporate credit cards. These expenses are generally incurred by such employees in the ordinary course of performing their job functions and include, among others, business-related travel and other expenses. The Angiotech Companies' employees use credit cards issued by American Express ("**American Express**") for the program.

217. Angiotech currently permits American Express to debit monthly the bank accounts of individual Petitioners in satisfaction of obligations owing by such Petitioners' employees in respect of the Amex Credit Card Program.

218. In September 2010, American Express requested and received from Angiotech a letter of credit in the amount of approximately $790,000 to secure obligations relating to the Amex Credit Card Program.

219. It is essential to the continued business operations of the Petitioners that they be permitted to continue to reimburse American Express for amounts charged to employee credit cards, whether such expenses are incurred before or after the commencement of this CCAA

proceeding. It would be highly disruptive to the Angiotech business if it were required to develop and adopt a new expense reimbursement program at this time.

## *Management Incentive Plan*

220. In connection with its recent restructuring efforts, Angiotech is developing a MIP that is designed to provide its participants (the "**MIP Participants**") with staged grants of New Common Shares and options to acquire New Common Shares. The MIP is intended to promote the long-term success of the Petitioners by providing designated key employees with stock-based incentives to continue in their present employment.

221. The number of New Common Shares to be issued to the MIP Participants will be calculated based on a benchmark and an evaluation of each MIP Participant's contribution to the Angiotech Companies and the restructuring. Pursuant to the MIP, on the date that the Plan is implemented, MIP Participants will be granted restricted New Common Shares representing 4% of the total pool of New Common Shares (subject to dilution for other affected claims) as well as options to acquire an additional 6% of the New Common Shares. The MIP also reserves options to acquire an additional 5% of the New Common Shares, which pool will be reserved for future distribution at the discretion of the board of directors put in place on the Implementation Date. The New Common Shares and the stock options granted under the MIP will vest in thirds on the first, second and third anniversaries of the Implementation Date and the stock options will have a seven year term.

222. The Petitioners are still in the process of identifying which Senior Management and key employees will be MIP Participants. It is intended that the MIP Participants will include individuals that have been essential to the restructuring initiatives taken to date and all are critical to the successful implementation of the Recapitalization Transaction. It is expected that the MIP Participants will include Angiotech's Senior Management, all of whom are seasoned executives with extensive experience in corporate affairs as well as specialized expertise in the medical device, pharmaceutical, biotechnology and health care industries. It is anticipated that the MIP Participants will also include key employees who have made important contributions to the Angiotech Companies and are deemed important to the restructuring.

223. The Petitioners are of the view that the MIP is necessary to provide the MIP Participants with incentives to continue in their employment pending the outcome of the

restructuring and beyond. Moreover, the Petitioners are concerned that the MIP Participants will consider other employment options if the MIP is not approved. As noted previously, Angiotech has already begun to lose certain of its key employees, including its Chief Medical Officer. The departures of other key employees would undoubtedly distract from the restructuring process that is underway with respect to the Petitioners. It would be extremely difficult at this stage of the restructuring process and this stage of the corporate history of Angiotech to find adequate replacements for Angiotech's Senior Management and key employees.

224. Accordingly, it is the belief of the Petitioners that the MIP will provide appropriate incentives for the MIP Participants to remain in their current positions, but also ensures that they are properly compensated for their assistance in the reorganization process.

225. The Petitioners will provide the Court with additional information in respect of the MIP once it has been finalized and approved by the Board of Directors.

## *Key Employee Incentive Program*

226. The Angiotech Companies have also developed the KEIP to provide cash incentives for designated key employees (the "**KEIP Participants**") to remain in their current employment through the implementation of the Recapitalization Transaction and the critical period immediately after implementation.

227. The KEIP consists of a series of individual agreements with designated KEIP Participants. KEIP Participants were identified and selected because their continued employment has been deemed to be critical to the successful implementation of the Recapitalization Transaction and the restructuring generally.

228. Under the KEIP, KEIP Participants will be eligible to receive cash incentive payments subject to the KEIP Participant's continued employment through designated milestones. The payments and milestones are to be as follows: (i) two-thirds of the KEIP Participant's award on the Implementation Date; and (ii) one-third of the KEIP Participant's award on the date that is 90 days following the Implementation Date. Any KEIP Participant that is terminated or resigns prior to a milestone forfeits his or her right to any future award payment. KEIP payments are calculated as a percentage of each KEIP Participant's base salary. The total

aggregate payments made pursuant to the KEIP will total no more than approximately $1.0 million.

229. As with the MIP, the KEIP is a program aimed at providing incentives to those employees that are most essential to the successful execution of the Recapitalization Transaction and the preservation of enterprise value during the course of this CCAA proceeding. The KEIP Participants are all highly experienced professionals that might consider other employment options if the KEIP is not approved. In the view of Senior Management, it would be highly disruptive to this CCAA proceeding and the Recapitalization Transaction if the Petitioners were forced to find replacements for the KEIP Participants at this critical stage in time.

230. Accordingly, it is the belief of the Petitioners that the KEIP not only provides appropriate incentives for the KEIP Participants to remain in their current positions, but also ensures that they are properly compensated for their assistance in the reorganization process.

231. The Petitioners are still in the process of identifying which key employees will be selected to participate in the KEIP. The Petitioners will provide the Court with additional informational on the KEIP and the KEIP Participants once the KEIP has been finalized and approved by the Board of Directors.

### *Chapter 15 Cases*

232. The Angiotech Companies have significant operations in the United States, and certain of the Petitioners are incorporated under state laws in the United States. All of Angiotech U.S. are guarantors under the Subordinated Notes, and the Petitioners need to ensure that they are protected from general creditor actions in the United States, including potential actions by the Subordinated Noteholders and the Floating Rate Noteholders. The Petitioners also require a recognition order under Chapter 15 to assist with global implementation of the Recapitalization Transaction. Significantly, the DIP Facility will not be available until the Petitioners have obtained a final recognition order from the U.S. Court. The Petitioners are therefore seeking authorization in the draft Initial Order for the Monitor to seek recognition of this proceeding as a "Foreign Main Proceeding" in respect of all of the Petitioners. The Petitioners also seek an endorsement by this Honourable Court confirming that British Columbia is the Petitioners' centre of main interest ("**COMI**").

233. The Petitioners intend that the relief requested in the Chapter 15 cases will include, among other things:

(a) recognition of the CCAA proceeding as "Foreign Main Proceedings";

(b) establishment of A&M as foreign representative; and

(c) enforcement of the Initial Order in the United States, including enforcement of the stay of proceedings, including in respect of enforcement or termination rights of any party against one of the Petitioners.

234. As noted previously, the Petitioners are part of an integrated business enterprise with primary operations in Canada and the United States. The Petitioners' COMI is British Columbia notwithstanding their substantial operations in the United States:

(a) all of the Petitioners have assets in Canada, and each of the companies comprising Angiotech U.S. has a bank account at the Royal Bank of Canada in Vancouver containing $1,000 on deposit;

(b) the operations of the Petitioners are directed from Angiotech's head office in Canada;

(c) all of the Petitioners report to Angiotech;

(d) corporate governance for the Petitioners is directed from Canada;

(e) strategic and key operating decisions and key policy decisions for the Petitioners are made by Angiotech staff located in Vancouver;

(f) the Petitioners' tax, treasury and cash management functions are managed from Vancouver and local plant finance staff report to senior finance management in Vancouver;

(g) the Petitioners' human resources functions are administered from Vancouver and all local human resources staff report into Vancouver;

(h) primary research and development functions including new product conceptions and development, regulatory and clinical development, medical affairs and quality control are directed from and carried out in Vancouver;

(i) the Petitioners' information technology and systems are directed from Vancouver;

(j) plant management and senior staff of the Petitioners regularly attend meetings in Vancouver;

(k) all public company reporting and investor relations are directed from Vancouver; and

(l) Angiotech's chief executive officer (the "**CEO**") is based in Vancouver and in addition to the Senior Management referenced above, all sales, manufacturing, operations and legal staff report to the CEO.

## REQUIREMENT FOR RELIEF REQUESTED

235. The Petitioners are currently in a very challenging financial position. After many years of successful product development, lucrative royalty revenue and strategic acquisitions that positioned the Angiotech Companies to be leaders in the medical products industry, the Petitioners have been faced with rapid and dramatic declines in royalty revenues. The default under the Subordinated Note Indenture, which raises the possibility of future defaults under the Floating Rate Note Indenture and the Wells Fargo Credit Facility, has pushed the Petitioners to the point of requiring creditor protection on an urgent basis to implement the Recapitalization Transaction and pursue other operational restructuring initiatives. In spite of the many financing and strategic alternatives pursued over the last several years and the restructuring efforts undertaken over the last six months, the Petitioners are no longer able to meet their financial obligations and require the protections afforded by the CCAA.

236. The stakeholders in an Angiotech restructuring are numerous and varied and include Angiotech employees, creditors, suppliers and the many patients whose lives are or may someday be improved by Angiotech technologies and products. If the Petitioners are forced to liquidate, patients in Canada and around the world may lose the benefits of products both currently in commercial circulation and under development. It is therefore in the interests of

individual and corporate stakeholders, as well as in the public interest, that the Petitioners be permitted to restructure their affairs as contemplated in order to return to viability.

237. The Board of Directors and Senior Management of Angiotech are fully committed to guiding Angiotech through a successful restructuring. Retaining the highly-experienced Board of Directors and Senior Management of Angiotech will provide a critical measure of stability in these otherwise uncertain and challenging times for the Petitioners. In turn, it is anticipated that this stability will bolster consumer and market confidence in Angiotech's viability and enable the Petitioners to maintain orderly operations and existing customer relations as well as maximize enterprise value throughout the course of the restructuring.

238. The Petitioners require the relief sought on an urgent basis. Recent events have accelerated the deterioration of Angiotech's financial position beyond all expectations. The Recapitalization Support Agreement can be terminated if this proceeding is not commenced before January 28, 2011 and the grace period under the Subordinated Notes expires on April 30, 2011. It is critical that Angiotech continue to advance the Recapitalization Transaction so as to remain in compliance with the Recapitalization Support Agreement and avoid the acceleration of the Subordinated Notes by the Subordinated Noteholders. In turn, this will prevent any potential cross-defaults that would permit the Floating Rate Noteholders and Wells Fargo to demand immediate repayment of all obligations owing to them. It is also imperative that all of Angiotech's stakeholders, including its employees, suppliers and customers, have confidence that the Petitioners will have the opportunity to leverage their existing expertise and resources to execute a business plan restoring the Angiotech Companies' profitability and positioning them to achieve future successes. The granting of the stay of proceedings, and the supervision of the Petitioners' restructuring by this Honourable Court, will facilitate the implementation of the Petitioners' strategies for preserving the value of their business enterprise for the benefit of all stakeholders, now and in the future.

SWORN (OR AFFIRMED) BEFORE ME )
at Vancouver, British Columbia, on )
28/01/2011 )
[signature] )
A Commissioner for taking Affidavits )
for British Columbia. )

[signature]
K. THOMAS BAILEY

REBECCA M. MORSE
*Barrister & Solicitor*
FARRIS, VAUGHAN, WILLS & MURPHY LLP
2500-700 West Georgia Street
P.O. Box 10026, Pacific Centre
Vancouver, BC V7Y 1B3

SCHEDULE "A"

1. 0741693 B.C. Ltd.
2. Angiotech International Holdings, Corp.
3. Angiotech Pharmaceuticals (US), Inc.
4. American Medical Instruments Holdings, Inc.
5. NeuColl, Inc.
6. Angiotech BioCoatings Corp.
7. Afmedica, Inc.
8. Quill Medical, Inc.
9. Angiotech America, Inc.
10. Angiotech Florida Holdings, Inc.
11. B.G. Sulzle, Inc.
12. Surgical Specialties Corporation
13. Angiotech Delaware, Inc.
14. Medical Device Technologies, Inc.
15. Manan Medical Products, Inc.
16. Surgical Specialties Puerto Rico, Inc.