***QSR Holdings.*** On October 6, 2010, we announced that we had been notified that QSR Holdings, Inc. ("QSR"), as the representative for the former stockholders of Quill Medical, Inc. ("QMI"), made a formal demand to the American Arbitration Association naming us and our Subsidiaries, QMI and Angiotech Pharmaceuticals (US), Inc. ("Angiotech US" and, together with Angiotech and QMI, the "Respondents") as respondents. The arbitration demand alleges that the Respondents failed to satisfy certain obligations under the Agreement and Plan of Merger, dated May 25, 2006, by and among Angiotech, Angiotech US, Quaich Acquisition, Inc. and QMI (the "Merger Agreement"), and seeks either direct monetary damages or, in the alternative, extension for one calendar year of certain earn-out periods as more fully set forth in the Merger Agreement. In addition, on October 5, 2010, certain of the Respondents were served with the Summons and Complaint in an action commenced in the United States District Court for the Middle District of North Carolina on October 1, 2010 by QSR, entitled QSR Holdings, Inc. v. Angiotech Pharmaceuticals, Inc., Angiotech Pharmaceuticals (US), Inc. and Quill Medical, Inc. (the "Federal Litigation"). The Complaint in the Federal Litigation alleges, among other items, that: (a) we breached certain contractual obligations under the Merger Agreement; (b) that certain misrepresentations or omissions were made by us during the initial negotiation of the Merger Agreement; and (c) tortious interference. QSR is seeking damages in an unstated amount together with punitive damages and/or attorneys fees to the extent allowed by law. Given the preliminary stages of these proceedings, it is not possible at this time to predict the outcome of the Federal Litigation or of any arbitration or other proceeding that may result from the Arbitration Demand. We intend to vigorously defend the Federal Litigation and any arbitration or other proceeding that may result from the Arbitration Demand.

***TAXUS® Clinical Results.*** On September 25, 2010 we announced that our corporate partner, BSC, released three-year follow-up data from the HORIZONS-AMI trial. The trial, sponsored by the Cardiovascular Research Foundation ("CRF") with grant support from Boston Scientific and The Medicines Company, is designed to determine the safety and efficacy of the TAXUS® Express2™ Paclitaxel-Eluting Coronary Stent System compared to bare-metal stenting in patients experiencing an acute myocardial infarction ("AMI"), or heart attack. With 3,006 patients enrolled worldwide, HORIZONS-AMI is the largest randomized trial to compare the use of drug-eluting stents to bare-metal stents for AMI patients. Analysis of the data was presented by Gregg W. Stone, M.D., Professor of Medicine and the Director of Research and Education at the Center for Interventional Vascular Therapy at the Columbia University Medical Center/New York-Presbyterian Hospital and Principal Investigator of the trial, at CRF's annual Transcatheter Cardiovascular Therapeutics ("TCT") scientific symposium in Washington, D.C. HORIZONS-AMI demonstrated that the TAXUS Express Stent significantly reduced clinical and angiographic restenosis compared to an otherwise identical bare-metal Express® control stent. After three years follow-up, the primary efficacy endpoint of ischemia-driven target lesion revascularization ("TLR") was 9.4 percent for patients treated with TAXUS Express vs. 15.1 percent for bare-metal Express ($p<0.001$), a relative reduction of 40 percent. The secondary efficacy endpoint of ischemia-driven target vessel revascularization was 12.4 percent for TAXUS Express vs. 17.6 percent for bare-metal Express ($p<0.001$), a relative reduction of 32 percent. The primary safety endpoint of major adverse cardiac events ("MACE") at three years was comparable for TAXUS Express and bare-metal Express patients (13.6 percent vs. 12.9 percent, respectively, $p=0.66$), which is consistent with findings at one and two years. Individual rates of death, repeat heart attack, stroke and stent thrombosis between the two groups through three years of follow-up were also comparable.

On September 22, 2010 we announced that our corporate partner, BSC, has released results from an analysis of 1,166 patients from its PERSEUS clinical program comparing the performance of the TAXUS® Element™ Paclitaxel-Eluting Coronary Stent System in diabetic versus non-diabetic patients. Results demonstrated that despite the known increased risk of restenosis for diabetics versus non-diabetics in patients undergoing coronary revascularization, the TAXUS Element Stent had comparable levels of TLR and late loss in both diabetic and non-diabetic patients. Analysis of the data was presented by Louis A. Cannon, M.D., of the Cardiac and Vascular Research Center of Northern Michigan in Petoskey, Michigan, and Co-Principal Investigator of the PERSEUS clinical program, at CRF's annual TCT scientific symposium in Washington, D.C. The PERSEUS diabetic analysis included clinical outcomes at one year among 314 diabetic patients and 852 non-diabetic patients treated with the TAXUS Element Stent from the PERSEUS Workhorse and Small Vessel clinical trials. Due to significant disparity in baseline characteristics between diabetic and non-diabetic patients, propensity score analysis was used to allow for adjustment of baseline differences (other than the presence of diabetes) between the two groups. Results showed that the TAXUS Element Stent maintained comparable rates of TLR at one year, whether adjusted or unadjusted, in the diabetic and non-diabetic patient populations (5.5 percent vs. 4.1 percent, $p=0.43$, adjusted). The adjusted and unadjusted rates of target lesion failure (TLF) at one year (defined as ischemia-driven TLR, or myocardial infarction ("MI")/cardiac death related to the target vessel) were also similar between the patient groups (7.5 percent vs. 5.4 percent, $p=0.31$, adjusted). Adjusted one-year rates of MACE, cardiac death, MI and Academic Research Consortium definite/probable stent thrombosis showed no differences between the two populations (p-values of 0.14, 0.12, 0.38, and 0.77, respectively). Nine-month adjusted angiographic outcomes showed similar in-segment late loss in diabetics and non-diabetics (0.23 mm vs. 0.19 mm, $p=0.52$). Rates of late loss for the TAXUS Element Stent were numerically lower than rates in prior studies for the TAXUS Express® and TAXUS Liberté® Stents.

On September 22, 2010 we announced that BSC has released comprehensive data from the TAXUS ATLAS clinical program, a series of global, prospective, single-arm trials evaluating the TAXUS® Liberté® Paclitaxel-Eluting Stent System in a variety of lesions and patient groups. Five-year results from the TAXUS ATLAS trial and four-year results from the TAXUS ATLAS Small Vessel and Long Lesion trials continue to show significant advantages for the thin-strut TAXUS Liberté Stent when compared to the first-generation TAXUS® Express® Stent. Analysis of the data was presented by the Co-Principal Investigators of the TAXUS ATLAS trials, Mark A. Turco, M.D., Director of the Center for Cardiac and Vascular Research, Washington Adventist Hospital, and John A. Ormiston, M.D., Mercy Angiography Unit, Mercy Hospital, Auckland, New Zealand, at CRF's annual TCT scientific symposium in Washington, D.C.

*Zilver® PTX® Clinical Data.* On September 24, 2010 we announced that a summary of the final clinical trial results for the randomized study of Cook Medical, Inc.'s ("Cook") Zilver® PTX® Drug-Eluting Peripheral Stent ("Zilver PTX") for use in patients with peripheral arterial disease in the superficial femoral artery ("SFA") was presented at CRF's annual TCT symposium in Washington D.C. The study met its 12-month primary endpoint showing non-inferior event-free survival ("EFS") and superior patency for the Zilver PTX as compared to balloon angioplasty. Cook Medical, a license holder of our proprietary paclitaxel technology, has developed Zilver-PTX, a self-expanding, highly durable nitinol stent that uses a proprietary technology to deliver a locally therapeutic dose of paclitaxel, a proven anti-restenotic drug, to the target lesion.

This multicenter, multinational, prospective, randomized study compared the safety and effectiveness of the Zilver PTX to balloon angioplasty and bare metal stenting. Patients with de novo or restenotic SFA lesions were randomized to balloon angioplasty or Zilver PTX stent placement. Balloon angioplasty patients experiencing acute failure (> 30% residual stenosis) underwent secondary randomization to provisional stenting with Zilver BMS (bare metal stent) or Zilver PTX. Endpoints included EFS, stent integrity by radiographic core laboratory analysis and primary patency by Duplex ultrasound core laboratory analysis (peak systolic velocity ratio < 2.0). The study enrolled 479 patients at 55 institutions in the United States, Japan and Germany, with 241 patients randomized to the Zilver PTX group and 238 to the balloon angioplasty group. Demographics and lesion characteristics were similar for both groups. Approximately half the balloon angioplasty group experienced acute failure and underwent secondary randomization, assigning 59 and 61 patients to provisional stenting with Zilver BMS and Zilver PTX, respectively.

In June 2010 we announced that Cook had submitted its Pre-Market Approval ("PMA") application to the U.S. Food and Drug Administration ("FDA") for Zilver PTX. We believe the data from the clinical trial described above supports this PMA application. In addition, in May 2010, we announced that Cook presented one-year data at Euro PCR that confirmed sustained clinical outcomes with Zilver PTX. According to data presented, 86.2% of all patient subgroups treated with Zilver PTX demonstrated vessel patency at 12 months without the requirement for an additional intervention. The data was collected as part of the world's largest clinical study of endovascular treatment for PAD in the SFA. The trial is based on a group of 787 patients, including symptomatic patients, diabetics, and those with the most complex lesions, including long lesions, total occlusions and in-stent restenosis.

In April 2010, we announced that Cook had enrolled its first patient in its landmark Formula™ PTX® clinical trial. The trial is the first of its kind to evaluate the safety and effectiveness of a paclitaxel-eluting stent to treat renal artery disease, the narrowing of the arteries that supply blood to the kidneys. The multi-center, randomized trial plans to enroll 120 patients at sites across Europe. The trial utilizes Cook's Formula renal stent, which is designed with a very low profile that may help it cross tightly blocked vessels for placement into diseased renal arteries.

*Athersys Inc.* On September 23, 2010 we, along with our partner Athersys, Inc. ("Athersys") announced updated results from the phase I clinical trial of MultiStem®, an allogeneic cell therapy product, administered to individuals following acute myocardial infarction, more commonly referred to as a heart attack. The phase I clinical trial was an open label, multi-center dose escalation trial evaluating the safety and maximum tolerated dose of a single administration of allogeneic MultiStem cells following an acute myocardial infarction. Enrolled patients received MultiStem delivered via a catheter into the damaged region of the heart 2-5 days following percutaneous coronary intervention, a standard treatment for heart attack. The study included patients in three treatment cohorts or dose groups (20 million, 50 million and 100 million cells per patient) and a registry group where patients received only standard of care. Nineteen treated- and 6 registry subjects were enrolled in the study. The trial was conducted at multiple cardiovascular treatment centers in the United States, including the Cleveland Clinic, Columbia University Medical Center and Henry Ford Health System.

In July, 2010 we announced that Athersys had announced positive results from its phase I clinical trial of MultiStem®. The study results, which represented at least four months of post-treatment patient data, demonstrated that MultiStem was well tolerated at all dose levels and also suggested improvement in heart function in treated patients.

The updated study results were presented at the TCT conference held in Washington, D.C. Dr. Marc Penn, M.D., Ph.D., co-principal investigator of this study and Director of Cardiovascular Cell Therapy at the Cleveland Clinic, and Director of the Skirball Laboratory for Cardiovascular Cellular Therapeutics presented the results at the Symposium "Strategies for Cardiovascular Repair: Stem Cell Therapy and Beyond."

New data presented by Dr. Penn included additional information about the nature and incidence of adverse events ("AEs") over the first four months of the trial, demonstrating that the AEs were generally mild-to-moderate in nature, there was no dose dependent effect of MultiStem on AEs, and overall, MultiStem had a favorable safety profile. Further, Dr. Penn shared the results from additional analysis of echocardiogram data collected over the first four months of the study, which suggests that MultiStem administration may also provide improvements in other measures of heart function. Patients receiving MultiStem, for instance, demonstrated a meaningful improvement in mean wall motion score at four months compared to baseline, though this improvement was not statistically significant. Interestingly, among those patients with more severe heart attacks (i.e. left ventricular ejection fraction, a measure of heart function, $\leq$ 45), the mean wall motion score for treated patients improved over the four-month period, while for registry patients it worsened over this time.

### Acquisitions

As part of our business development efforts we have completed several significant acquisitions. Terms of certain of these acquisitions require us to make future milestone or contingent payments upon achievement of certain product development and commercialization objectives, as discussed under "Contractual Obligations".

On April 6, 2010, we acquired certain product candidates and technology assets of Haemacure Corporation ("Haemacure") for consideration of $3.9 million. Haemacure had been involved in proceedings under Canada's Bankruptcy and Insolvency Act and Chapter 11 of the U.S. Bankruptcy Code. Through an asset sale transaction, we acquired all of the relevant research and development activities, manufacturing operations, key personnel, and intellectual property rights necessary to pursue further clinical development of Haemacure's human biomaterial product candidates, specifically fibrin sealant and thrombin hemostat. Under ASC No. 805, the transaction qualified as a business combination and the acquisition method was used to account for the transaction.

Prior to the acquisition, we entered into various license, distribution, development and supply agreements for fibrin and thrombin technologies. The collaboration was intended to provide us with access to technology for certain of its surgical product candidates which are currently in preclinical development. As these agreements did not contain any settlement provisions and were neither favorable nor unfavorable when compared to current market pricing for similar transactions, no settlement gains or losses were recognized.

As part of the collaboration, we provided Haemacure with a senior secured bridge financing facility (the "loan") of $2.5 million in multiple draw-downs throughout 2009. The loan was for a two year term, bore an annual interest rate of 10%, compounded quarterly, and was senior to all of Haemacure's indebtedness, subject to certain exceptions. The loan was secured by substantially all of Haemacure's assets. As at December 31, 2009, the loans were recognized at their fair value of $1.6 million with the remainder being amortized on account of an arrangement for prepaid services. On January 11, 2010 Haemacure announced it filed a notice of intention to make a proposal to its creditors under the Bankruptcy and Insolvency Act (Canada) and its wholly-owned U.S. subsidiary sought court protection under Chapter 11 in the U.S. These actions were taken in light of Haemacure's financial condition and inability to raise additional financing. We subsequently provided an additional $1.0 million of financing to fund Haemacure's insolvency proceedings and day-to-day operations. The loan and accrued interest was effectively settled in exchange for certain assets acquired from Haemacure. In addition, we paid an additional $0.2 million in cash to settle certain obligations owed by Haemacure.

As at April 5, 2010, the carrying value of the loan owed by Haemacure was $2.5 million compared to the contractual amount of $3.7 million. In accordance with ASC No. 805-10-55-21, we recognized a $1.2 million gain on the effective settlement of the pre-existing debt arrangement, which reflects the difference between the contractual settlement amount of the loan and its carrying value.

The estimated fair values of the net assets acquired at the date of acquisition are summarized as follows:

| | April 6, 2010 |
|---|---|
| Property, plant and equipment | $ 2,906 |
| Intangible assets | 1,700 |
| Deferred income tax liability | (720) |
| Estimated fair value of net assets acquired | 3,886 |
| Consideration: | |
| Face value of the loan receivable, including accrued interest | 3,686 |
| Cash paid | 200 |
| Total consideration | $ 3,886 |

We used the income approach to determine the fair value of the intangible assets acquired. The fair values of the property, plant and equipment were estimated using a cost-based approach which considers replacement values as well as the values ascribed to the assets for their highest and best use as defined by U.S. GAAP.

As the acquisition qualified as a business combination, transaction-related expenses of $0.3 million and $0.6 million were charged to selling, general and administration costs, respectively, during the three and six months ended June 30, 2010. No additional costs were incurred in the three months ending September 30, 2010. This preliminary assessment is based on initial estimates by management of the fair values of the assets acquired as at April 6, 2010. The final purchase price allocation is subject to the finalization of subsequent valuation procedures. We expect to finalize the purchase price allocation by December 31, 2010. The assets acquired from Haemacure have been included in the consolidated financial statements since the date of acquisition.

*Pro forma information (unaudited)*

The following unaudited pro forma information is provided for the business combination assuming that it occurred at the beginning of the earliest period presented, January 1, 2009. The pro forma information combines our financial results with the financial results of Haemacure for the three and nine month periods ended September 30, 2010 and September 30, 2009.

| | Three months ended September 30, 2010 | Three months ended September 30, 2009 | Nine months ended September 30, 2010 | Nine months ended September 30, 2009 |
|---|---|---|---|---|
| Net loss | $ (18,500) | $ (9,891) | $ (40,755) | $ (11,365) |
| Net loss per share | (0.22) | (0.12) | (0.48) | (0.13) |

The information presented above is for illustrative purposes only and is not indicative of the results that would have been achieved had the business combination taken place at the beginning of the earliest period presented. For comparative purposes, the pro forma information above excludes the impact of the $1.2 million non-recurring loan settlement gain and $0.6 million of transaction costs which were incurred in connection with business combination during the nine months ended September 30, 2010. The pro forma impact on revenue was not material for any of the periods presented.

**Collaboration, License and Sales and Distribution Agreements**

In connection with our research and development efforts, we have entered into various arrangements with corporate and academic collaborators, licensors, licensees and others for the research, development, clinical testing, regulatory approval, manufacturing, marketing and commercialization of our product candidates. Terms of the various license agreements may require us, or our collaborators, to make milestone payments upon achievement of certain product development and commercialization objectives and pay royalties on future sales of commercial products, if any, resulting from the collaborations.

As discussed above, in April 2010, we announced the closing of the acquisition of certain product candidates and technology assets of Haemacure. In June 2009, we had previously extended Haemacure a $2.5 million senior secured bridge loan as part of a collaboration that provided us with certain technology and product distribution rights. In January 2010 Haemacure announced that it had filed a notice of intention to make a proposal to its creditors under the Bankruptcy and Insolvency Act (Canada), and that its wholly-owned U.S. subsidiary sought court protection under Chapter 11 of the U.S. Bankruptcy Code. In March 2010, Haemacure announced that it had obtained authorization from the Superior Court of the Province of Québec to sell its assets to us and that the U.S. Bankruptcy Court had authorized the sale to us of the assets of Haemacure's U.S. subsidiary. Prior to the purchase of these assets, we had funded approximately $1.5 million in expenses, which include the funding of Haemacure's insolvency proceedings and day-to-day operations, legal fees and expenses. We expect that modest additional expenditures for research and development may be required in the remainder of 2010, depending upon final decisions as to product development timelines and the operations and personnel of a newly acquired manufacturing facility.

Our other significant collaborations, licenses, sales and distribution agreements are listed in the exhibits index to the 2009 Annual Report and may be found at the locations specified therein.

**Critical Accounting Policies and Estimates**

Our consolidated financial statements are prepared in accordance with U.S. GAAP. These accounting principles require management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue and expenses. We believe that the estimates and assumptions upon which we rely are reasonable and are based upon information available to us at the time the estimates and assumptions were made. Actual results could differ materially from our estimates.

An accounting policy is deemed to be critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time the estimate is made, and if different estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur periodically, could materially impact our consolidated financial statements. Our critical accounting policies and estimates are discussed in the 2009 Annual Report. Other than with respect to the going concern disclosure, we believe that there have been no significant changes to our critical accounting policies during the three and nine months ended September 30, 2010.

## Going Concern

In accordance with U.S. GAAP, the interim consolidated financial statements have been prepared on the basis that we will continue to operate as a going concern. This basis of presentation assumes that we will continue to realize assets and discharge liabilities in the normal course of business. However, as discussed in the Liquidity and Capital Resources section of this document and in note 1 to the Notes to the Consolidated Financial Statements included under Part I, Item 1, there are several material uncertainties which cast substantial doubt about the validity of this assumption. The financial statements do not reflect any adjustments related to the recoverability or classification of assets that may be necessary if we are unable to continue operating as a going concern.

## Results of Operations

*Overview*

| (in thousands of U.S.$ except per share data) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Revenues | | | | |
| Medical Products | $ 51,868 | $48,660 | $155,796 | $141,976 |
| Pharmaceutical Technologies | 7,116 | 14,584 | 28,415 | 74,141 |
| Total revenues | 58,984 | 63,244 | 184,211 | 216,117 |
| Operating (loss) income | (6,020) | 4,018 | (8,265) | 31,101 |
| Other expenses | (12,934) | (9,758) | (29,036) | (30,767) |
| (Loss) income before income taxes | (18,954) | (5,740) | (37,301) | 334 |
| Income tax (recovery) expense | (454) | 2,062 | 1,968 | 7,569 |
| Net loss | $(18,500) | $(7,802) | $(39,269) | $ (7,235) |
| Basic and diluted net loss per common share | $ (0.22) | $ (0.09) | $ (0.46) | $ (0.08) |

For the three months ended September 30, 2010, we recorded a net loss of $18.5million ($0.22 basic and diluted net loss per common share) compared to a net loss of $7.8 million ($0.09 basic and diluted net loss per common share) for the three months ended September 30, 2009.

The $10.7 million increase in net loss is due to several factors, including: (i) a reduction of $7.8 million in royalty revenue derived from BSC's sales of paclitaxel-eluting coronary stent systems; (ii) an increase in selling, general and administrative costs of $4.6 million, primarily resulting from the addition of sales and marketing staff to support our Quill Knotless Tissue-Closure Device product line; (iii) an increase in other expenses of $3.2 million primarily resulting from an increase in professional fees relating to the potential restructuring transaction with the holders of our Subordinated Notes and other related activities; and (iv) an increase in research and development costs of $1.6 million primarily resulting from higher salaries and benefits costs in 2010 relating to personnel conducting research and development of certain of our Proprietary Medical Products as well as relating to certain personnel retained and occupancy costs incurred in connection with our acquisition of assets from Haemacure. The unfavourable impact of the factors above were partially offset by an improvement in gross profit of $2.4 million due to a relative increase in sales of our higher gross margin Proprietary Medical Products, improvement in certain manufacturing related costs, in particular reduced labor costs, improved utilization of our fixed cost manufacturing facilities and a reduction of income tax expense of $2.5 million resulting from a higher loss in the current period.

For the nine months ended September 30, 2010, we recorded a net loss of $39.3 million ($(0.46) basic and diluted net loss per common share) compared to net loss of $7.2 million ($0.08 basic and diluted net loss per common share) for the same period in 2009. The $32.1 million decline in earnings as compared to the prior period is primarily due to: (i) the receipt of a one-time, $25.0 million payment from Baxter International, Inc. ("Baxter") in the first quarter of 2009; (ii) a $19.6 million reduction in royalty revenue derived from BSC's sales of paclitaxel-eluting coronary stent systems; (iii) an increase in selling, general and administrative costs of $7.8 million, primarily resulting from the addition of sales and marketing staff as previously discussed; (iv) an increase in other expenses of $3.2 million as previously discussed; and (v) an increase in research and development costs of $2.4 million. This decline was partially offset by: (i) an improvement in gross profit of $9.5 million, primarily due to the factors previously noted above; (ii) a $1.2 million gain on settlement of the loan with Haemacure recorded upon completion of our acquisition of certain product candidates and technology assets of Haemacure; (iii) the escrow settlement recovery of $4.7 million in regards to the RoundTable litigation matter settled during the first quarter of 2010; (iv) a reduction of income tax expense of $5.6 million; and (v) a reduction in interest expense of $1.2 million due to lower interest expense incurred under the Existing Floating Rate Notes during the period. The escrow settlement recovery in regards to the RoundTable litigation resulted from the receipt of $4.7 million in January 2010 in full settlement of an outstanding litigation matter related to a claim we had made against amounts paid into escrow in connection with our March 2006 acquisition of American Medical Instruments Holdings, Inc. that remained in escrow pending resolution of certain representations and warranties in the agreement governing the acquisition.

*Revenues*

| (in thousands of U.S.$) | Three Months Ended September 30, 2010 | Three Months Ended September 30, 2009 | Nine Months Ended September 30, 2010 | Nine Months Ended September 30, 2009 |
|---|---|---|---|---|
| *Medical Products:* | | | | |
| Product sales | 51,868 | 48,660 | 155,796 | 141,976 |
| *Pharmaceutical Technologies:* | | | | |
| Royalty revenue – paclitaxel-eluting stents | $ 6,070 | $13,833 | $ 25,305 | $ 44,822 |
| Royalty revenue – other | 993 | 698 | 2,951 | 3,816 |
| License fees | 53 | 53 | 158 | 25,503 |
| | $ 7,116 | $14,584 | $ 28,415 | $ 74,141 |
| Total revenues | $58,984 | $63,244 | $184,211 | $216,117 |

We operate in two reportable segments:

*Medical Products*

Our Medical Products segment manufactures and markets a wide range of single-use specialty medical products and medical device components. These products are sold directly to end users or other third-party medical products manufacturers. This segment contains specialized direct sales and distribution capabilities as well as significant manufacturing capabilities. Many of our medical products are made using our proprietary manufacturing processes or are protected by our intellectual property.

Sales of our Proprietary Medical Products increased to $17.3 million during the three months ended September 30, 2010 from $14.9 million during the same period in 2009. The increase was due primarily to higher sales of certain of our product lines, most significantly our Quill Knotless Tissue-Closure Device product line and our Option IVC Filter, partly offset by the elimination of revenue from our EnSnare™ product line starting in the first quarter of 2010. In 2009 we elected not to match an offer made to our partner Hatch Medical, LLC to purchase rights to the EnSnare product line, and as a result we no longer sell EnSnare. We do not expect the elimination of the EnSnare product line to have a material impact on our product sales or gross profit margin in 2010 or future periods as compared to prior periods. Sales of our Proprietary Medical Products increased to $49.5 million during the nine months ended September 30, 2010 from $41.5 million during the same period in 2009, due primarily to similar factors explaining the increase during the three months ended September 30, 2010.

Sales of our Base Medical Products increased to $34.5 million during the three months ended September 30, 2010 from $33.8 million during the same period in 2009, due primarily to growth in sales of medical device components manufactured by us and sold to other third-party medical device manufacturers. Sales of our Base Medical Products increased to $106.4 million during the nine months ended September 30, 2010 from $100.4 million during the same period in 2009, due primarily to growth in sales of certain of our biopsy, dental suture and microsurgical knife product lines, as well as due to modest growth in sales of medical device components manufactured by us and sold to other third-party medical device manufacturers as noted above.

Overall, revenue from our Medical Products segment was $51.9 million for the three months ended September 30, 2010, an increase of 6.6% from the $48.7 million recorded for the same period in 2009, and $155.8 million for the nine months ended September 20, 2010, an increase of 9.7% from the $142.0 million recorded for the same period in 2009.

Because we believe certain of our Proprietary Medical Products have a high potential for growth, we believe that revenue in our Medical Products segment will continue to increase during the remainder of 2010 as compared to 2009.

*Pharmaceutical Technologies*

Our Pharmaceutical Technologies segment includes royalty revenue generated from licensing our proprietary paclitaxel technology to various partners, as well as revenue derived from the licensing of certain of our biomaterials and other technologies. Currently, our principal revenues in this segment are royalties derived from sales by BSC of TAXUS coronary stent systems incorporating the drug paclitaxel.

Royalty revenue derived from sales of paclitaxel-eluting coronary stent systems by BSC for the three months ended September 30, 2010 decreased by 56% as compared to the same period in 2009, as a result of lower sales of paclitaxel-eluting stents by BSC. Royalty revenue for the quarter ended September 30, 2010 was based on BSC's net sales for the period April 1, 2010 to June 30, 2010 of $113 million, of which $66 million was in the U.S., compared to net sales for the same period in the prior year of $226 million, of which $96 million was in the U.S. The average gross royalty rate earned in the three months ended September 30, 2010 on BSC's net sales was 6.0% for sales in the U.S. and 4.5% for sales in other countries, compared to an average rate of 6.2% for sales in the U.S. and 6.1% for sales in other countries for the same period in the prior year. The average gross royalty rates declined in the current period as a result of our tiered royalty rate structure for sales in certain territories including the U.S., E.U. and Japan, pursuant to which we receive lower royalty rates as end-user sales of paclitaxel-eluting stents decline in these territories.

Royalty revenue derived from sales of paclitaxel-eluting coronary stent systems by BSC for the nine months ended September 30, 2010 decreased by 44% as compared to the same period in 2009. The decrease in royalty revenues was a result of lower sales of paclitaxel-eluting coronary stent systems by BSC. Royalty revenue for the nine months ended September 30, 2010 was based on BSC's net sales for the period from October 1, 2009 to June 30, 2010 of $442 million, of which $210 million was in the U.S., compared to net sales for the same period in 2009 of $717 million, of which $226 million was in the U.S. The average gross royalty rate earned in the first nine months of 2010 on BSC's net sales was 6.0% for sales in the U.S. and 5.5% for sales in other countries, compared to an average rate of 6.4% for sales in the U.S. and 6.1% for sales in other countries for the same period in 2009. As described above, the average gross royalty rates declined in the first nine months of 2010 as a result of our tiered royalty rate structure for sales in the U.S., E.U. and Japan.

For the nine months ended September 30, 2010, other royalty revenue decreased by $0.9 million as compared to the same period in 2009 due to the elimination of royalty payments from Baxter as a result of the Amended and Restated Distribution and License Agreement which was completed in the first quarter of 2009. The entry into the Amended and Restated Distribution and License Agreement with Baxter also explains the $25.3 million reduction in license fees for the nine months ended September 30, 2010 as compared to the same period in 2009, primarily due to the one-time $25.0 million payment we received upon entry into the agreement.

We expect revenues in our Pharmaceutical Technologies segment may continue to decrease for the remainder of 2010 as compared to revenues recorded in the same period in 2009, primarily as a result of continued competitive pressures in the market for drug-eluting coronary stent systems and the related potential decline in royalty revenues we derive from sales by BSC of TAXUS and the elimination of ongoing royalty payments from Baxter as a result of our entry into the Amended and Restated Distribution and License Agreement.

***Expenditures***

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| (in thousands of U.S.$) | 2010 | 2009 | 2010 | 2009 |
| Cost of products sold | $26,808 | $25,958 | $ 79,883 | $ 75,606 |
| License and royalty fees | 1,170 | 2,463 | 4,884 | 7,937 |
| Research and development | 6,240 | 4,596 | 19,900 | 17,526 |
| Selling, general and administrative | 22,489 | 17,924 | 66,871 | 59,102 |
| Depreciation and amortization | 8,297 | 8,285 | 24,948 | 24,845 |
| Write-down of other assets held for sale | — | — | 700 | — |
| Escrow settlement recovery | — | — | (4,710) | — |
| | $65,004 | $59,226 | $192,476 | $185,016 |

*Cost of Products Sold*

Cost of products sold comprises costs and expenses related to the production of our various medical device, device component and biomaterial products and technologies, including direct labor, raw materials, depreciation and certain fixed overhead costs related to our various manufacturing facilities and operations.

Cost of products sold increased only marginally to $26.8 million for the three months ended September 30, 2010 compared to $25.9 million for the same period of 2009. Gross margins for our Medical Products segment sales were 48.3% for the three months ended September 30, 2010 compared to 46.7% for the same period of 2009. Medical products segment gross margins for the three months ended September 30, 2010 were positively impacted by a relative increase in sales of our higher gross margin Proprietary Medical Products, improved labor costs resulting from our move of certain manufacturing operations to lower cost jurisdictions and the benefit of improved absorption of fixed manufacturing costs as a result of higher sales volumes.

Cost of products sold increased by $4.3 million to $79.9 million for the nine months ended September 30, 2010 compared to $75.6 million for the same period of 2009, primarily driven by higher levels of aggregate Medical Products segment sales. Gross margins for our Medical Products segment sales were 48.7% for the nine months ended September 30, 2010 compared to 46.7% for the same period of 2009. Medical Products segment gross margins for the nine months ended September 30, 2010 were positively impacted for the same reasons as described above.

We expect that cost of products sold will continue to be significant and that gross margins may continue to improve during the remainder of 2010, primarily as a result of improved sales mix and specifically as a result of potential increases in sales of certain of our Proprietary Medical Products that provide higher relative gross margins. These improvements may be offset by the impact of certain sales and pricing initiatives for our Base Medical Products designed to improve sales volume, market share, fixed manufacturing capacity utilization and overall operating cash flow.

*License and Royalty Fees on Royalty Revenue*

License and royalty fee expense of $1.2 million and $4.9 million for the three and nine months ended September 30, 2010, compared to $2.5 million and $7.9 million for the comparative periods in 2009. These expenses include license and royalty payments due to certain of our licensors, primarily relating to royalty revenue received from BSC for sales of paclitaxel-eluting coronary stent systems. The decrease in this expense for the three and nine months ended September 30, 2010 as compared to the same period in the prior period reflects the reduction in our royalty revenue discussed above.

We expect license and royalty fee expense to continue to be a significant cost during the remainder of 2010, commensurate with the amount of royalty revenue we earn. As described above, we expect that royalty revenues may continue to decline during the remainder of 2010, resulting in a corresponding decrease in our license and royalty fee expenses.

*Research and Development*

Our research and development expense comprises costs incurred in performing research and development activities, including salaries and benefits, clinical trial and related clinical manufacturing costs, contract research costs, patent procurement costs, materials and supplies, and operating and occupancy costs. Our research and development activities occur in two main areas:

*(i) Discovery and pre-clinical research.* Our discovery and pre-clinical research efforts are divided into several distinct areas of activity, including screening and pre-clinical evaluation of pharmaceuticals and various biomaterials and drug delivery technologies, evaluation of mechanism of action of pharmaceuticals, mechanical engineering and pursuing patent protection for our discoveries.

*(ii) Clinical research and development.* Clinical research and development refers to internal and external activities associated with clinical studies of product candidates in humans, and advancing clinical product candidates towards a goal of obtaining regulatory approval to manufacture and market these product candidates in various geographies.

Research and development expenditures increased by $1.6 million to $6.2 million for the three months ended September 30, 2010 compared to $4.6 million for the same period of 2009, primarily related to higher salaries and benefits costs incurred in 2010 relating to personnel conducting research and development of certain of our Proprietary Medical Products, as well as relating to certain personnel retained and occupancy costs incurred in connection with our acquisition of assets from Haemacure. Research and development expenditures increased by $2.4 million to $19.9 million for the nine months ended September 30, 2010 compared to $17.5 million for the same period in 2009. The increase during the nine months ended September 30, 2010 was due to the factors noted above

Consistent with our business strategy of offering innovative new medical products, we anticipate we will continue to incur significant research and development expenditures during the remainder of 2010 and for the foreseeable future. We expect our research and development expenditures during the remainder of 2010 to continue to be slightly higher than in 2009. Some of this increase will be driven by additional expenditures for research and development costs relating to our acquisition of technology and product candidates from Haemacure, which will depend on final decisions regarding product development timelines and the operations and personnel of a newly acquired manufacturing facility. We expect to fund these activities with our cash resources and any borrowings available under the revolving credit facility, in addition to cash generated from operations or cash available per commitments of certain of our creditors.

*Selling, General and Administrative Expenses*

Our selling, general and administrative expenses comprise direct selling and marketing costs related to the sale of our various medical products, including salaries, benefits and sales commissions, and our various management and administrative support functions, including salaries, commissions, benefits and other operating and occupancy costs.

Selling, general and administrative expenditures increased by $4.6 million for the three months ended September 30, 2010 to $22.5 million compared to $17.9 million for the same period in 2009, primarily resulting from increased salaries and benefits, travel and other costs relating to increased sales and marketing personnel for certain of our Proprietary Medical Products. Selling, general and administrative expenditures increased by $7.8 million to $66.9 million for the nine months ended September 30, 2010 as compared to $59.1 million for the same period in 2009. The higher expenditures were primarily due to the factors noted above, partially offset by reduced legal costs primarily as a result of the settlement of the RoundTable litigation matter as discussed previously.

We expect that selling, general and administrative expenses may continue to increase in the remainder of 2010 as compared to the same period in 2009, primarily due to potential increases in expenses relating to commercial activities for certain of our Proprietary Medical Products. These expenditures could fluctuate depending on product sales levels, the timing of launch of certain new products and growth of new product sales, or as a result of unforeseen litigation or other legal expenses that may be incurred to support and defend our intellectual property portfolio or other aspects of our business. As discussed previously, we expect to fund these increases with our cash resources and any borrowings available under the revolving credit facility, in addition to cash generated from operations or cash available per commitments of certain of our creditors.

*Depreciation and Amortization*

Depreciation and amortization expense of $8.3 million and $24.9 million for the three and nine months ended September 30, 2010, respectively were comparable to the same periods in 2009. Depreciation and amortization expense is comprised of amortization of licensed technologies and identifiable intangible assets purchased through business combinations.

We expect depreciation and amortization expense during the remainder of 2010 to continue to be comparable to the prior year.

*Settlement of Escrow Claim*

As noted above, in January 2010 we received $4.7 million in full settlement of an outstanding litigation matter with RoundTable. The proceeds received were recorded as escrow settlement recovery during the first quarter of 2010.

*Write-down of Assets Held For Sale*

In connection with our plans for capacity rationalization in our Pharmaceutical Technologies segment, in 2008 we reclassified a property that is no longer used as a current asset as held for sale in accordance with guidance for accounting for impairment of long-lived assets under ASC No. 350 – *General Intangibles Other than Goodwill* and ASC No. 360 – *Property, Plant and Equipment*. This property has a carrying value of approximately $2.3 million as of September 30, 2010, which represents the lower of cost and fair value less cost to sell. Impairment charges related to this property of $0.7 million were recorded against income from continuing operations during the first quarter of 2010.

*Other Income (Expense)*

| (in thousands of U.S.$) | Three Months Ended September 30, 2010 | Three Months Ended September 30, 2009 | Nine Months Ended September 30, 2010 | Nine Months Ended September 30, 2009 |
|---|---|---|---|---|
| Foreign exchange gain (loss) | $ 3 | $ (518) | $ 1,269 | $ (1,227) |
| Investment and other income | (126) | 46 | (512) | 74 |
| Debt restructuring costs | (2,978) | — | (2,978) | — |
| Interest expense on long-term debt | (9,833) | (9,286) | (27,779) | (28,971) |
| Write-down of investments | — | — | (216) | (643) |
| Loan settlement gain | — | — | 1,180 | — |
| Total other expenses | $(12,934) | $(9,758) | $(29,036) | $(30,767) |

Net foreign exchange gains and losses were primarily the result of changes in the relationship of the U.S. dollar to each of the Canadian dollar, Euro, Danish kroner and other foreign currency exchange rates when translating our foreign currency denominated monetary assets and liabilities to U.S. dollars for reporting purposes at period end. We continue to hold foreign currency denominated cash and cash equivalents to assist in meeting our anticipated operating and capital expenditure foreign currency requirements in future periods in jurisdictions outside of the U.S. We do not use derivatives to hedge against foreign currency exposures arising from our foreign denominated balance sheet financial instruments and therefore are exposed to future fluctuations in the U.S. dollar to foreign currency exchange rates.

Investment and other income for the three ended September 30, 2010 decreased by $0.2 million when compared to the same period in 2009, primarily as a result of lower interest income received in 2010 due to reduced cash balances available to invest. Included in investment and other income for the nine months ended September 30, 2010 is a charge of $0.3 million relating to the write-off of leasehold improvements for a leased property no longer in use.

Debt restructuring costs for the three and nine months ended September 30, 2010 of $3.0 million are for fees and expenses relating to the proposed recapitalization transaction. These fees and expenses represent professional fees paid to both our, and the Consenting Noteholders' financial and legal advisors to assist in the analysis of financial and strategic alternatives. We expect to continue to incur substantial costs related to the pursuit of the proposed recapitalization transaction and exploration of other financial and strategic alternatives for the next three to six months. These costs may further impact our cash and liquidity position. For more information see notes 13 and 22 to the Notes to the Consolidated Financial Statements included as Part I, Item 1.

During the three months ended September 30, 2010, we incurred interest expense on our outstanding long-term debt obligations of $9.8 million compared to $9.3 million for the same period in 2009. This increase is driven by a $0.6 million expense related to interest on royalties to be paid to one of our licensors. We incurred interest expense of $27.8 million in the nine months ended September 30, 2010, compared to $29.0 million for the same period in 2009, driven by a decline in the interest rate applicable to our Floating Rate Notes, which averaged 4.2% for the nine months ended September 30, 2010 compared to 5.0% for the same period in 2009, due to lower LIBOR rates. Interest expense also includes $0.7 million and $2.2 million, respectively, for amortization of deferred financing costs for the three and nine months ended September 30, 2010 compared to $0.7 million and $2.1 million, respectively, for the three and nine months ended September 30, 2009.

During the nine months ended September 30, 2010, we recorded a $1.2 million loan settlement gain relating to the settlement of the loan with Haemacure in connection with the acquisition of assets of Haemacure, as more fully described above (see "Acquisitions").

*Income Tax*

For the three months ended September 30, 2010 we recorded an income tax recovery of $0.5 million and for the nine months ended September 30, 2010 we recorded an income tax expense of $2.0 million, compared to an income tax expense of $2.1 million and $7.6 million for the three and nine months ended September 30, 2009, respectively. The income tax expense for the nine months ended September 30, 2010 is primarily due to positive net earnings from operations in the U.S. and certain foreign jurisdictions.

The effective tax rate for the current period differs from the statutory Canadian tax rate of 28.5% and is primarily due to valuation allowances on net operating losses, the net effect of lower tax rates on earnings in foreign jurisdictions, and permanent differences not subject to tax.

**Liquidity and Capital Resources**

At September 30, 2010, we had working capital of $49.2 million and cash and cash equivalents of $25.6 million. For the nine months ended September 30, 2010, our working capital decreased by $17.3 million as compared to December 31, 2009, primarily due to decreases in cash and cash equivalents and short-term investments, partly offset by increases in accounts receivable and inventories and decreases in accounts payable and accrued liabilities and income taxes payable.

Our most significant financial liabilities are our Existing Floating Rate Notes and our Subordinated Notes, which together comprise $575 million in aggregate principal amount. As discussed, these debt obligations were originally supported in substantive part by our license revenue derived from sales of TAXUS coronary stent systems by our partner BSC. The sustained and sharp decline in royalty revenues we receive from BSC has had a significant negative impact on our liquidity and ability to service our long term debt obligations. As a result of the decline in TAXUS and other liquidity constraints, on October 1, 2010, we announced that we were in negotiations with the Consenting Noteholders and that we would not be making the $9.7 million interest payment due to holders of the Subordinated Notes on October 1, 2010. Subsequently, on October 29, 2010, we announced that we had entered into the Support Agreement with holders of approximately 73% of the outstanding aggregate principal amount of our Subordinated Notes. The recapitalization transaction proposed by the Support Agreement would eliminate $250 million of our debt in exchange for new common shares in Angiotech, subject to various conditions.

In addition, on October 29, 2010, we also entered into a support agreement with holders of approximately 51% of the principal amount of our Existing Floating Rate Notes for the exchange of such notes for the New Floating Rate Notes. The FRN Exchange Offer will be open to all qualifying holders of the Existing Floating Rate Notes. The New Floating Rate Notes will be issued on substantially the same terms and conditions as the Existing Floating Rate Notes, other than amendments to certain covenants in respect of the incurrence of additional indebtedness and definitions relating to permitted liens and change of control. In addition, the New Floating Rate Notes will be secured by a second lien over the property and assets of the Company and certain of our Subsidiaries, which secure our existing revolving credit facility (as amended to the date hereto, including the fourth amendment thereto entered into on November 4, 2010, the "Existing Credit Facility") described in note 13 (d) in the Notes to the Consolidated Financial Statements of Part I, Item 1. Pursuant to the terms of the Support Agreement, the obligation of the Consenting Noteholders to complete the recapitalization transaction is conditioned on the completion of the transactions contemplated by the FRN Support Agreement.

Under the Support Agreement, at least 98% of the aggregate principal amount of the Subordinated Noteholders must consent to the Exchange Offer on or before January 7, 2011. If the Minimum Exchange Offer Threshold is not met, we may be required to pursue the recapitalization transaction pursuant to a plan of arrangement under the Canada Business Corporations Act. Under the Support Agreement, we may also be required to pursue the completion of the proposed recapitalization transaction pursuant a plan of compromise or arrangement under the Companies' Creditors Arrangement Act and/or other court proceedings.

Pursuant to the terms of the Subordinated Notes, we had a 30-day grace period from October 1, 2010 to make the required interest payment before an Event of Default arose under the indenture with respect to such interest payment. Under the terms of the supplemental indenture governing the Subordinated notes that was executed in connection with the Support Agreement and with the consent of the Consenting Noteholders, this grace period was extended to November 30, 2010. We expect that additional extensions will be required to complete the recapitalization transaction. Failure to make the interest payment by such extended date may constitute an Event of Default under both the Subordinated Notes and Existing Floating Rate Notes indentures. An Event of Default under the indenture governing the Subordinated Notes, arising from the failure to make the interest payment within the grace period would permit holders of 25% or more of the aggregate outstanding principal amount of the Subordinated Notes to demand immediate repayment of our debt obligations owing under the Subordinated Notes. Similarly, an Event of Default under the indenture governing the Existing Floating Rate Notes, arising from failure to make the interest payment on the Subordinated Notes within the grace period would permit the holders of 25% or more of the aggregate outstanding principal amount of the Existing Floating Rate Notes to demand immediate repayment of our debt obligations owing under the Existing Floating Rate Notes.

We maintain a senior secured revolving credit facility with Wells Fargo with the potential to borrow up to $25.0 million (subject to a borrowing base formula derived from the value of certain of our and our subsidiaries' finished goods inventory and accounts receivable). The amount we are able to borrow under the Existing Credit Facility therefore fluctuates from month to month. As of September 30, 2010, the amount of financing available under the Existing Credit Facility was approximately $16 million, which is net of $2.0 million in letters of credit issued under the Existing Credit Facility. As of September 30, 2010, there were no borrowings outstanding under the Existing Credit Facility.

Our cash resources and any borrowings available under the Existing Credit Facility, in addition to cash generated from operations or cash available per commitments of certain of our creditors, are used to support our continuing sales and marketing initiatives, working capital requirements, debt servicing requirements, clinical studies, research and development initiatives and for general corporate purposes. We may also use our cash resources to fund acquisitions of, or investments in, businesses, products or technologies that expand, complement or are otherwise related to our business. Our ability to use cash resources for such acquisitions and investments is severely constrained by our current limited liquidity and capital resources.

Any borrowings outstanding under the Existing Credit Facility bear interest ranging from LIBOR + 3.25% to LIBOR +3.75%, with a minimum Base LIBOR Rate of 2.25%. As the minimum Base LIBOR Rate under the Existing Credit Facility is 2.25% and the LIBOR rate was 0.29% on September 30, 2010, a 0.50% increase or decrease in the LIBOR rate as of September 30, 2010 would have no impact on interest payable under the credit facility. The Existing Credit Facility includes certain covenants and restrictions with respect to our operations and requires us to maintain certain levels of adjusted earnings before interest, taxes, depreciation and amortization ("Adjusted EBITDA") and fixed charge coverage ratios, among other terms and conditions. A breach of any of these covenants could result in our inability to draw on the facility or the immediate repayment of any then outstanding principal and interest. Repayment of any amounts drawn under the Existing Credit Facility can be made at certain points in time with ultimate maturity being February 27, 2013. Prepayments made under the Existing Credit Facility in certain circumstances cannot be re-borrowed by us. In April 2010 we completed an amendment to our credit agreement with Wells Fargo, which included, among other items, amendments to financial covenants pertaining to minimum EBITDA levels, fixed charge coverage ratios and the definition of Adjusted EBITDA. This amendment allow us continued access to funds per the terms of the credit agreement, and are primarily intended to reflect the continued decline and uncertainty of sales of TAXUS by BSC and the related potential impact on our Adjusted EBITDA. However, there are no assurances that we will continue to meet the specified conditions to borrow under the facility.

Utilization of the Existing Credit Facility is subject to a borrowing base formula based on the value of certain finished goods inventory and accounts receivable as well as certain restrictive covenants pertaining to operations and the maintenance of minimum levels of Adjusted EBITDA and fixed charge ratios. While we expect to be able to comply with the Adjusted EBITDA and fixed charge covenants specified under the Existing Credit Facility throughout the remainder of 2010, it is possible that we may not be able to comply with the covenants specified in the Existing Credit Facility in 2011 and beyond. A breach of these covenants, failure to complete the proposed recapitalization transaction, expiration of the Amended and Restated Forbearance Agreement, failure to make the interest payment on the Subordinated Notes by the amended expiration date of the relevant grace period, or failure to obtain waivers to cure any further breaches of the covenants and restrictions set forth under the Existing Credit Facility may limit our ability to borrow under the Existing Credit Facility, and there are no assurances that we will continue to meet the specified conditions to borrow under the Existing Credit Facility, or result in demands for accelerated repayment, thus further straining our working capital position and ability to continue operations. Although we are in compliance with the covenants as at September 30, 2010, there are no assurances that we will continue to meet the specified conditions to borrow under the Amended Credit Facility.

Concurrent with the ongoing discussions with certain holders of the Subordinated Notes, on September 30, 2010, we entered into the Forbearance Agreement with Wells Fargo to preserve the Existing Credit Facility described in note 13 (d) in the Notes to the Consolidated Financial Statements of Part I, Item 1. In addition, On November 4, 2010, we entered into the Amended and Restated Forbearance Agreement, under which Wells Fargo has agreed to not immediately exercise any rights or remedies it has related to the failure to make our interest payment due on October 1, 2010 with respect to the Subordinated Notes, our ongoing litigation with QSR Holdings or any future failure to deliver an unqualified audit opinion for the fiscal year ending December 31, 2010. We incurred $0.1 million to complete both the Forbearance Agreement and Amended and Restated Forbearance Agreement.

The Amended and Restated Forbearance Agreement will terminate on the earliest to occur of:

(i) the occurrence of another event constituting an Event of Default under the existing revolving credit facility;

(ii) the occurrence of a Material Adverse Change as defined under the existing revolving credit facility, subject to exclusions for changes relating to the recapitalization plan;

(iii) failure to attain certain intermediate milestones with respect to the recapitalization plan,

(iv) termination of the Support Agreement or the FRN Support Agreement;

(v) consummation of the recapitalization plan on terms and conditions not reasonably satisfactory to Wells Fargo under the existing revolving credit facility;

(vi) failure to remain within the applicable grace period with respect to the non-payment of the interest payment due to the Subordinated Note holders on October 1, 2010; and

(vii) April 30, 2011.

The purpose of the Fourth Amendment to the Existing Credit Facility with Wells Fargo is to provide Angiotech with liquidity during the period required to complete the proposed recapitalization transaction and fulfill the liquidity requirement specified by the Support Agreement. See note 13 (d) in the Notes to the Consolidated Financial Statements of Part I, Item 1 for a description of the key changes. Because the Support Agreement requires that, upon implementation of the recapitalization transaction, the Existing Credit Facility be amended, refinanced or replaced to provide not less than $25 million and not more than $35 million in liquidity, further consent from Wells Fargo under the Existing Credit Facility will be required in connection with the consummation of the proposed recapitalization transaction. If such consent is not obtained, we would be required to replace the Existing Credit Facility with a new revolving credit facility. We incurred $0.3 million to complete the Fourth Amendment to the credit facility. We currently have no borrowings outstanding under the credit facility other than amounts under letters of credit referred to below.

The Fourth Amendment to our Existing Credit Facility with Wells Fargo provides for, among other changes:

(i) an amendment of financial covenants pertaining to minimum EBITDA levels and fixed charge coverage ratios;

(ii) an increase the borrowing base available to secure loans by including in such borrowing base the value of certain real property, securities and intellectual property owned by us and our subsidiaries, in addition to accounts receivable and inventory, in each case subject to reserves, eligibility standards and advance rate formulas. As a result of such amendment, the amount of financing available to us under our amended revolving credit facility will immediately increase to approximately $25 million, which excludes $2.8 million relating to outstanding secured letters of credit under the credit facility;

(iii) an amendment to the specified use of proceeds provisions to allow for certain secured and unsecured intercompany loans by our U.S. entities to our Canadian entities; and

(iv) an amendment to permit the sale of certain assets of the Company.

Further consent from the lenders under the revolving credit facility will be required in connection with the consummation of the proposed recapitalization transaction, as the Support Agreement requires that we either amend the existing revolving credit facility to provide ongoing liquidity under said facility of between $25 million and $35 million following the consummation of the recapitalization transaction, or requires us to replace our existing revolving credit facility with a new revolving credit facility.

As at November 9, 2010, we estimate the amount of financing available under the Existing Credit Facility is approximately $25 million, which is net of $2.8 million of currently outstanding secured letters of credit under the Existing Credit Facility. We currently have no borrowings outstanding under the Existing Credit Facility other than such letters of credit.

Due to numerous factors that may impact our future cash position, working capital and liquidity as discussed below, and the significant cash that will be necessary to continue to execute our business plan, including selected growth and new product development initiatives in our Medical Products segment, initiatives to maintain sales of our Base Medical Products and to service our current level of debt obligations, there can be no assurance that we will have adequate liquidity and capital resources to satisfy our future financial obligations, including the Existing Floating Rate Notes and the Subordinated Notes.

Our current cash inflows, cash balances and liquidity position are subject to numerous uncertainties, including but not limited to our ability to effectuate a transaction with the holders of our Subordinated Notes or Existing Floating Rate Notes, changes in drug-eluting coronary stent markets, including the impact of increased competition in such markets and research relating to the efficacy of drug-eluting stents and the sales achieved in such markets by our partner BSC, the timing and success of product sales and marketing initiatives and new product launches, the timing and success of our research, product development and clinical trial activities, the timing of completing certain operational initiatives including but not limited to facility closures, our ability to effect reductions in certain aspects of our budgets in an efficient and timely manner, changes in interest rates, fluctuations in foreign exchange rates and regulatory or legislative changes.

In particular, as our royalties received from BSC have continued to decline significantly as compared to prior periods, and given that such royalties significantly impact our operating cash flows, liquidity position and cash balances immediately in the period they are recorded, our current liquidity and capital resources have been materially adversely affected by the decline in royalties.

Our ability to continue as a going concern will depend upon its ability to: (i) execute and complete the proposed recapitalization transaction as described above and in note 13, (ii) restructure, refinance or amend terms of its other existing debt obligations; (iii) remain in compliance with its debt covenants to maintain access to its Existing Credit Facility; (iv) obtain additional equity or debt financing; (v) achieve revenue growth and improvement of gross margins; and (vi) achieve greater operating efficiencies or a reduction of expenses.

Our future plans and current initiatives to manage its operating, going concern and liquidity risks include, but are not limited to the following:

- Implementation and execution of the proposed recapitalization transaction to reduce the burden of existing debt levels and interest expense;
- Exploration of various other strategic and financial alternatives, including potential future equity or debt financing;
- Attainment of the necessary debt waivers, extensions or temporary concessions to provide relief during the restructuring period;
- Maintenance and utilization of the Existing Credit Facility with Wells Fargo;

- Evaluation of amounts expended for certain sales and marketing programs;
- Selected gross margin improvement initiatives;
- Potential sale of non-productive property, plant and equipment assets;
- Renegotiation of certain licensing and distribution agreements; and
- Optimization of day-to-day operating cash flows.

We continue to closely monitor and manage liquidity by regularly preparing rolling cash flow forecasts, monitoring the condition and value of assets available to be used as security in financing arrangements, seeking flexibility in financing arrangements and establishing programs to maintain compliance with the terms of financing agreements.

Although we have entered into various agreements with the intention to recapitalize the Company, there is no assurance that we will be able to successfully execute and complete the proposed recapitalization transaction before the before the expiration of the existing temporary waivers, extensions and other relief granted by the Amended and Restated Forbearance Agreement, the Support Agreement and the Fourth Amendment. Any recapitalization transaction contemplated by the Support Agreement may also be subject to governmental, court, regulatory, shareholder and third party approvals. In the event that we are unable to successfully complete the recapitalization transaction or make our interest payments on the Subordinated Notes by the expiration of the applicable grace period, the Subordinated Noteholders, holders of our Existing Floating Rate Notes, or Wells Fargo under our Existing Credit Facility may elect to trigger provisions under the respective indentures or credit agreements allowing them to accelerate repayment, and, in the case of Wells Fargo under our Existing Credit Facility, refuse to extend further credit to us. In this case, our current cash and credit capacity would not be sufficient to service principal debt and interest obligations. In addition, restrictions on our ability to borrow and the possible accelerated demand of repayment of existing or future obligations by any of our creditors may jeopardize our working capital position and ability to sustain its operations. In such circumstances, we would explore other alternatives, which may include a potential reorganization under the applicable bankruptcy and insolvency laws.

While we believe that we have developed planned courses of action and identified other opportunities to mitigate the operating, going concern and liquidity risks outlined above, there is no assurance that we will be able to complete any or all of the plans or initiatives that have been identified or obtain sufficient liquidity to execute our business plan. Furthermore, there may be other material risks and uncertainties that may impact our liquidity position that have not yet been identified.

*Cash Flow Highlights*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| (In thousands of U.S.$) | 2010 | 2009 | 2010 | 2009 |
| Cash and cash equivalents, beginning of period | $29,666 | $50,658 | $ 49,542 | $38,952 |
| Cash (used in) provided by operating activities | (2,795) | 2,953 | (18,881) | 22,824 |
| Cash used in investing activities | (1,589) | (1,901) | (4,652) | (7,038) |
| Cash provided by (used in) financing activities | (223) | (216) | (235) | (3,192) |
| Effect of exchange rate changes on cash | 507 | (36) | (208) | (88) |
| Net (decrease) increase in cash and cash equivalents | (4,100) | 800 | (23,976) | 12,506 |
| Cash and cash equivalents, end of period | $25,566 | $51,458 | $ 25,566 | $51,458 |

*Cash Flows from Operating Activities*

Cash used in operating activities for the three months ended September 30, 2010 was $2.8 million, compared to cash provided by operating activities of $3.0 million for the same period in 2009. The increase in cash requirements in the current quarter was driven primarily by a $10.7 million increase in operating loss, partly offset by a $5.9 million decrease in working capital requirements. The increase in operating loss was primarily due to decreases in royalty revenue received from BSC, and increases in operating expenses as discussed above. Working capital changes were primarily a result of a decrease in net cash outflows from accounts payable and accrued liabilities due to extended payment terms with certain of our licensors, reduced payments for license and royalty fees due to reduced license and royalty fee expenses as described previously, and an increase in accrued professional fees related to debt restructuring as described above.

Cash used in operating activities for the nine months ended September 30, 2010 was $18.9 million, compared to cash provided by operating activities of $22.8 million for the same period in 2009. The change in year over year cash requirements was due primarily to: (i) the one-time cash payment of $25.0 million received from Baxter in the first quarter of 2009; (ii) decreases in royalty revenue received from BSC during the period; and (iii) a $13.5 million increase in net working capital requirements, offset by: (i) improved gross margins of $9.5 million; (ii) the $4.7 million settlement of the escrow claim with RoundTable; and (iii) government grant proceeds received of $2.1 million . Working capital changes included an increase in net cash outflows from inventories of $3.4 million due to an increase in inventory of certain of our Proprietary Medical Products, a decrease in net cash inflows from prepaid expenses and other assets of $7.6 million due to non-cash tax expense related to Baxter during the first quarter of 2009 and an increase in net cash outflows related to income taxes payable of $5.2 million, offset by a decrease in net cash outflows from accounts payable and accrued liabilities of 3.6 million as described above.

*Cash Flows from Investing Activities*

Net cash used in investing activities for the three months ended September 30, 2010 was $1.6 million compared to net cash used of $1.9 million for the same period in 2009. For quarters ended September 30, 2010 and September 30, 2009, net cash used in investing activities was for capital expenditures of $1.6 million and $1.9 million, respectively.

Net cash used in investing activities for the nine months ended September 30, 2010 was $4.7 million compared to net cash used of $7.0 million for the same period in 2009. For the nine months ended September 30, 2010, the net cash used in investing activities was primarily for capital expenditures of $4.2 million and proceeds on disposition of property, plant and equipment of $0.8 million. In addition, we advanced a further $1.0 million to Haemacure during the nine months ended September 30, 2010. For the nine months ended September 30, 2009, the net cash used in investing activities was primarily for capital expenditures of $3.6 million as well as a $2.5 million milestone payment made to Rex Medical relating to our Option IVC Filter product, and a $1.2 million advance provided to Haemacure.

Depending on the composition and aggregate amount of our cash portfolio, we may invest our excess cash in short-term marketable securities, principally investment grade commercial debt and government agency notes. Investments are made with the secondary objective of achieving the highest rate of return while meeting our primary objectives of liquidity and safety of principal. Our investment policy limits investments to certain types of instruments issued by institutions with investment grade credit ratings and places restrictions on maturities and concentration by type and issuer. At September 30, 2010, we were not holding any short-term marketable securities.

At September 30, 2010 and December 31, 2009, we retained the following cash and cash equivalents denominated in foreign currencies in order to meet our anticipated foreign operating and capital expenditures in future periods.

| (in thousands of U.S.$) | September 30, 2010 | December 31, 2009 |
|---|---|---|
| Canadian dollars | $ 1,155 | $ 5,542 |
| Swiss franc | 614 | 986 |
| Euro | 3,466 | 5,680 |
| Danish krone | 1,634 | 412 |
| Other | 1,116 | 2,587 |

*Cash Flows from Financing Activities*

Net cash used in financing activities for the three and nine months ended September 30, 2010 was $0.2 million primarily for expenditures related to our senior secured credit facility with Wells Fargo as described above (see "Liquidity and Capital Resources"). Net cash used in financing activities for the three and nine months ended September 30, 2009 were $0.2 million and $3.2 million, respectively, and were primarily for expenditures related to our senior secured credit facility with Wells Fargo as described above.

## LONG-TERM DEBT

*(a) Existing Floating Rate Notes*

On December 11, 2006, we issued the Existing Floating Rate Notes in the aggregate principal amount of $325.0 million. The Existing Floating Rate Notes bear interest at an annual rate of LIBOR plus 3.75%, which is reset quarterly. Interest is payable quarterly in arrears on March 1, June 1, September 1, and December 1 of each year through to maturity. The Existing Floating Rate Notes are unsecured senior obligations, are guaranteed by certain of our subsidiaries and rank equally in right of payment to all of our existing and future senior indebtedness. At September 30, 2010, the interest rate on these notes was 4.1%. We may redeem all or a part of the Existing Floating Rate Notes at specified redemption prices.

As part of the proposed recapitalization transaction announced on October 29, 2010, we entered into the FRN Support Agreement with holders of approximately 51% of the aggregate principal amount of our Existing Floating Rate Notes to exchange such notes for New Floating Rate Notes. The New Floating Rate Notes would be issued on substantially the same terms and conditions as the Existing Floating Rates Notes, other than proposed amendments to certain to key provisions of the Floating Rate Note indenture as follows:

- Changes to covenants pertaining to the incurrence of additional indebtedness and liens, including a reduction in the allowance from $100 million to $50 million for the Company to obtain new senior secured indebtedness having seniority to the New Floating Rate Notes;
- The provision of security for holders of the New Floating Rate Notes by a second lien over the property and assets of the Company and certain of its subsidiaries, that secure the Existing Credit Facility, subject to customary carve-outs and certain permitted liens; and
- Changes to the definitions of certain "Change of Control" provisions.

As discussed previously, in the event that we are unable to successfully complete the recapitalization transaction or make our interest payment by the expiration of the applicable grace period, the Subordinated Noteholders or holders of our Senior Floating Rate Notes may elect to trigger provisions under the respective indentures allowing them to accelerate repayment. An Event of Default under the indenture governing the Existing Floating Rate Notes, arising from the failure to make the interest payment on the Subordinated Notes within the grace period would permit the holders of 25% or more of the aggregate outstanding principal amount of the Existing Floating Rate Notes to demand immediate repayment of our debt obligations owing under the Existing Floating Rate Notes. In this case, our current cash and credit capacity would not be sufficient to service principal debt and interest obligations. In addition, restrictions on our ability to borrow and the possible accelerated demand of repayment of existing or future obligations by any of our creditors may jeopardize our working capital position and ability to sustain its operations. In such circumstances, we would explore other alternatives, which may include a potential reorganization under the applicable bankruptcy and insolvency laws.

*(b) Subordinated Notes*

On March 23, 2006, we issued the Subordinated Notes in the aggregate principal amount of $250.0 million. The Subordinated Notes bear interest at an annual rate of 7.75% payable semi-annually in arrears on April 1 and October 1 of each year through to maturity. The Subordinated Notes are unsecured obligations. The Subordinated Notes and related note guarantees provided by us and certain of our subsidiaries are subordinated to our Floating Rate Notes described above and our existing and future senior indebtedness. We may redeem all or a part of the Subordinated Notes at specified redemption prices.

Due to the liquidity constraints as described previously and other factors, October 1, 2010 we announced that we were in negotiations with the Consenting Noteholders to restructure existing debt levels and that we would not be making the $9.7 million interest payment due to the Subordinated Noteholders on October 1, 2010. Subsequently, on October 29, 2010 we announced that we had entered into a Recapitalization Support Agreement with the holders of approximately 73% of of the outstanding aggregate principal amount of our Subordinated Notes to effectuate a recapitalization of the Company that would result in a significant reduction of the our debt. Upon implementation, the recapitalization transaction would eliminate $250 million in total indebtedness and provide significant improvements to our credit ratios, liquidity and financial flexibility. The outstanding interest obligation of $9.7 million has been fully accrued for as at September 30, 2010.

Pursuant to the terms of the Subordinated Notes, we had a 30-day grace period from October 1, 2010 to make the required interest payment before the Subordinated Noteholders would have the right to demand repayment of all obligations thereunder.. Under the terms of the supplemental indenture governing the Subordinated Notes that was executed in connection with the Support Agreement, this grace period was extended to November 30, 2010. We expect that additional extensions will be required to complete the recapitalization transaction. Failure to make the interest payment by the extended deadline would constitute an Event of Default under both the Subordinated Notes and Floating Rate Notes indentures. An Event of Default under the indenture governing the Subordinated Notes, arising from the failure to make the interest payment within the grace period would permit the holders of 25% or more of the aggregate outstanding principal amount of the Subordinated Notes to demand immediate repayment of our debt obligations owing under the Subordinated Notes. Similarly, an Event of Default under the indenture governing the Existing Floating Rate Notes, arising from the failure to make the interest payment on the Subordinated Notes within the grace period would permit the holders of 25% or more of the aggregate outstanding principal amount of the Existing Floating Rate Notes to accelerate repayment of our debt obligations owing under the Existing Floating Rate Notes.

Key elements of the proposed recapitalization transaction are as follows:

a) Under the terms of the Support Agreement, the Consenting Noteholders have agreed to exchange their Subordinated Notes for new common stock issued by the Company through the Exchange Offer, which is expected to be initiated on or before November 29, 2010. All Noteholders will be eligible to participate in the Exchange Offer, under which they would receive 90% of the new common stock upon completion of the recapitalization transaction, subject to potential dilution. Contingent upon the Exchange Offer being implemented, the Subordinated Noteholders consenting to the terms of the Support Agreement would be entitled to receive, on a pro-rata basis, an additional 3.5% of the new common stock upon completion of the recapitalization transaction, subject to potential dilution. Pursuant to the Support Agreement, the obligation of the Consenting Noteholders to complete the recapitalization transaction is conditioned on, among other things, the completion of the transactions contemplated by the FRN Support Agreement with the holders of the Existing Floating Rate Notes as described in note 13(a) above.

b) Upon implementation of the recapitalization transaction, existing common stockholders would receive, in exchange for their existing shares, 2.5% of the new common stock and options to acquire 10% of the new common stock (each subject to dilution) with a strike price that provides for a par recovery to the Subordinated Noteholders. This consideration would be conditioned upon receipt of either a favorable shareholder vote on the recapitalization transaction or an exemption order.

c) Upon completion of the proposed recapitalization, all existing options, warrants or other rights to purchase common stock would be cancelled.

d) Under the Support Agreement, at least 98% of the aggregate principal amount of the Subordinated Noteholders must consent to the Exchange Offer (the "Minimum Exchange Offer Threshold") on or before January 7, 2011. If the Minimum Exchange Offer Threshold is not met, we might be required to pursue the recapitalization transaction pursuant to a plan of arrangement under the *Canada Business Corporations Act*. Under the Support Agreement, we might also be required to pursue the completion of the recapitalization transaction pursuant a plan of compromise or arrangement under the *Companies' Creditors Arrangement Act* and/or other court proceedings.

e) Upon implementation of the proposed recapitalization transaction, the Support Agreement requires that our credit facility with Wells Fargo be amended, refinanced or replaced to provide not less than $25 million and not more than $35 million in liquidity.

f) The completion of the proposed recapitalization transaction is also subject to the establishment of a stock-based incentive plan that is satisfactory to us and the Consenting Noteholders. The stock-based incentive plan may provide, over the life of the plan, for the grant of restricted stock and options representing up to 15% of the new common stock, subject to potential dilution, as well as vesting and other considerations consistent with such stock-based incentive plans.

g) Under the terms of the Support Agreement, the proposed recapitalization transaction must be implemented no later than April 30, 2011, which date may be waived or extended by the Consenting Noteholders in accordance with the terms of the Support Agreement.

Although we have entered into various agreements with the intention to recapitalize the Company, there is no assurance that we will be able to successfully execute and complete the recapitalization transaction before the expiration of the existing temporary waivers and extensions granted by the Amended and Restated Forbearance Agreement, the Support Agreement and the Fourth Amendment. The completion of the proposed recapitalization transaction is also subject to completion of definitive documentation and satisfaction of any conditions contained therein.

*(c) Debt Covenants*

The terms of the indentures governing our Existing Floating Rate Notes and our Subordinated Notes include various covenants that impose restrictions on the operation of our business and the business of our subsidiaries, including the incurrence of certain liens and other indebtedness.

In addition, our revolving credit facility includes a number of customary financial covenants, including a requirement to maintain certain levels of Adjusted EBITDA and fixed charge coverage (defined as interest expense divided by Adjusted EBITDA), as well as covenants that limit our ability to, among other things, incur indebtedness, create liens, merge or consolidate, sell or dispose of assets, change the nature of our business, make distributions or make advances, loans or investments. As discussed above, in April 2010 we completed an amendment to the credit agreement which included amendments to the required financial covenants for minimum Adjusted EBITDA levels and fixed charge ratios. As previously discussed, in September 2010 we entered into a Forbearance Agreement with Wells Fargo to preserve the Existing Credit Facility. On November 4, 2010, we entered into an Amended and Restated Forbearance Agreement, pursuant to which Wells Fargo has agreed to leave in place our existing revolving credit facility and not immediately exercise any rights or remedies it has relating to the failure to make our interest payment due on October 1, 2010 with respect to the Subordinated Notes. In addition, on November 4, 2010 we completed the Fourth Amendment to the Existing Credit Facility to, among other things, further amended the financial covenants for minimum Adjusted EBITDA levels and fixed charge coverage ratios. Failure to complete the proposed recapitalization transaction, expiration of the Amended and Restated Forbearance Agreement, failure to make the interest payment on the Subordinated Notes by the amended expiration date of the relevant grace period, or failure to obtain waivers to cure any further breaches of the covenants and restrictions set forth under the Existing Credit Facility, would permit Wells Fargo to terminate the credit facility, accelerate obligations outstanding and discontinue future lending. Although we are in compliance with the covenants as at September 30, 2010, there are no assurances that we will continue to meet the specified conditions to borrow under the Existing Credit Facility.

**Contractual Obligations**

During the three and nine months ended September 30, 2010, there were no significant changes in our payments due under contractual obligations, as disclosed in our Management's Discussion and Analysis of Financial Condition and Results of Operations contained in the 2009 Annual Report.

**Contingencies**

We are party to various legal proceedings, including patent infringement litigation and other matters. See Part II, Item 1 and Note 14 (b) "Contingencies", in the Notes to the Consolidated Financial Statements of Part I, Item 1 of this Quarterly Report on Form 10-Q for more information.

**Off-Balance Sheet Arrangements**

As of September 30, 2010, we do not have any off-balance sheet arrangements, as defined by applicable securities regulators in Canada and the U.S., that have, or are reasonably likely to have, a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that would be material to investors.

**Recently Adopted Accounting Policies**

In August 2009, the Financial Accounting Standards Board ("FASB") issued an accounting standard update ("ASU") on measuring liabilities at fair value under accounting standard codification ("ASC") No. 820, *Fair Value Measurements and Disclosures*. The update provides clarification on how to measure the fair value of a liability when a quoted price for an identical liability is not available in an active market. This includes a discussion of appropriate valuation techniques. ASC No. 820 is effective for reporting periods, including interim periods, beginning after August 26, 2009. Given that we did not elect the fair value option of any of its liabilities, the adoption of this standard had no impact on the valuation of our liabilities.

In June 2009, the FASB issued a new standard under ASC No. 810-10, *Consolidation* which changes the consolidation model for variable interest entities ("VIE"). The revised model increases the qualitative analysis required when identifying which entity is the primary beneficiary that has (i) the power to direct the activities of a VIE that most significantly impact the entity's economic performance and (ii) the obligation to absorb losses or the right to receive benefits from the VIE. The new standard eliminates the Qualifying Special Purpose Entity ("QSPE") exemption, requires ongoing reconsideration of the primary beneficiary and amends the events which trigger reassessment of whether an entity is a VIE. We adopted the new guidance effective January 1, 2010. Adoption of this standard did not have a material impact on our 2010 financial results.

In January 2010, the FASB issued ASU No. 2010-02, *Consolidation: Accounting and Reporting for Decreases in Ownership of a Subsidiary – a Scope Clarification*, under ASC No. 810. The update clarifies the scope of decreases in ownership provisions and expands required disclosures for subsidiaries that are deconsolidated or group of assets that are derecognized. ASU No. 2010-02 is effective beginning in the first interim or annual reporting period ending on or after December 15, 2009, however, the amendments must be applied retrospectively to the first period that an entity adopted ASC No. 810-10. The adoption of the update did not have any impact on our financial statements.

In January 2010, the FASB issued ASU No. 2010-06, *Fair Value Measurements and Disclosures: Improving Disclosures about Fair Value Measurements*, under ASC No. 820-10. The update requires new disclosures about (i) significant transfers in and out of Level 1 and Level 2 fair value measurements and (ii) the roll forward activity affecting Level 3 fair value measurements. ASU No. 2010-06 also clarifies disclosures required about inputs, valuation techniques and the level of disaggregation applied to each class of assets and liabilities. With the exception of the changes to Level 3 fair value measurements, all new disclosures and clarifications under ASC No. 2010-06 are effective for interim and annual reporting periods beginning after December 15, 2009. These amendments have had no impact on our financial results given that they relate to disclosure and presentation only. New disclosures about Level 3 fair value measurements are effective for interim and annual reporting periods beginning after December 15, 2010. These disclosures are not expected to have a material impact on our financial statements.

In February 2010, the FASB issued ASU No. 2010-09, *Subsequent Events: Amendments to Certain Recognition and Disclosure Requirements*. The amendment removes the requirement for an SEC filer to disclose the date through which subsequent events have been evaluated in both issued and revised financial statements. SEC filers are still required to evaluate subsequent events through the date that the financial statements are issued. ASU No. 2010-09 was effective upon issuance and had no material impact on our financial statements or disclosures.

In April 2010, the FASB issued ASU No. 2010-17, *Revenue Recognition – Milestone Method of Revenue Recognition*, under ASC No. 605. The new guidance defines specific criteria for evaluating whether the milestone method is appropriate for the purposes of assessing revenue recognition. ASU No. 2010-17 stipulates that consideration tied to the achievement of a milestone may only be recognized if it meets all of the defined criteria for the milestone to be considered substantive. The guidance also requires expanded disclosures about the overall arrangement, the nature of the milestones, the consideration and the assessment of whether the milestones are substantive. ASU No. 2010-17 is effective on a prospective basis for milestones achieved in fiscal years and interim periods beginning on or after June 15, 2010. We are assessing the potential impact of adopting ASU No. 2010-17.

**Future Accounting Pronouncements**

In October 2009 the FASB issued ASU No. 2009-13, *Multiple-Deliverable Revenue Arrangements*, under ASC No. 605. The new guidance provides a more flexible alternative to identify and allocate consideration among multiple elements in a bundled arrangement when vendor-specific objective evidence or third-party evidence of selling price is not available. ASU No. 2009-13 requires the use of the relative selling price method and eliminates the residual method to allocation arrangement consideration. Additional expanded qualitative and quantitative disclosures are also required. The guidance is effective prospectively for revenue arrangements entered into or materially modified in years beginning on or after June 15, 2010. We are assessing the potential impact that the adoption of ASU No. 2009-13 may have on its consolidated balance sheets, results of operations and cash flows.

In April 2010, the FASB issued ASU No. 2010-13, *Effect of Denominating the Exercise Price of a Share-Based Payment Award in the Currency of the Market in Which the Underlying Equity Security Trades.* ASC No. 718, *Compensation – Stock Compensation*, which provides guidance on whether share-based payments should be classified as either equity or a liability. Under this section, share-based payment awards that contain conditions which are not market, performance or service conditions are classified as liabilities. The updated guidance clarifies that an employee share-based payment award, with an exercise price denominated in the currency of a market in which substantial portion of the entity's equity securities trade and which differs from the functional currency of the employer entity or payroll currency of the employee, are not considered to contain a condition that is not a market, performance or service condition. As such, these awards are classified as equity. ASU No. 2010-13 is effective for fiscal years and interim periods beginning on or after December 15, 2010. The cumulative effect of adopting this guidance should be applied to the opening balance of retained earnings. We are assessing the potential impact of adopting ASU No. 2010-13.

**Outstanding Share Data**

As of September 30, 2010, there were 85,176,449 common shares issued and outstanding for a total of $472.7 million in share capital. At September 30, 2010, we had 5,352,884 CDN dollar stock options, and stock options with tandem stock appreciation rights, which we refer to as awards, outstanding under the Angiotech Pharmaceuticals, Inc. stock option plan (of which 2,851,267 were exercisable) at a weighted average exercise price of CDN$4.00. We also had 3,974,218 U.S. dollar awards outstanding under this plan at September 30, 2010 (of which 1,640,551 were exercisable), at a weighted average exercise price of US$1.50. Pursuant to the 2006 Stock Incentive Plan, holders of each CDN dollar award and U.S. dollar award issued on or after October 1, 2002 may exercise their tandem stock appreciation right instead of the underlying stock option. The holder exercising the underlying stock option receives one common share of Angiotech Pharmaceuticals, Inc. for each option exercised. The holder exercising the tandem stock appreciation right portion of an award receives a portion of a common share of Angiotech Pharmaceuticals, Inc. with a fair value equal to the excess of the fair value of the common share subject to the underlying option at the time of exercise over the option price as set forth in the option agreement. Holders of each CDN dollar stock option issued prior to October 1, 2002 may exercise each option for one common share of Angiotech Pharmaceuticals, Inc.

As of September 30, 2010, there were 78 stock options outstanding in the American Medical Instruments Holdings, Inc. stock option plan (of which 49 were exercisable). Each stock option issued under this plan is exercisable for approximately 3,852 common shares of Angiotech Pharmaceuticals, Inc. at a weighted average exercise price of US$15.44 per option.

## Item 3. Quantitative and Qualitative Disclosures about Market Risk

The primary objective of our investment activities is to preserve our capital to fund operations. We also seek to maximize income from our investments without assuming significant risk. To achieve our objectives, we maintain a portfolio of cash equivalents and investments in a variety of securities of high credit quality. As of September 30, 2010, we had cash and cash equivalents of $25.6 million (December 31, 2009 – $49.5 million).

*Interest Rate Risk*

As the issuer of the Floating Rate Notes, we are exposed to interest rate risk. The interest rate on the Floating Rate Notes is reset quarterly to the 3-month LIBOR plus 3.75%. The aggregate principal amount of the Floating Rate Notes is $325 million and the notes bear interest at a rate of approximately 4.1% at September 30, 2010 (December 31, 2009 – 4.0%). Based upon our average floating rate debt levels during the three months ended September 30, 2010, a 100 basis point increase in interest rates would have impacted our interest expense by approximately $0.8 million for each of the three months ended September 30, 2010 and 2009. We do not use derivatives to hedge against interest rate risk.

*Foreign Currency Risk*

We operate internationally and enter into transactions denominated in foreign currencies. As such, our financial results are subject to the variability that arises from exchange rate movements in relation to the U.S. dollar. Our foreign currency exposures are primarily limited to the Canadian dollar, the Swiss franc, the Danish kroner, the Euro and the U.K. pound sterling. We incurred foreign exchange gains of $0.03 million and $1.3 million, respectively, for the three and nine months ended September 30, 2010 (foreign exchange losses of $0.5 million and $1.2 million, respectively, for the three and nine months ended September 30, 2009) primarily as a result of changes in the relationship of the U.S. to Canadian dollar and other foreign currency exchange rates when translating our foreign currency-denominated monetary assets and liabilities to U.S. dollars for reporting purposes at period end. We have not entered into any forward currency contracts or other financial derivatives to hedge foreign exchange risk, and therefore we are subject to foreign currency transaction and translation gains and losses. We purchase goods and services in U.S. and Canadian dollars, Swiss francs, Danish kroner, Euros, and U.K. pounds sterling, and earn a significant portion of our license and milestone revenues in U.S. dollars. Foreign exchange risk is mitigated somewhat by satisfying foreign denominated expenditures with cash flows or assets denominated in the same currency.

Since we operate internationally and approximately 12% of our net revenue for the three months ended September 30, 2010 (12% for the three months ended September 30, 2009) was generated in other than the U.S. dollar, foreign currency exchange rate fluctuations could significantly impact our financial position, results of operations, cash flows and competitive position.

For purposes of specific risk analysis, we used a sensitivity analysis to measure the potential impact to our consolidated financial statements for a hypothetical 10% strengthening of the U.S. dollar compared within the other currencies which we denominate product sales in for the three months ended September 30, 2010. Assuming a 10% strengthening of the U.S. dollar, our product net revenue would have been negatively impacted by approximately $2.8 million on an annual basis (September 30, 2009 - $2.7 million).

## Item 4. Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Based upon an evaluation of the effectiveness of disclosure controls and procedures, our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") have concluded that as of the end of the period covered by this Quarterly Report on Form 10-Q our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) under the Exchange Act) were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the rules and forms of the SEC and is accumulated and communicated to management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

### Changes in Internal Control over Financial Reporting

No change was made to our internal control over financial reporting during the three months ended June 30, 2010 that has materially affected, or is reasonably likely to materially affect, such internal control over financial reporting.

## PART II—OTHER INFORMATION

### Item 1. Legal Proceedings

On April 4, 2005, together with BSC, the Company commenced a legal action in the Netherlands against Sahajanand Medical Technologies Pvt. Ltd. ("SMT") for patent infringement. On May 3, 2006, the Dutch trial court ruled in the Company's favor, finding that our EP (NL) 0 706 376 patent was valid, and that SMT's Infinnium™ stent infringed the patent. On March 13, 2008, a Dutch Court of Appeal held a hearing to review the correctness of the trial court's decision. The Court of Appeal released their judgment on January 27, 2009, ruling against SMT (finding the Company's patent novel, inventive, and sufficiently disclosed). The Court of Appeal however requested amendment of claim 12 before rendering their decision on infringement. The Company has filed a response to the Court of Appeal's decision, and have additionally filed a further writ against SMT seeking to prevent SMT from, among other things, using its CE mark for SMT's Infinnium stent. Any decision of the Court of Appeal is appealable to the Supreme Court of the Netherlands. On October 22, 2009, Angiotech and BSC settled this litigation with SMT on favorable terms. The Company has continued this matter before the Court of Appeal with respect to the requested amendment to claim 12. A hearing was held on April 22, 2010 and on August 31, 2010 this court rendered a decision favorable to Angiotech. This matter is therefore concluded.

In July 2004, Dr. Gregory Baran initiated legal action, alleging infringement by the Company's subsidiary Medical Device Technologies Inc. ("MDT"), of two U.S. patents owned by Dr. Baran. These patents allegedly cover MDT's BioPince™ automated biopsy device. On September 25, 2007, the judge issued her decision pursuant to the Markman hearing of December 2005. The Company submitted a Motion for Summary Judgment to the court based upon the Markman decision and on September 30, 2009, the judge ruled in MDT's favor, finding that the BioPince device did not infringe a key claim of Dr. Baran's patents. Dr. Baran appealed this decision. A hearing on Dr. Baran's appeal was held before the U.S. Court of Appeals for the Federal Circuit on June 9, 2010 and on August 12, 2010, this court decided in our favor. Dr. Baran petitioned for a rehearing, but this has been denied.

On October 4, 2010 the Company was notified that QSR Holdings, Inc. ("QSR"), as the representative for the former stockholders of Quill Medical, Inc. ("QMI"), made a formal demand to the American Arbitration Association naming the Company and its subsidiaries, QMI and Angiotech Pharmaceuticals (US), Inc. ("Angiotech US" and, together with Angiotech and QMI, the "Respondents") as respondents. The arbitration demand alleges that the Respondents failed to satisfy certain obligations under the Agreement and Plan of Merger, dated May 25, 2006, by and among the Company, Angiotech US, Quaich Acquisition, Inc. and QMI (the "Merger Agreement"), and seeks either direct monetary damages or, in the alternative, extension for one calendar year of certain earn-out periods as more fully set forth in the Merger Agreement. In addition, QSR commenced an action in the United States District Court for the Middle District of North Carolina on October 1, 2010 against the Respondents, entitled QSR Holdings, Inc. v. Angiotech Pharmaceuticals, Inc., Angiotech Pharmaceuticals (US), Inc. and Quill Medical, Inc. (the "Federal Litigation"). The Complaint in the Federal Litigation alleges, among other items, that: (a) the Respondents breached certain contractual obligations under the Merger Agreement; (b) that certain misrepresentations or omissions were made during the initial negotiation of the Merger Agreement; and (c) tortious interference. QSR is seeking damages in an unstated amount together with punitive damages and/or attorneys fees to the extent allowed by law. On October 15, 2010 the Respondents filed a motion to dismiss the Complaint in part and to transfer venue. Given the preliminary stages of these proceedings, it is not possible at this time to predict the outcome of the Federal Litigation or of any arbitration or other proceeding that may result from the Arbitration Demand. As such, no accruals have been recorded related to this matter as at September 30, 2010.

At the European Patent Office ("EPO"), various patents either owned or licensed by or to the Company are in opposition proceedings including the following:

- In EP1155689, Oral Proceedings have been set for November 25, 2010.
- In EP1159974, the EPO decided to revoke the patent as a result of Oral Proceedings held on June 9, 2010. Angiotech filed a Notice of Appeal on August 27, 2010. A Statement of Grounds of Appeal is due on November 2, 2010.
- In EP1159975, a Notice of Opposition was filed on June 5, 2009. On February 4, 2010, Angiotech requested that the EPO set oral proceedings. On April 20, 2010, Angiotech filed a response to the Opposition.
- In EP0876165, the EPO revoked the patent as an outcome of an oral hearing held on June 24, 2009. On August 20, 2009, the Company filed a Notice of Appeal. On April 8, 2010, the opponent filed their response to the appeal.
- In EP0991359, a Notice of Opposition was filed. Angiotech filed a response on September 8, 2009. A hearing date was set for March 10, 2010, and then canceled by the EPO after the opponent withdrew from the proceedings. On April 1, 2010, the EPO maintained the patent in amended form. As no appeal was filed by the opponent before the appeal deadline, the decision is regarded as final.
- In EP1857236, a Notice of Opposition was filed against Quill Medical, Inc. by ITV Denkendorf Produkservice GmbH. Quill Medical has until January 29, 2011, to file its response.
- In EP1858243, a Notice of Opposition was filed against Quill Medical, Inc. by ITV Denkendorf Produkservice GmbH. Quill Medical has until January 22, 2011, to file its response.

## Item 1A. Risk Factors

### Risks Related to Our Business

*Part I, Item 1A, "Risk Factors," of the 2009 Annual Report includes a detailed discussion of risks and uncertainties which could adversely affect the Company's future results. In addition to the risk factors set forth in the 2009 Annual Report, the following risk factors modify and supplement, and should be read in conjunction with, the risk factors disclosed in the 2009 Annual Report, on the Quarterly Report on Form 10-Q filed with the SEC on May 7, 2010, and on the Quarterly Report on Form 10-Q filed with the SEC on August 9, 2010. You should consider carefully this information about the risks and uncertainties, together with all of the other information contained within this document. Additional risks and uncertainties not currently known to the Company or that the Company currently deems immaterial may impair the Company's business operations. If any of the following risks actually occur, the Company' business, results of operations and financial condition could be harmed.*

***There is significant doubt regarding our ability to remain a going concern***

There are material uncertainties regarding our ability to continue as a going concern, and such ability will depend upon our ability to: (i) complete the proposed recapitalization transaction contemplated by the Support Agreement and in the FRN Support Agreement, (ii) restructure, refinance or amend terms of our other existing debt obligations; (ii) remain in compliance with our debt covenants to maintain access to the Existing Credit Facility with Wells Fargo; (iii) obtain additional equity and/or debt financing; (iv) achieve revenue growth and improvement of gross margins; and (v) achieve greater operating efficiencies or a reduction of expenses. We reported net losses for the fiscal quarters ending March 31, 2010, June 30, 2010 and September 30, 2010. Our cumulative losses, high level of outstanding indebtedness and ability to comply with related debt covenants, in addition to our current liquidity situation, lead to uncertainty as to our ability to continue as a going concern for a period longer than twelve months from October 1, 2010. Our ability to continue as a going concern depends on, among other factors, a return to profitable operations and a successful restructuring of our obligations related to the Subordinated Notes and Existing Floating Rate Notes. Until the completion of the recapitalization transaction and strategic process, our future remains uncertain, and there can be no assurance that our efforts in this regard will be successful.

***We may seek to implement a plan of arrangement under the Canadian Business Corporations Act or file for protection under the Companies' Creditors Arrangement Act or similar laws of the United States***

In light of recent developments and our liquidity risks, we reviewed strategic and financing alternatives available with assistance from legal and financial advisors. On October 29, 2010, we entered into the Support Agreement with certain holders of the Subordinated Notes and the FRN Support Agreement with certain holders of the Existing Floating Rate Notes. We also continue to be engaged in active discussions with Wells Fargo, the lender under the Existing Credit Facility and on November 4, 2010 we entered into the Fourth Amendment to the Existing Credit Facility. There can be no assurance that we will be able to consummate a restructuring pursuant to the terms of the support agreements or at all. Furthermore, we may be unable to maintain adequate liquidity prior to the restructuring contemplated under such support agreements or otherwise, or we may be unable to attain certain required approvals of additional holders of the Subordinated Notes or holders of the Company's common stock and, as a result, we may be required to seek protection pursuant to a voluntary filing under the Companies' Creditors Arrangement Act of Canada and/or Title 11 of the Bankruptcy Code of the United States.

***If we enter into a plan of arrangement or file for bankruptcy protection, our business and operations will be subject to certain risks***

A bankruptcy filing by or against the Company and certain of our subsidiaries (each referred to as a "filer") would subject our business and operations to various risks, including but not limited to, the following:

- A bankruptcy filing by or against a filer may adversely affect our business prospects and our ability to operate during the reorganization process;
- The coordination of a bankruptcy filing and operating under the protection of a bankruptcy court would involve significant costs, including expenses of legal counsel and other professional advisors. These costs may be significantly higher than those of other companies due to our large size and complex legal structure;
- We may have difficulty continuing to obtain and maintain contracts necessary to continue our operations and at affordable rates with competitive terms;
- We may have difficulty maintaining existing and building new customer and supplier relationships;
- Transactions by filers outside the ordinary course of business would be subject to the prior approval of the court, which may limit our ability to respond to certain events or take advantage of certain opportunities in a timely manner;

- Filers may not be able to obtain court approval or such approval may be delayed with respect to motions made in the reorganization cases;
- We may be unable to retain and motivate key executives and associates through the process of reorganization, and we may have difficulty attracting new employees;
- There can be no assurance as to our ability to maintain or obtain sufficient financing sources for operations or to fund any reorganization plan and meet future obligations;
- There can be no assurance that we will be able to successfully develop, prosecute, confirm and consummate one or more plans of reorganization that are acceptable to the bankruptcy court and our creditors, equity holders and other parties in interest;
- The value of our common stock could be reduced to zero as result of a bankruptcy filing.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Reserved**

**Item 5. Other Information**

None

**Item 6. Exhibits**

The following Exhibits are filed as a part of this report:

| Exhibit Number | Description | Location |
|---|---|---|
| 10.1 | License, Supply, Marketing and Distribution Agreement by and between Angiotech Pharmaceuticals (US), Inc. and Rex Medical, LP, dated as of March 13, 2008. | Filed herewith |
| 10.2 | Amendment dated August 9, 2009 to License, Supply, Marketing and Distribution Agreement by and between Angiotech Pharmaceuticals (US), Inc. and Rex Medical, LP, dated as of March 13, 2008. | Filed herewith |
| 10.3 | Forbearance Agreement, dated as of September 30, 2010, by and among Angiotech Pharmaceuticals, Inc. ("Parent"), the subsidiaries of Parent listed as borrowers on the signature pages thereto, the lenders signatory thereto and Wells Fargo Capital Finance, LLC (f/k/a Wells Fargo Foothill, LLC), as arranger and administrative agent. | Exhibit 10.1, Form 8-K Filed October 4, 2010 |
| 10.4 | Form of U.S. Director Indemnification Agreement. | Exhibit 10.2, Form 8-K Filed October 4, 2010 |
| 10.5 | Form of Canadian Director Indemnification Agreement. | Exhibit 10.3, Form 8-K Filed October 4, 2010 |
| 10.6 | Form of U.S. Executive Indemnification Agreement. | Exhibit 10.4, Form 8-K Filed October 4, 2010 |
| 10.7 | Form of Canadian Executive Indemnification Agreement. | Exhibit 10.5, Form 8-K Filed October 4, 2010 |
| 10.8 | Form of William L. Hunter Indemnification Agreement. | Exhibit 10.6, Form 8-K Filed October 4, 2010 |
| 31.1 | Certification of CEO Pursuant to Securities Exchange Act Rules 13a-14 and 15d-14 as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | Filed herewith |
| 31.2 | Certification of CFO Pursuant to Securities Exchange Act Rules 13a-14 and 15d-14 as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | Filed herewith |
| 32.1 | Certification of CEO and CFO Pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | Filed herewith |
| 99.1 | Earnings ratios update. | Filed herewith |

* portions of this exhibit have been omitted and filed separately with the SEC pursuant to a request for confidential treatment.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Angiotech Pharmaceuticals, Inc.

Date: November 9, 2010

By: /s/ K. Thomas Bailey

**K. Thomas Bailey**

**(Principal Financial Officer and Duly Authorized Officer)**

Exhibit 10.1

# LICENSE, SUPPLY, MARKETING AND DISTRIBUTION AGREEMENT

This License, Supply, Marketing and Distribution Agreement ("Agreement") is entered into as of March 13, 2008 (the "Effective Date") between **Angiotech Pharmaceuticals (US), Inc.**, a company incorporated under the laws of Washington ("Angiotech") and **Rex Medical, LP**, a limited partnership formed under the laws of Pennsylvania ("Rex Medical").

## Recital

**WHEREAS,** Rex Medical has developed a Vena Cava filter product, which it intends to market under the name "Option™";

**AND WHEREAS,** Angiotech manufactures, distributes and sells various medical devices for use in various markets;

**AND WHEREAS,** Rex Medical desires to grant to Angiotech, and Angiotech desires to receive, an exclusive license during the Term (as hereinafter defined) to market and distribute the Product in the Territory;

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby covenant and agree as follows:

## Agreement

1. **Definitions.**

"AAA " shall mean the American Arbitration Association.

"Annual Minimum Sales Requirement" shall have the meaning set out in Section 6H.

"Annual Net Sales" shall mean the total Net Sales achieved by Angiotech during a Term Year.

"Change of Control" means a sale of either party, whether by merger, consolidation or other transaction or series of related transactions in which, in each case, the holders of such party's voting securities outstanding immediately prior to the consummation of the transaction or the series of related transactions own securities with less than a majority of the voting power of such party or a successor immediately after the transaction or such transactions, or a sale of all or substantially all of such party's assets or capital stock, or otherwise.

"Commercially Reasonable Efforts" means, with respect to the research, development, manufacture, clinical study, commercialization, marketing or sale of the Product, as the case may be, efforts and resources commonly used in the medical device industry for products with similar commercial and scientific potential at a similar stage in their lifecycle, taking into consideration their safety and efficacy, their cost to develop, the competitiveness of alternative products, the anticipated or actual nature and extent of their market exclusivity (including Patent Rights coverage and regulatory exclusivity), the likelihood of regulatory approval, and their estimated profitability, including the amounts of marketing and promotional expenditures and all other relevant factors.

"Confidential Information" means all proprietary, confidential and other non-public information, know-how and data (oral, written, graphic, demonstrative, machine recognizable or otherwise) relating to the proprietary technology and/or business of (i) the Disclosing Party, and (ii) a third party who has disclosed such information, know-how and data to the Disclosing Party under obligations of confidentiality, and which in either case is disclosed by the Disclosing Party to the Receiving Party within the context of this Agreement; provided, that, it shall be explicitly understood that Confidential Information includes, without limitations, information specifically related to the Product. "Disclosing Party" means the party disclosing Confidential Information to the other party pursuant to this Agreement and "Receiving Party" means the party receiving Confidential Information from the other party pursuant to this Agreement.

"Contract Manufacturers" shall have the meaning set out in Section 5A.

"Cost of Goods" or "COGS" shall have the meaning set out in Section 5B.

"Cumulative Minimum Sales Requirement" shall have the meaning set out in Section 6H.

"Dispute " shall have the meaning set out in Section 10A.

"Drug-Loaded Product" means a version of the Product that is created when Angiotech applies one or more drug-loading technologies to the Product.

"Field " shall mean the prevention of pulmonary emboli.

"First Sale" shall mean the earlier of: (i) the date the first Product is shipped by Angiotech to a customer (including end users, distributors, affiliates or related entities) that is not deemed a sample; or (ii) the date the first Product is invoiced by Angiotech to a customer (including end users, distributors, affiliates or related entities).

"FDA " means the U.S. Food and Drug Administration, including any successor regulatory federal agency.

"Improvement " means all improvements, variations, updates, modifications, and enhancements made by either party to the Product (other than specifically relating to the Drug-Loaded Product) during the term of the Agreement.

"Licensed Technology" means, in each case for use in the Field, (a) the patents and applications listed on Exhibit A, and other U.S. and international pending patent applications and issued patents, held by or assigned to Rex Medical or its affiliates related to the Product, including any patents issuing from any of the foregoing patent applications and any reissues, re-examinations, confirmations, extensions, renewals, substitutions, continuations, divisions, patent term extensions, and continuation-in-part applications of the foregoing; (b) know-how, techniques, trade secrets, data, information, materials and other intellectual property of any kind necessary or useful for exploitation of the Product; and (c) any and all Improvements made or conceived during the term of this Agreement.

"Loss " shall have the meaning set out in Section 9C.

"Manufacturing Cost" shall have the meaning set out in Section 5B.

"Net Sales" shall have the meaning set out in Section 6E.

"Net Sales Price" shall mean the Net Sales of the Products over a specified period of time, divided by the number of units of such Products sold during that period of time.

"Patent Offices " shall mean the United States Patent and Trademark Office, and the Canadian and European equivalents.

"Product " shall mean the packaged and ready for sale vena cava filter product and delivery system developed by Rex Medical, including any Improvements thereto.

"Quality Agreement" shall have the meaning set out in Section 7B.

"Royalty " and "Royalty Rate" shall have the meaning ascribed to them in Section 6C.

"Specifications" shall mean the Product specifications as set out in Exhibit F.

"Term ", "Initial Term" and "Renewal Term" shall have the meaning ascribed to them in Section 8A.

"Term Year" shall mean, for the first year of the Term, the period of time from First Sale to eighteen (18) months after First Sale, and for each successive year, each consecutive period of twelve (12) months thereafter until the end of the Term.

"Territory " shall mean the entire world.

"Trademarks" shall mean the trademark "Option" and the trade name "Rex Medical".

2. License Grant.

A. Patent License. Rex Medical hereby grants to Angiotech during the Term a sole and exclusive (even as to Rex Medical) fully sub-licensable to affiliates of Angiotech (without consent of Rex Medical) and to third parties (with the consent of Rex Medical, which shall not be unreasonably withheld) license to the Licensed Technology to develop, have developed, manufacture, have manufactured, use, have used, market, have marketed, distribute, have distributed, sell, have sold, offer for sale, export and import the Product in the Field in the Territory. Angiotech hereby grants back to Rex Medical a license to the Licensed Technology to allow Rex Medical to develop, have developed, manufacture, have manufactured and to sell to Angiotech, the Product, all as provided for in this Agreement.

B. Trademark License. Rex Medical hereby further grants to Angiotech an exclusive license (except as set forth herein) to use the Option™ Trademark at Angiotech's reasonable discretion, in accordance with the terms and conditions set forth herein, as well as a non-exclusive license to use the Rex Medical Trademark, in accordance with the terms and conditions set forth herein and other

reasonable trademark usage guidelines provided by Rex Medical from time to time, in association with the Products during the Term of this Agreement. Rex Medical retains the right to use the Option™ trademark on its website and in promotional materials, such as brochures, case studies, white papers, and advertising related to the Product. Rex Medical shall be responsible for registering and maintaining, at Rex Medical's expense, the Trademarks in the U.S., Canada and European Union. In the event that Angiotech determines that it is commercially prudent to register the Option™ Trademark in any other countries in the Territory, Angiotech shall have the right to do so, with Rex Medical listed as the Trademark owner, all at the cost and expense of Angiotech. Rex Medical agrees to use Commercially Reasonable Efforts to assist Angiotech in obtaining any such registration.

3. Commercialization by Angiotech.

A. Commercialization Plan and Progress Reports. All sales and marketing activities for the Product in the Field will be the responsibility of Angiotech. Rex Medical shall provide reasonable input and direction with respect to the following areas including without limitation: pricing structure, promotional strategy, and geographic roll-out strategy. Angiotech shall in its sole discretion decide on the manner in which it executes on any and all activities related to the commercialization of Product. Angiotech agrees that it shall use Commercially Reasonable Efforts to carry out the marketing and commercialization of the Product in the Field throughout the Territory. Angiotech will maintain and support appropriate field sales force levels throughout the Territory (including without limitation maintaining during the Term a minimum of 48 sales persons in the U.S.) and shall hire and train qualified dedicated marketing personnel for the Product. Angiotech shall also provide Commercially Reasonable Efforts with respect to promotional (budgetary and advertising and marketing) support and have a commercially reasonable presence at all major industry trade shows and conferences. Angiotech shall provide Rex Medical with quarterly reports containing units sold, average selling price and applicable royalty rate within thirty (30) days of the end of each calendar quarter during the Term, coinciding with the Royalty payments to be made under Section 6D. The parties agree that Angiotech shall be allowed a period of thirty (30) days from the date of receipt of 510K approval for the sale of the Product to have adequately trained a field sales force of at least 48 sales persons in the U.S., and Angiotech shall not be in breach of this Section should such the number of sales persons decline below the minimum of 48 persons after such date; provided that Angiotech hires and trains replacements such that the minimum number is again satisfied within one hundred eighty (180) days after any such decline, and continues to use its Commercially Reasonable Efforts to market and sell the Product throughout the Term.

B. Marketing Practices. Angiotech shall: (i) conduct its business in a manner that reflects favorably at all times on the Product and the good name, goodwill, and reputation of Rex Medical; (ii) avoid deceptive, misleading, or unethical practices that are or might be detrimental to, the Product, or the public, including, but not limited to, disparagement of Rex Medical or the Product or the Trademarks; (iii) make no false or misleading representation with respect to the Product; and (iv) not publish or use any misleading or deceptive advertising material.

C. Expenses of Angiotech. Angiotech will assume and pay all costs incurred in marketing and commercializing the Product unless otherwise specifically provided for herein.

D. Trademark Display. Angiotech will highlight the Trademarks on all packaging and promotional material (including brochures, website content, case studies, white papers, articles, and print and other advertising), and in so doing, will provide reasonably acceptable attribution to Rex Medical on the packaging as the owner of the Trademarks. Angiotech shall provide to Rex Medical a mock-up of the Product packaging depicting Angiotech's proposed use of the Trademarks within sixty (60) days of the Effective Date for approval by Rex Medical, which approval shall not be unreasonably withheld, conditioned or delayed. Angiotech shall not alter, modify or obscure the Trademarks, except with the consent of Rex Medical.

4. Drug-Loaded Product Development

A. Cost. Both Parties hereby acknowledge and agree that Angiotech will be responsible for all regulatory, development and commercialization costs associated with the Drug-Loaded Product and that decisions concerning development and/or commercialization of such Product will be at the reasonable discretion of Angiotech, subject to the reasonable input and consent of Rex Medical on material decisions relating to market acceptance, market impact, product features and feasibility, regulatory and intellectual property issues and other issues reasonably likely to affect the market for and distribution of the Product, which consent shall not be unreasonably withheld, conditioned or delayed. Both Parties further acknowledge and agree that ownership of an improvement, which results in the creation of, and solely relates to, a Drug-Loaded Product, shall be owned solely by Angiotech.

5. Terms of Product Manufacture and Supply

A. Manufacture of Product. Rex Medical, through its contract manufacturers, including those listed in Exhibit C ("Contract Manufacturers"), shall be responsible for the manufacture of the Products for all of Angiotech's needs pursuant to the terms of this Agreement. In the event that all or a part of the manufacture of the Product is transferred during the Term to Angiotech or its affiliate, the parties agree to review and negotiate, acting reasonably and in good faith, any modifications that may be necessary or appropriate based on the resultant changes in relative roles and responsibilities of the parties.

B. Prices. The cost of the Product to Angiotech ("COGS") shall initially be the sum of the prices of the Product components to be manufactured by the Contract Manufacturers (the "Manufacturing Cost"), plus all packaging and shipping costs to the extent not included. The parties intend that any reduction in COGS that are attributable to improvements to the manufacturing process shall be to the account of Rex Medical and any reductions that are attributable to sales volume are to be for the account of Angiotech. The Manufacturing Cost and COGS for the Product for the 3,000 unit pilot build is estimated to be approximately $286 per unit. The COGS after the initial order shall reflect any increase or decrease in the Manufacturing Cost, except as set forth below. The price of the second order of 5,000 units is expected to be approximately $270 per unit. The parties acknowledge and agree that Rex Medical has been using its Commercially Reasonable Efforts, and will continue after execution of this Agreement, to dedicate resources to identify and develop bona fide cost reduction initiatives to reduce the Manufacturing Cost. With respect to any such initiatives of Rex Medical's that are ultimately incorporated into the commercial manufacturing process for the Product, Rex Medical shall receive all of the cost savings from the first order of Product after the initial 3,000 unit and 5,000 unit orders, based on an assumed COGS of $270 per unit. For example, assume that the Manufacturing Cost is $260 per unit on an order of 10,000 units which is made after the initial orders of 3,000 and 5,000 units. In this case, the COGS to Angiotech shall be $270 per unit for such order, plus all packaging and shipping costs to the extent not included, and Rex Medical shall retain the $10 per unit cost savings. Thereafter, any further cost savings will reduce Angiotech's COGS in the amount of the cost reduction, except for cost reductions associated with the delivery system sheath that are related to manufacturing process improvements, which shall remain for Rex Medical's benefit. For example, if the Manufacturing Cost of the next order of 10,000 units after the preceding order of 10,000 units is $250 per unit, and such reduction is not associated with the delivery system sheath, then Angiotech's COGS on such order is $260 per unit, plus all packaging and shipping costs to the extent not included. In the event that the Manufacturing Cost increases as a result of increases in material costs or labor costs from Rex Medical's Contract Manufacturers, the COGS to Angiotech will be the full amount of the revised Manufacturing Cost, plus all packaging and shipping costs to the extent not included. Rex Medical shall notify Angiotech in writing within 5 days when Rex Medical implements any manufacturing improvement with its Contract Manufacturers. Rex Medical shall report to Angiotech on a quarterly basis the Manufacturing Cost, including any decrease in Manufacturing Cost as a result of implemented process improvements or increased sales volumes.

C. Order Procedures; Acceptance. Angiotech shall provide Rex Medical with quarterly rolling forecasts of its projected demand for Product from and after First Sale. Angiotech shall order Product from Rex Medical by submitting a written binding purchase order identifying the number, requested delivery date(s) and any export/import information required to enable Rex Medical to fill the order. Upon receipt of an order, Rex Medical shall promptly advise Angiotech of lead time required for the manufacture and delivery of such order in its entirety. Once such delivery date is identified and agreed to by the parties, Rex Medical shall use Commercially Reasonable Efforts to fully comply therewith, subject to applicable limitations set forth in agreements with the Contract Manufacturers. For the avoidance of doubt, subject to the other terms of this Agreement, Angiotech shall be obligated to pay for all Product delivered that is the subject of a purchase order that is accepted by Rex Medical, and such purchase order is binding and cannot be cancelled or modified by Angiotech without Rex Medical's express written consent, to be given or withheld in Rex Medical's absolute discretion Rex Medical will notify Angiotech promptly if it becomes aware that delivery times cannot be met and advise Angiotech of its contract manufacturer's anticipated production and shipping schedules. All orders shall be governed by this Agreement, and in the event of a conflict between this Agreement and a term or provision of any purchase order issued by Angiotech or invoice issued by Rex Medical, this Agreement shall govern.

D. Shipment and Delivery. Product will be shipped F.O.B. from a Contract Manufacturer's processing facility or sterilizing facility to any location specified by Angiotech. Delivered orders shall be accompanied by an invoice (or such invoice shall be sent contemporaneously by Rex Medical) which will clearly indicate the Manufacturing Cost, the COGS to Angiotech and the total amount due. Acceptance of delivery of any Product by Angiotech shall not constitute a waiver of any of the express warranties stated in this Agreement or, except as otherwise set forth herein, any rights or remedies provided by law.

E. Inability to Fulfill Supply Obligations. During the Term, if Rex Medical (either itself or through its Contract Manufacturers) is unable to provide Angiotech with all of its Product requirements, based on and reasonably consistent with the forecasts as set forth above, then Rex Medical shall promptly provide written notice to Angiotech of such occurrence. In the event that the inability to supply such reasonable Product requirements continues for a period of three (3) months after such notice, Angiotech shall have the right in its sole discretion to engage a back-up supplier to manufacture and supply Product to Angiotech, subject to the following: Rex Medical shall use Commercially Reasonable Efforts to assist Angiotech with transferring Product manufacturing to Angiotech or a back-up supplier, as applicable; provided, however, Angiotech acknowledges and agrees that Rex Medical may not have the contractual rights to transfer manufacturing from one or more of its Contract Manufacturers at such time, and that Angiotech will be responsible for any and all costs and expenses related thereto, including without limitation any transfer fees. The applicable Annual Minimum Sales Requirement(s) and Cumulative Minimum Sales Requirements shall also be prorated to account for any period of time that Angiotech is unable to obtain adequate supply of Product which is reasonably consistent with rolling forecasts at a commercially viable price from Rex Medical.

F. Technical Support and Training. Rex Medical shall, as reasonably requested by Angiotech, render advice in connection with familiarizing Angiotech in the Specifications, characteristics and use of the Product. In the event Angiotech requests any Improvement to the Product that Angiotech acting reasonably has determined will enhance the safety and or marketability of the Product, Rex Medical agrees to discuss the commercial viability of the Improvement in good faith with Angiotech and the appropriate contract manufacturer, and if Rex Medical then determines that such Improvement is commercially viable, it agrees to use its Commercially Reasonable Efforts to work with Angiotech and the appropriate Contract Manufacturers to develop any such Improvement to the Product.

6. License Fees; Milestone Payments; Royalties

A. Initial Up-Front License Fee. Upon the execution of this Agreement by both parties, Angiotech shall pay to Rex Medical by wire transfer to Rex Medical's bank account an initial non-refundable and non-creditable up-front license fee of Two Million Five Hundred Thousand US Dollars (US$2,500,000).

B. Milestone Payments. Angiotech shall pay to Rex Medical the following one time non-refundable and non-creditable milestone payments:

(i) Two Million Five Hundred Thousand US Dollars (US$2,500,000) by wire transfer or bank check within five (5) days after Rex Medical notifies Angiotech of its receipt of 510K approval for sale of the Product;

(ii) Five Hundred Thousand US Dollars (US$500,000) within thirty (30) days of the end of the calendar quarter after which Angiotech first achieves more than Two Million Five Hundred Thousand US Dollars (US$2,500,000) in Annual Net Sales;

(iii) One Million US Dollars (US$ 1,000,000) within thirty (30) days of the end of the calendar quarter after which Angiotech first achieves more than Five Million US Dollars (US$5,000,000) in Annual Net Sales;

(iv) One Million Five Hundred Thousand US Dollars (US$1,500,000) within thirty (30) days of the end of the calendar quarter after which Angiotech first achieves more than Fifteen Million US Dollars (US$15,000,000) in Annual Net Sales; and,

(v) Two Million US Dollars (US$2,000,000) within thirty (30) days of the end of the calendar quarter after which Angiotech first achieves more than Twenty Million US Dollars (US$20,000,000) in Annual Net Sales.

For the avoidance of doubt, more than 1 of the foregoing milestone payments may be earned in the same calendar quarter, and in such event all milestone payments that are earned in such quarter shall be paid as set forth above.

C. Royalties. Upon First Sale, Angiotech shall pay to Rex Medical a royalty on the Annual Net Sales of Product in each Term Year in the Territory (the "Royalty") in accordance with the following table:

| Annual Net Sales (US$) | "ROYALTY RATE" |
|---|---|
| From $0 to $10M | 30% |
| From $10M to $20M | 35% |
| From $20M to $30M | 40% |
| Greater than $30M | 47.5% |

For the avoidance of doubt, each Term Year the Royalty Rate shall reset to the lowest tier and increase based on the Net Sales achieved for that Term Year only. Further, should Angiotech develop and receive regulatory approval for a Drug-Loaded Product, the above Royalty schedule and milestone payments shall apply to all combined revenue derived from Product Sales and Drug-Loaded Product sales for the periods indicated.

D. Payment. Royalty payments shall be due and payable on a quarterly basis at the conclusion of each calendar quarter (March 31st, June 30th, September 30th, and December 31st) during the Term. Payments will be made to Rex Medical not later than thirty (30) days after the close of the applicable calendar quarter together with a report setting forth the amount of Product sold during such quarter.

E. Net Sales. The term "Net Sales" shall mean the sum, over a specified period of time, of: (i) actual gross sales of Product to end user customers (i.e., the providers of medical procedures using the Product such as hospitals, surgical centers, medical groups, physicians, clinics, etc.) by Angiotech, its parent, affiliate and subsidiary entities, employees, subcontractors, resellers or agents in the Territory, minus (ii) reasonable and customary actual trade or volume discounts, credits or rebates, refunds, freight charges and taxes (collectively referred to as "rebates and charges"); provided, however that the parties acknowledge and agree that, in the event that the Product has been packaged in combination with other product of Angiotech or its parent, affiliate or subsidiary entities, the rebates and charges shall be allocated by and among all of the combined Product and that only the rebates and charges that are reasonably allocable to the Product shall constitute rebates and charges to be netted against the actual gross sales. Finally, if Product has been packaged in combination with other Product of Angiotech or its parent, affiliate or subsidiary entities and the sales price of Product are not separately identified, the Net Sales shall be calculated using a fair allocation of the value of the Product

portion of the combination product less applicable rebates and charges as set forth above. In the event of a dispute between the parties as to the appropriate allocation of rebates and charges and/or the allocation of the value of the Product, the matter will be resolved by the parties' respective Chief Financial Officers, acting reasonably.

F. When a "Sale" Occurs. Product shall be deemed to have been "sold" on the earlier of (i) the date Product is shipped by Angiotech to the applicable customer (including end users, distributors, affiliates or related entities); or (ii) the date an invoice for Product is sent by Angiotech to the applicable customer (including end users, distributors, affiliates or related entities).

G. Sales Taxes; Governmental Regulations. Angiotech shall be solely responsible for any sales taxes, duties, fees or other charges imposed by any governmental authority, domestic or foreign, in connection with the purchase, sale or other disposition by Angiotech of the Product, excluding those based on income of Rex Medical. Angiotech shall be required to comply with any and all governmental laws, regulations and orders which may be applicable to Angiotech by reason of its execution and performance of this Agreement, including all laws, regulations or orders which govern or affect the ordering, shipment, import, sale, delivery or redelivery, or export or re-export of the Product.

H. Annual Minimum Sales Requirement. Angiotech agrees to sell during each Term Year the minimum number of units of Product specified for each such year on **Exhibit B** (such minimum for each Term Year, the "Annual Minimum Sales Requirement") or the Cumulative Minimum Sales Requirement (also provided for in **Exhibit B**). Angiotech and Rex Medical each agree to begin to negotiate in good faith to agree upon the Annual Minimum Sales Requirement for each year during the Renewal Term not less than three (3) months prior to the expiration of the Initial Term; provided that the Annual Minimum Sales Requirement that Angiotech will be required to sell during the Renewal Term shall not be more than twenty percent (20%) higher than the Annual Minimum Sales Requirement for the last year of the Initial Term and the Annual Minimum Sales Requirement shall not thereafter increase year-over-year by greater than twenty percent (20%).

I. Failure to Meet Minimum Sales Requirement. Subject to section 6E, in the event that (i) during any Term Year Angiotech has failed to sell the Annual Minimum Sales Requirements and, (ii) as of the last day of such Term Year, Angiotech has failed to sell the Cumulative Minimum Sales Requirements, then the Agreement will automatically terminate ninety (90) days after Rex Medical gives Angiotech written notice of termination pursuant to the section unless, within sixty (60) days following the date of such notice, Angiotech pays Rex Medical an amount equal to the product of the following (the "Cure"):

i. the difference between the Annual Minimum Sales Requirement as of the last day of the applicable Term Year and the aggregate number of Product sold by Angiotech during the Term Year; multiplied by,

ii. the average Net Sale price for the Product sold during the applicable Term Year; multiplied by,

iii. the applicable Royalty Rate.

In the event that Angiotech makes the payment provided for in Section 6I for any Term Year, then thereafter the Cumulative Minimum Sales Requirement shall be calculated as if Angiotech had sold the Annual Minimum Sales Requirement for such Term Year and Angiotech shall have been deemed to fulfill the Annual Minimums for that Term Year.

J. Sole Remedy. Rex Medical acknowledges and agrees that its right of termination contained in Section 8B hereof (subject to Angiotech's right to cure thereunder) is Rex Medical's sole remedy for Angiotech's failure to meet the Annual Minimum Sales Requirement and the Cumulative Minimum Sales Requirement, and Rex Medical shall not be entitled to payment of any Royalties based solely upon the Annual Minimum Sales Requirement or Cumulative Minimum Sales Requirement after or in the event of termination of the Term, for any reason (other than any unpaid Royalties on Net Sales which shall remain due and payable). Rex Medical shall continue to be entitled to the applicable Royalties due under this Agreement pursuant to any sales of the Product after the Expiration or Termination of this Agreement.

K. Rex Medical Audit Rights. Angiotech shall keep accurate records of all of its operations, and shall cause its affiliates to keep accurate records of all of their respective operations within the scope of this Agreement, for at least three (3) years following each payment period (as described in Section 6D). Rex Medical shall, at its expense, have the right to have a certified public accountant inspect such records once per calendar year, upon two (2) weeks prior written notice by Rex Medical, solely for the purpose of verifying the calculation and payment of the Royalties due hereunder, at the offices of Angiotech and its affiliates, as applicable, no later than three (3) years after the end of the calendar quarter to which such records pertain; provided, however, that such time limitation shall not apply if Rex Medical subsequently becomes aware of information which gives it a reasonable basis to call for an audit of an earlier period. The certified public accountant shall agree in writing with Angiotech to be bound by reasonable confidentiality provisions with respect to such information prior to receiving access to such information. In the event the examination shows an underpayment for any calendar quarter, Angiotech shall pay to Rex Medical the amounts underpaid within ten (10) days of receipt of the results of the audit. Where the amount of any underpayment is more than five percent (5%) for any calendar quarter, Angiotech shall also reimburse Rex Medical for the actual out-of-pocket costs incurred by Rex Medical to conduct such examination, plus interest at the published prime rate of interest in the United States, from the initial date the underpayment was due until the date that is ten (days) after the audit, and thereafter at the rate set forth in Section 19 hereof, and in such instance Rex Medical shall have the right in its sole discretion to request an additional audit at any time during that calendar year, upon two (2) weeks prior written notice as set forth above.

L. Angiotech Audit Rights. Rex Medical shall keep accurate records of all of its operations, and shall cause its affiliates to keep accurate records of all of their respective operations within the scope of this Agreement, for at least three (3) years following the payment of each Product invoice by Angiotech (as described in Article 5). Angiotech shall, at its expense, have the right to have a certified public accountant inspect such records once per calendar year, upon two (2) weeks prior written notice by Angiotech, solely for the purpose of verifying the Manufacturing Cost and the accuracy of the COGS charged to Angiotech, at the offices of Rex Medical and its affiliates, as applicable, no later than three (3) years after the payment of the invoice to which such records pertain; provided, however, that such time limitation shall not apply if Angiotech subsequently becomes aware of information which gives it a reasonable basis to call for an audit of an earlier period. The certified public accountant shall agree in writing with Rex Medical and/or one or more of the Contract Manufacturers, as the case may be, to be bound by reasonable confidentiality provisions with respect to such information prior to receiving access to such information. In the event the examination shows an overcharge on any invoice, Rex Medical shall pay to Angiotech, in cash or credit at the discretion of Angiotech, the amounts overpaid within ten (10) days of receipt of the results of the audit. Where the amount of any overpayment is more than five percent (5%) for any calendar quarter, Rex Medical shall also reimburse Angiotech for the actual out-of-pocket costs incurred by Angiotech to conduct such examination, plus interest at the published prime rate of interest in the United States, over the relevant period from the initial date the overpayment was made until the date that is ten (10) days after the audit, and thereafter at the rate set forth in Section 19 hereof, and in such instance Angiotech shall have the right in its sole discretion to request an additional audit at any time during that calendar year, upon two (2) weeks prior written notice as set forth above.

7. Regulatory Matters

A. Regulatory. Rex Medical will develop all regulatory files and clinical trial protocols for the Product in the Field and, except as otherwise specifically set forth in this Agreement, Rex Medical shall be responsible for the completion and execution of all regulatory filings associated with obtaining FDA approval in the United States and the CE mark in the countries of the European Union. All costs associated with the aforementioned activities shall be the responsibility of Rex Medical. Rex Medical will be designated as the sponsor of any 510(k), Investigational Device Exemption and Premarket Approval Application for the Product, as applicable. Angiotech shall be responsible for, and shall be the registered owner of, all regulatory filings associated with obtaining FDA approval in the United States, CE mark in the countries of the European Union and comparable filings for regulatory approval in countries in the rest of the world with respect to obtaining the applicable regulatory approvals for the Drug-Loaded Product. Angiotech also agrees that it will use Commercially Reasonable Efforts to fund and manage the necessary clinical trials and any other filings for the Product required by other countries outside of the U.S. or Europe where Angiotech believes it is commercially profitable to do so, all with the reasonable assistance and cooperation of Rex Medical. All costs associated with the aforementioned Angiotech activities shall be the responsibility of Angiotech and all such regulatory approvals shall be filed in Angiotech's name, when relating to the Drug-Loaded Product, and Rex Medical's name, when relating to the Product.

B. Quality. Rex Medical shall use Commercially Reasonable Efforts to ensure that its Contract Manufacturers' commercial Product manufacturing processes comply with existing governmental regulations and standards in the United States and the European Union. Rex Medical shall use Commercially Reasonable Efforts to ensure that any contract manufacturer maintains at its factory a quality control inspection program to help assure that each lot of Product meets the Specifications and that the Products are manufactured according to Good Manufacturing Practices. Upon reasonable prior notice, Rex Medical shall use Commercially Reasonable Efforts to facilitate with the Contract Manufacturers to permit authorized employees and agents of Angiotech to enter the Contract Manufacturers' facilities during normal business hours for the purpose of inspecting Product in various stages of manufacture and to conduct device Good Manufacturing Practices or I.S.O. audits; provided, however, that Angiotech recognizes and agrees that any such contract manufacturer may require that Angiotech and its employees or agents execute a confidentiality agreement satisfactory to such contract manufacturer prior to entering any facility, that some facilities or areas within facilities may nonetheless be off limits or may only be visited by independent third parties acceptable to the Contract Manufacturers, and that these determinations are outside of Rex Medical's control. Rex Medical shall also provide to regulatory authorities information and documentation in its possession that is reasonably requested by such authorities related to Angiotech's pursuit or maintenance of regulatory approvals for the Product and shall use its Commercially Reasonable Efforts to have the contract manufacturer provide any such information in its possession. Angiotech shall also provide to regulatory authorities information and documentation reasonably requested by such authorities that may be in its possession or within its access related to Rex Medical's pursuit or maintenance of regulatory approvals for the Product. Any material modifications to the Specifications shall require the written consent of both parties, which consent from Angiotech shall not be unreasonably withheld, conditioned or delayed.

Angiotech shall use Commercially Reasonable Efforts to ensure that its commercial Drug-Loaded Product manufacturing processes comply with existing governmental regulations and standards in the United States and the European Union. Angiotech shall use Commercially Reasonable Efforts to ensure that it maintains at its factory a quality control inspection program to help assure that each lot of Drug-Loaded Product meets the Specifications and that the Drug-Loaded Products are manufactured according to Good Manufacturing Practices. Angiotech shall also provide to regulatory authorities information and documentation in its possession that is reasonably requested by such authorities related to Angiotech's pursuit or maintenance of regulatory approvals for the Drug-Loaded Product.

C. Governmental Inspection. Rex Medical agrees to promptly notify Angiotech of any inspection by a governmental or regulatory representative that it becomes aware of, including but not limited to those from the FDA, that pertains to the Product or any component thereof. In such event, Rex Medical shall promptly provide Angiotech with a written report, summarizing the purpose, concerns if any, and outcome of any such inspection and shall permit Angiotech to review and copy, upon reasonable prior notice, any correspondence, reports, or other communications between Rex Medical and any governmental agency concerning or affecting said Product or component.

Angiotech agrees to promptly notify Rex Medical of any inspection by a governmental or regulatory representative that it becomes aware of, including but not limited to those from the FDA, that could have a material adverse effect on the sales or manufacturing of the Drug-Loaded Product or any component thereof. In such event, Angiotech shall promptly provide Rex Medical with a written report, summarizing the purpose, concerns if any, and outcome of any such inspection and shall permit Rex Medical to review and copy, upon reasonable prior notice, any correspondence, reports, or other communications between Angiotech and any governmental agency that could have a material adverse effect on the sales or manufacturing of the Drug-Loaded Product or any component thereof.

D. Product Recall.

(a) Coordination of Product Recall. In the event of a recall, stock recovery, withdrawal, or field correction with respect to, or if there is any governmental seizure of, any Product, the party receiving such knowledge shall promptly notify the other in writing of the details regarding such action, including, without limitation, providing copies of all relevant documentation.

(b) Costs and Expenses of Product or Drug-Loaded Product Recall.

(x) In the event of a Product recall, stock recovery, withdrawal or field correction with respect to, or if there is any governmental seizure of, any Product supplied hereunder, to the extent that it is due to: (i) the failure of Rex Medical to comply with any applicable law, rule, regulation, standard, court order, or decree; (ii) changes or additions to the Product or its packaging that were made by Rex Medical without the knowledge and consent of Angiotech; (iii) an inherent defect in the design of the Product or the failure of the Product to conform to the Specifications or other requirement set forth in this Agreement, except to the extent any such defect or failure is caused by or relates to the Drug-Loaded Product; or (iv) the negligent or intentional wrongful act or omission of Rex Medical in connection with performance hereunder, except to the extent that such recall, stock recovery, withdrawal or field correction is caused by or results from one of Angiotech's actions set forth below, Rex Medical shall bear all costs and expenses of the seizure, recall, stock recovery, withdrawal, or field correction.

(y) In the event of a Product or Drug-Loaded Product recall, stock recovery, withdrawal, or field correction with respect to, or if there is any governmental seizure of, any Product supplied hereunder, to the extent that it is due to: (i) Angiotech's marketing, selling or promotion of the Product or Drug-Loaded Product, including selling Product or Drug-Loaded Product beyond its shelf life or storing Product or Drug-Loaded Product other than in accordance with its Specifications; (ii) changes or additions to the Product or its packaging that were made by Angiotech without the knowledge and consent of Rex Medical; (iii) an inherent defect in the design of the Drug-Loaded Product or the failure of the Drug-Loaded Product to conform to the Specifications or other requirement set forth in this Agreement, except to the extent any such defect or failure relates to the Product; (iv) the failure of Angiotech to comply with any applicable law, rule, regulation, standard, court order, or decree; or (v) the negligent or intentional wrongful act or omission of Angiotech in connection with performance hereunder, shall be undertaken by Angiotech at its cost and expense.

(z) In the event of a Product recall that is determined to be attributed to a breach by Rex Medical as set forth above, Angiotech shall not be obligated to meet the Annual Minimum Sales Requirements for that Term Year, and the parties agree to negotiate in good faith, acting reasonable, a mutually agreeable revised Annual Minimum Sales Requirements schedule for the remainder of such Term Year, if applicable, and revised Annual Minimum Sales Requirements and Cumulative Annual Minimum Sales Requirements for any subsequent Term Year. If no such agreement can be made after following the dispute resolution procedures set forth in Section 10A only, then Angiotech shall have the right to terminate the Agreement upon thirty (30) days prior written notice.

E. Serious Adverse Event Reporting. In the event that a serious adverse event is reported with respect to the Product in the Territory, the party receiving the report shall provide the other with a copy of any such reports within five (5) business days of receipt. The party holding the regulatory approval in the countries in which the serious adverse event needs to be reported shall report such incident promptly and in a manner that is generally acceptable in the industry and shall, within five (5) business days of any communication with the applicable regulatory body(s), provide the other party with copies of any such communications concerning the safety and efficacy of the Product. Once a serious adverse event has been reported and notice has been given to the other party, the parties agree to work together to formulate a plan as to how to deal with such event. Both parties acknowledge and agree that any delay in resolving such issues could result in significant harm and therefore both parties agree to deal with any such incidents promptly and in a manner that is generally acceptable in the industry. The cost of any action made necessary by the finding of a serious adverse event shall be attributed between the parties as provided for in Section 7(D).

F. Product Liability Insurance. Both Parties shall obtain and keep in force during the Term of this Agreement and for one (1) year after termination, the following insurance policies, with an insurance carrier with an A.M. Best rating of not less than A-:

(a) Comprehensive General Liability in an amount not less than $3,000,000 each occurrence for bodily injury and property damage for (including coverage under umbrella liability policies):

(i) premises-operations;

(ii) Product/completed operations;

(iii) blanket contractual liability; and

(iv) personal injury.

(b) Workers' Compensation, Occupational Disease And Disability in accordance with applicable statutory requirements.

(c) Employer's Liability in an amount of not less than $1,000,000.

8. Term and Termination

A. Term. This Agreement shall commence on the Effective Date and, unless earlier terminated as provided for herein, shall continue in effect for sixty six (66) months from the date of First Sale (the "Initial Term"). Upon expiration of the Initial Term, this Agreement may be extended by mutual agreement of the parties for additional one (1) year terms (the "Renewal Term") with Annual Minimums to be mutually agreed upon. The Initial Term and the Renewal Term will be collectively referred to as the "Term".

B. Termination for Breach and Insolvency.

(x) Rex Medical shall have the right to terminate the Agreement upon ninety (90) days prior written notice if any of the following occurs:

(i) Angiotech materially breaches its obligations, representations or warranties under this Agreement, including without limitation failure to demonstrate Commercially Reasonable Efforts in the promotion and distribution of Product in the Territory and failure to pay milestone payments and Royalties when due;

(ii) Angiotech fails to sell the Annual Minimum Sales Requirements and the Cumulative Minimum Sales Requirements in any year and fails to satisfy the Cure, all as provided for in Section 6I; or,

(iii) Angiotech is or becomes bankrupt or insolvent, enters into an arrangement, readjustment of debt, general assignment for the benefit of creditors, dissolution or liquidation proceeding, or enters into a transaction that would result in a Change of Control.

(y) Angiotech shall have the right to terminate this Agreement upon ninety (90) days prior written notice under the following:

(i) Rex Medical materially breaches its obligations, representation or warranties under this Agreement;

(ii) The Product ceases to have valid and enforceable patent protection in the United States; or,

(iii) Rex Medical is or becomes bankrupt or insolvent, enters into an arrangement, readjustment of debt, general assignment for the benefit of creditors, dissolution or liquidation proceeding, or enters into a transaction that would result in a Change of Control.

C. Termination by Agreement. The parties may also terminate this Agreement at any time by mutually agreeing in writing to do so.

D. Effects of Termination. Upon termination or expiration of this Agreement, other than as a result of Angiotech's material breach of its obligations under this Agreement or failure to sell the minimum annual units in any year and fails to satisfy the Cure, Angiotech will continue to distribute the Product worldwide, and Rex Medical will continue to manufacture the Product, on an exclusive basis for a period of 180 days post termination; provided, however, that any orders from Angiotech immediately prior to and after the expiration of the Agreement shall be made in accordance with the procedures set forth in Section 5C and be reasonably consistent with the immediately preceding forecast and sales volumes for the prior quarter. At the end of this 180 day period, Angiotech will have the right to sell only any Product remaining in its inventory. Notwithstanding anything to the contrary in this Agreement, upon termination or expiration of this Agreement all licenses granted by Rex Medical to Angiotech hereunder, express or implied, automatically terminate except to the extent necessary for Angiotech to sell Product after termination as permitted by this Section 8D.

9. Representations and Warranties; Indemnification.

A. Representations and Warranties of Each Party. Each party represents and warrants that:

(i) this Agreement has been duly executed and delivered by such party and constitutes a valid and binding obligation of such party, enforceable against such party in accordance with its terms, except as enforceability may be limited by bankruptcy, fraudulent conveyance, insolvency, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and by general equitable principles;

(ii) as of the Effective Date, the execution, delivery and performance of this Agreement have been duly authorized by all necessary action on the part of such party, its officers and directors and does not conflict with any agreement, instrument or understanding, oral or written, to which such party is a party or by which it may be bound, and, to the best of its knowledge, does not violate any material law or regulation of any court, governmental body or administrative or other agency having authority over it;

(iii) such party has full power and authority to perform the obligations set forth herein;

(iv) such party is not subject to any order, decree or injunction by a court of competent jurisdiction which may prevent or materially delay the consummation of the transactions contemplated by this Agreement; and

(v) such party is duly organized, validly existing and in good standing under the laws of the jurisdiction where it is organized.

B. Representations, Warranties and Covenants of Rex Medical. Rex Medical represents, warrants and covenants to Angiotech that Product manufactured, assembled, sterilized and packaged by the Contract Manufacturers' under this Agreement shall:

(i) not be adulterated or misbranded within the meaning of the United States Food, Drug, and Cosmetic Act, as amended, and the regulations issued thereunder, or within the meaning of any state or local law, the adulteration and misbranding provisions of which are similar to such act;

(ii) not be misused, contaminated, damaged, tampered with or otherwise altered, mishandled, or subjected to negligence while in the custody and control of Rex Medical or its Contract Manufacturers;

(iii) be manufactured in accordance with Good Manufacturing Practices, be free from defects in material and workmanship and conform to the Specifications at the time of shipment to Angiotech; and,

(iv) be free and clear from any security interest or any other lien or encumbrance.

Rex Medical further represents and warrants that: (a) it is the sole owner of the Licensed Technology; (b) the Product is the subject of freedom to operate (right to use) opinions and Rex Medical has provided Angiotech with a list of patents referenced in such opinions; (c) no royalties are due to others by reason of the sale of the Product; (d) the clinical studies done on the Product prior to the date hereof were conducted in good faith and not in contravention of any applicable laws, rules, regulations or guidelines concerning the performance of such studies and the interpretation of data collected; and, (e) it will comply with the terms of the agreements that it has with its Contract Manufacturers, including without limitation, the obligation to pay the Contract Manufacturers for Product and components manufactured by them for shipment to Angiotech, except to the extent any such Contract Manufacturers have breached their obligations to Rex Medical.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, REX MEDICAL SHALL NOT BE LIABLE FOR MISBRANDING WITH RESPECT TO ANY PRODUCT LABELING OR PACKAGE INSERT TEXT PROVIDED OR USED BY ANGIOTECH OR ITS AFFILIATES OR SUBDISTRIBUTORS, NOR WITH RESPECT TO ANY FAILURE TO MEET PRODUCT SPECIFICATIONS, ADULTERATION OR MISBRANDING, OR ANY FAILURE TO MANUFACTURE IN ACCORDANCE WITH GMPS, IF AND TO THE EXTENT RELATED TO THE HANDLING, PACKAGING OR OTHER ACT OR OMISSION OF ANGIOTECH OR ITS AFFILIATES OR SUBDISTRIBUTORS. REX MEDICAL MAKES NO REPRESENTATIONS OR WARRANTIES, AND SHALL HAVE NO LIABILITY, RELATING TO INFRINGEMENT, PRODUCT LIABILITY, WARRANTY OR OTHERWISE, TO THE EXTENT THAT ANY LIABILITY ARISES FROM THE DESIGN OF THE DRUG-LOADED PRODUCT, OR FROM ANY CHANGES TO THE DESIGN OF THE PRODUCT OR ITS PACKAGING THAT WERE MADE BY OR AT THE DIRECTION OF ANGIOTECH WITHOUT THE KNOWLEDGE AND CONSENT OF REX MEDICAL. REX MEDICAL MAKES NO REPRESENTATIONS OR WARRANTIES, AND SHALL HAVE NO LIABILITY, FOR ANY CLAIMS THAT THE PRODUCT INFRINGES ANY THIRD PARTY INTELLECTUAL PROPERTY TO THE EXTENT THAT ANY SUCH CLAIMS ARISE FROM ANY CHANGES TO THE DESIGN OF THE PRODUCT OR ITS PACKAGING THAT WERE MADE BY OR AT THE DIRECTION OF ANGIOTECH, WITH OR WITHOUT THE KNOWLEDGE AND CONSENT OF REX MEDICAL. REX MEDICAL'S WARRANTY SHALL NOT APPLY TO OR COVER ANY DEFECT OR NON-CONFORMANCE IN ANY PRODUCT THAT RESULTS DIRECTLY OR INDIRECTLY FROM SUCH PRODUCT HAVING NOT BEEN STORED ACCORDING TO THE SPECIFICATIONS AFTER BEING SHIPPED BY REX MEDICAL OR

ITS CONTRACT MANUFACTURERS OR FROM ITS PACKAGING, FURTHER MANUFACTURING, CARTONING OR HANDLING BY ANYONE OTHER THAN REX MEDICAL OR ITS CONTRACT MANUFACTURERS, OR ANY ADULTERATION OCCURRING AFTER THE PRODUCT IS SHIPPED BY REX MEDICAL OR ITS CONTRACT MANUFACTURERS. REX MEDICAL'S WARRANTIES SET FORTH IN THIS SECTION 9B ARE ITS EXCLUSIVE WARRANTIES TO ANGIOTECH WITH RESPECT TO THE PRODUCT, AND ARE GIVEN AND ACCEPTED IN LIEU OF ANY AND ALL OTHER WARRANTIES, GUARANTEES, CONDITIONS AND REPRESENTATIONS, EXPRESS OR IMPLIED, CONCERNING THE PRODUCT, OR ANY PATENT OR PROPRIETARY RIGHTS RELATING THERETO, AND INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ANGIOTECH SHALL NOT BE ENTITLED TO INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, LOSS OF USE, OR LOSS OF GOODWILL AS A RESULT OF ANY BREACH OF WARRANTY EXCEPT TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILFULL MISCONDUCT OF REX MEDICAL, AS PROVEN BY CLEAR AND CONVINCING EVIDENCE.

C. Representations, Warranties and Covenants of Angiotech. Angiotech represents, warrants and covenants to Rex Medical that neither it nor any of its affiliates shall, during the Term, market or sell any product that is competitive with the Product or the Drug-Loaded Product. Angiotech further represents, warrants and covenants to Rex Medical that Drug-Loaded Product manufactured, assembled, sterilized and packaged by Angiotech (and its contract manufacturers') under this Agreement shall:

(i) not be adulterated or misbranded within the meaning of the United States Food, Drug, and Cosmetic Act, as amended, and the regulations issued thereunder, or within the meaning of any state or local law, the adulteration and misbranding provisions of which are similar to such act;

(ii) not be misused, contaminated, damaged, tampered with or otherwise altered, mishandled, or subjected to negligence while in the custody and control of Angiotech or its contract manufacturers;

(iii) be manufactured in accordance with Good Manufacturing Practices, be free from defects in material and workmanship and conform to the Specifications at the time of shipment to end-user customers; and

(iv) be free and clear from any security interest or any other lien or encumbrance.

D. Indemnification by Angiotech. Angiotech agrees to indemnify and hold Rex Medical, its officers, directors, employees, successors and assigns harmless from and against all losses, damages, action, suit, claim, demand, liability, penalty, expense (including, without limitation, reasonable attorneys' fees and expenses), bodily injury, death, or property damage (collectively, "Losses"), which they, or any of them, may sustain or incur resulting from, arising out of, or relating to claims, actions or suits (including a governmental investigation) by third parties to the extent arising from; (i) Angiotech's breach of or failure to perform any obligation, provision, condition, representation, warranty or covenant of Angiotech contained in any of the provisions of this Agreement; (ii) any negligent or wrongful act or omission of Angiotech or its directors, officers, affiliates, employees or agents; (iii) failure of Angiotech to pay when due all taxes, assessments, levies or charges from any sources which may be assessed or levied against the Product purchased, or, if applicable, manufactured by Angiotech or against Angiotech itself in connection with Angiotech's performance of this Agreement, including, without limitation, any tax in the nature of an excise tax, sales tax, value-added tax, import duty, customs duty, or import licensing fee or charge; (iv) violation by Angiotech (or any of its directors, officers, affiliates, employees or agents) of any applicable law, rule, regulation or order; ); (v) failure to manufacture and package Drug-Loaded Product in accordance with Specifications and in accordance with Good Manufacturing Practices; (vi) an inherent defect in the design or functionality of the Drug-Loaded Product; or (vii) any claims, settlements, losses, or judgments to the extent caused by any actual or alleged infringement of trademarks, patents or other intellectual property held by third parties by the Angiotech trademarks, patents or other intellectual property used on or in, the Product, or the Drug-Loaded Product, or changes or additions to the Product or its packaging that were made by or at the direction of Angiotech.

E. Indemnification by Rex Medical. Rex Medical agrees to indemnify and hold Angiotech, its officers, directors, employees, successors and assigns harmless from and against all Losses, which they, or any of them, may sustain or incur resulting from, arising out of, or relating to claims, actions or suits (including a governmental investigation) by third parties to the extent arising from; (i) Rex Medical's breach of or failure to perform any obligation, provision, condition, representation, warranty or covenant of Rex Medical contained in any of the provisions of this Agreement; (ii) any negligent or wrongful act or omission of Rex Medical or its directors, officers, affiliates, employees or agents; (iii) failure of Rex Medical to pay when due all taxes, assessments, levies or charges from any sources which may be assessed or levied against the Product manufactured, if applicable, or against Rex Medical itself in connection with Rex Medical's performance of this Agreement, including, without limitation, any tax in the nature of an excise tax, sales tax, value-added tax, import duty, customs duty, or import licensing fee or charge; (iv) violation by Rex Medical (or any of its directors, officers, affiliates, employees or agents) of any applicable law, rule, regulation or order; (v) failure to manufacture and package Product in accordance with Product Specifications and in accordance with Good Manufacturing Practices; (vi) an inherent defect in the design or functionality of the Product, except to the extent that any Losses arise from the Drug-Loaded Product or a change made to the Product by or at the direction of Angiotech; or (vii) any claims, settlements, losses, or judgments to the extent caused by any actual or alleged infringement of patents, trademarks or other intellectual property held by third parties by the Rex Medical Trademarks, patents or other intellectual property used on or in the Product, except to the extent such claims arise from a Drug-Loaded Product, or from changes or additions to the Product or its packaging that were made by or at the direction of Angiotech.

F. Indemnification Procedure. If indemnification is sought pursuant to Sections 10D or E above, the indemnified party shall: (i) give written notice to the indemnifying party within fifteen (15) days after receipt by the indemnified party of such claim, suit or demand; provided, however, that the failure to give notice within such time period shall not relieve the indemnifying party of its obligation to indemnify, unless it shall be materially prejudiced by such failure; (ii) permit the indemnifying party to assume direction and control of the defense of claims resulting therefrom; and (iii) at its own cost and expense, cooperate fully as requested by the indemnifying party in the defense of the claims. No offer of settlement, settlement or compromise by the indemnifying party shall be binding on an indemnified party without its prior written consent (which consent shall not be unreasonably withheld or delayed), unless such settlement fully releases the indemnified party without any liability, loss, cost or obligation incurred by such indemnified party. No offer of settlement, settlement or compromise by the indemnified party shall be binding on an indemnifying party without its prior written consent (which consent shall not be unreasonably withheld or delayed).

G. Disclaimer. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR INDIRECT, PUNITIVE, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS OR OTHER COMMERCIAL OR ECONOMIC LOSS, AND LOSS OR INTERRUPTION OF BUSINESS. The foregoing provision shall not be construed to limit a party's indemnification obligation under this agreement for third party claims which may include consequential, punitive or other types of damages.

10. **Dispute Resolution.**

A. Negotiation of Parties. In the event of any dispute, claim or controversy arising out of or relating to the interpretation of any provision of this Agreement, to the performance of either Party under this Agreement or to any other matter under this Agreement, including any action in tort, contract or otherwise, at equity or at law, and any claims of fraud in the inducement (a "Dispute"), either Party may at any time provide the other Party written notice specifying the terms of such Dispute in reasonable detail. As soon as practicable after receipt of such notice, the Chief Executive Officers of both Angiotech and Rex Medical shall meet (in person or otherwise) at a mutually agreed upon time and location for the purpose of resolving such Dispute. They shall engage in good faith discussions and/or negotiations for a period of up to thirty (30) days to resolve the Dispute or negotiate an interpretation or revision of the applicable portion of this Agreement which is mutually agreeable to both parties, without the necessity of formal procedures relating thereto. During the course of such discussion and/or negotiation, the parties shall reasonably cooperate and provide information that is not materially confidential in order so that each of the parties may be fully informed with respect to the issues in Dispute.

B. Arbitration.

(a) Submission. If the Dispute is not resolved within the thirty (30) day period referenced in Section 10A, either party may deliver written notice to the other party demanding submission of such Dispute to binding arbitration conducted pursuant to the provisions of this Agreement and the then-current commercial arbitration rules of the American Arbitration Association ("AAA"), except to the extent such AAA rules are inconsistent with the provisions of this Agreement. Even though the arbitrator(s) shall apply the AAA rules, the arbitration shall not be conducted by the AAA.

(b) Appointment of Arbitrator(s). The arbitration shall be conducted by a panel of three (3) arbitrators. Each party shall choose one arbitrator within ten (10) days after the expiration of the thirty (30) day period described in (a), and the two selected shall choose a third arbitrator within ten (10) days of their appointment. If the issues of the Dispute involve scientific, technical or commercial matters, any arbitrator chosen hereunder shall have educational training and/or industry experience sufficient to demonstrate a reasonable level of relevant scientific, medical and industry knowledge.

(c) Location/Costs. The site of the arbitration shall be in the metropolitan area of New York, New York, USA. The exact location within such metropolitan area shall be designated by the arbitrator(s). The non-prevailing party shall pay all expenses of the arbitration proceeding, including the expenses and fees of the parties' witnesses and legal counsel and of the arbitrator(s), unless otherwise provided in the arbitration award.

(d) Discovery/Interim Relief. The arbitrator(s) shall allow the parties to conduct limited discovery. Either party may apply to any court having jurisdiction hereof seeking injunctive relief so as to maintain the status quo until such time as the arbitration award is rendered or the Dispute is otherwise resolved.

(e) Final Award. The arbitrational award shall be final and binding upon the parties and may be entered and enforced at any court having jurisdiction. Each party hereby submits to personal jurisdiction of the Federal Courts located in the City of New York and consents to the entry of the arbitration award in such courts and in the appropriate courts located in any other jurisdiction of a party's residence.

11. **Confidential Information.** It has been contemplated that in the course of the negotiation and the performance of this Agreement each party may have access to, or may disclose, Confidential Information of or to the other, as the case may be. Each party agrees that for the Term and for a period of five (5) years thereafter, the Receiving Party shall keep confidential and shall not publish or otherwise disclose, and will not use any Confidential Information of the Disclosing Party except for the limited purposes set forth in

this Agreement; provided, however, that no provision of this Agreement shall be construed to preclude such disclosure of Confidential Information as may be necessary or appropriate (a) to obtain from any governmental agency any necessary approval contemplated by this Agreement, (b) to file patent applications or obtain patents that are included in the Licensed Technology consistent with the terms of this Agreement; provided, further, however, that the party whose information is to be disclosed shall be notified as soon as possible and the party that is being required to disclose such information shall, if requested by the party whose information is to be disclosed, use reasonable good faith efforts, at the expense of the requesting party, to assist in seeking a protective order (or equivalent) with respect to such disclosure or otherwise avoid making such disclosure. The Receiving Party will take all precautions as are reasonably necessary to prevent unauthorized access to, reproduction, duplication, disclosure or use of the other party's Confidential Information and shall only disclose the Confidential Information of the other party to those of its officers, directors and employees, or to officers, directors and employees of its affiliates, on a "need to know basis" provided each such officer, director or employees agrees in favor of the Disclosing Party to be bound by the same obligations of secrecy and confidentiality that the Receiving Party is bound to under this Agreement and provided, further, that the Receiving Party shall be directly responsible to the Disclosing Party for any losses or damages suffered as a result of the breach of such obligations by the Receiving Party's directors, officers or employees.

12. Relationship of Parties. Nothing herein shall be deemed to create an agency, joint venture, amalgamation, partnership, franchise or similar relationship between Angiotech and Rex Medical. Notwithstanding any of the provisions of this Agreement, neither party shall at any time enter into, incur, or hold itself out to third parties as having authority to enter into or incur, on behalf of the other party, any commitment, expense, or liability whatsoever, and all such commitments, expenses and liabilities undertaken or incurred by one party in connection with or relating to the development, manufacture or sale of Product or components thereof shall be undertaken, incurred or paid exclusively by that party, and not as an agent or representative of the other party.

13. Intellectual Property.

A. General. Angiotech and Rex Medical agree that each party retains all rights to, any and all patents, patent applications, trademarks, trademark applications, trade names, copyrights, trade secrets, inventions, know-how, and any and all other intellectual property rights conceived, reduced to practice or developed by such party prior to the Effective Date. Any Improvements developed by Rex Medical and/or Angiotech shall be the sole property of Rex Medical, and Angiotech hereby assigns all right, title and interest to any such Improvements to Rex Medical. Any inventions, improvements, or other intellectual property conceived, reduced to practice or developed by Angiotech, to the extent they relate solely to the drug-loading technology that is applied to the Drug-Loaded Product, shall be the sole property of Angiotech, and Rex Medical hereby assigns all right, title and interest to any such inventions, improvements, or other intellectual property that relates solely to the drug-loading technology that is applied to the Drug-Loaded Product to Angiotech.

B. Patents and Related Expenses. Rex Medical shall, at its own expense, apply for, prosecute before the Patent Offices and maintain in the Patent Offices all patent applications and patents listed on Exhibit A. Rex Medical shall keep Angiotech reasonably informed of all matters related to filing, prosecution and maintenance of such patents and patent applications, including providing Angiotech with, or making available to Angiotech, copies of substantive official communications relating to examination on the merits sent to, or received from, any patent office, with such documents to be sent to patents@angio.com unless otherwise available on-line through the US PTO or its foreign equivalent.

C. Infringement of Patents. Angiotech shall be entitled, but is not obligated, to take any and all action that it deems appropriate, at its expense, to assert any or all of the Licensed Technology against any party(s) deemed by Angiotech to infringe said Licensed Technology, and Rex Medical hereby agrees to cooperate with Angiotech as necessary in the pursuit of said action(s). Angiotech shall promptly keep Rex Medical informed of and provide copies of all material correspondence and documents relating to any such actions, and shall consult with Rex Medical on all major decisions regarding such actions, and Rex Medical shall have the right to consent to major decisions which are reasonably likely to affect Rex Medical, which consent shall not be unreasonably withheld, conditioned or delayed. In the event that Angiotech is successful in an action against a third party for patent infringement (or otherwise) and Angiotech is awarded damages for lost sales, reasonable royalties or otherwise of or relating to the Product, the parties agree that any money recovered as a result thereof will be divided among the parties in a manner that is consistent with the terms of this Agreement, particularly the terms of Section 6, after the recovery by Angiotech and Rex Medical of any outstanding direct, out-of-pocket costs and expenses, including without limitation reasonable attorneys' fees, incurred by it in prosecuting the action. In the event that Angiotech decides not to pursue any action to assert the patents, Rex Medical shall have the option, at its expense, to take any and all action it deems appropriate to assert the patents. Rex Medical shall keep Angiotech reasonably informed of all matters related to any such action.

D. Infringement by Third Party Product.

(i) In the event that an infringement suit is filed naming Rex Medical and/or Angiotech as defendants and alleging that the Product infringes one or more patent(s) held by a third party, other than an infringement claim that arises from or is based on drug-loading technology, then Rex Medical shall be obligated to take any and all action that it deems appropriate, at its expense, to defend the Licensed Technology against the third party alleging infringement, and Angiotech hereby agrees to cooperate with Rex Medical as necessary in the pursuit of said action(s) as provided for in Section 9F. Rex Medical shall promptly keep Angiotech informed of and

provide copies of all material correspondence and documents relating to any such actions, and shall consult with Angiotech on all major decisions regarding such actions, and Angiotech shall have the right to consent to major decisions which are reasonably likely to affect Angiotech, which consent shall not be unreasonably withheld, conditioned or delayed.

(ii) In the event that an infringement suit is filed naming Rex Medical and/or Angiotech as defendants and alleging that the Product infringes one or more patent(s) held by a third party, other than an infringement claim that arises from or is based on drug-loading technology, then Rex Medical shall also be obligated to deposit royalty payments due to it by Angiotech hereunder into an interest-bearing escrow account as follows:

(a) Rex Medical shall not be obligated to deposit any royalty payments due to it by Angiotech hereunder into the escrow account until after the end of the first Term Year;

(b) After the first Term Year, Rex Medical shall be obligated to deposit 10% of any royalty payments paid to it by Angiotech hereunder into the escrow account until there is two million dollars ($2M) deposited in the escrow account;

(c) Rex Medical shall be entitled to withdraw funds from the escrow account only for use to defend itself and Angiotech from the infringement action, or to pay an agreed upon settlement amount;

(d) In the event that there is any draw-down of the escrow account by Rex Medical, Rex Medical shall be obligated to again deposit 10% of any royalty payments paid to it by Angiotech hereunder into the escrow account until there is again two million dollars ($2M) deposited in the escrow account;

(e) Notwithstanding anything to the contrary in the foregoing, the total amount of royalty payments withheld under this Section 13D(ii) on account of all infringement actions shall not exceed a total amount of three million five hundred thousand dollars ($3.5M); and,

(f) The terms of an Escrow Agreement governing the escrow account shall be agreed to by the parties before the end of the first Term Year.

(iii) In the event that Rex Medical and/or Angiotech are unsuccessful in defending the infringement action, or if a settlement is reached whereby the party alleging infringement is to receive an amount of money in consideration for such settlement, then the amount deposited in the escrow account shall be used to satisfy all costs and pay any judgment rendered against Angiotech and/or Rex Medical, or any settlement that requires a payment by Angiotech and/or Rex Medical, all as provided for in Section 9(E)(vii), and both parties shall instruct the escrow agent to release such escrow funds to the applicable third party and/or counsel. Notwithstanding anything in this Agreement to the contrary, in the event that the amount set aside in the escrow account is not sufficient to indemnify Angiotech as provided for in Section 9(E)(vii), Rex Medical shall remain liable to Angiotech for any amount in excess of the amount received by Angiotech from the escrow account pursuant to the terms of this Agreement.

(iv) In the event that: (a) Rex Medical's Product is found not to infringe the third party patent(s) and no further avenues of appeal are available to the third party and no further infringement suit(s) have been filed against Rex Medical or Angiotech alleging the Product infringes one or more patent(s) held by a third party; or, (b) there are excess funds available in the escrow account after the satisfaction by Rex Medical of its indemnification obligations in Section 9(E)(vii); then both parties shall instruct the escrow agent to release all remaining escrow funds to Rex Medical.

(v) In the event that an infringement action relating to the Product (other than an infringement claim that arises from or is based on drug-loading technology) is settled by the parties in such a way that requires Angiotech to take a license to a third party's intellectual property, then Angiotech and Rex Medical shall split equally the amount of any royalty responsibility to such third party up to and including a three percent (3%) royalty. In the event that the parties agree to a license with such third party that has a royalty in excess of three percent (3%), the parties shall split equally the amount of any royalty responsibility for the next two percent (2%). In the unlikely event that the parties are assessed or agree to a license with such third party that has a royalty in excess of five percent (5%), the parties shall split the amount of such royalty responsibility that is in excess of five percent (5%) in a manner to be mutually agreed upon, with the intent that Rex Medical shall be responsible for more than fifty percent (50%) of such excess, but in no event shall Rex Medical be responsible for more than seventy five percent (75%) of such excess above five percent (5%).

14. Force Majeure. Neither party shall be liable for any delay in or failure of performance hereunder due to any contingency beyond its reasonable control. Should the delay or failure continue for more than six (6) months, then the other party shall have the right to immediately terminate this Agreement upon written notice to the other party. However, nothing contained herein shall relieve either party from its obligation to make all payments due hereunder when such payments are due.

15. Notices. Any notice to be given pursuant to this Agreement shall be made and deemed effective if sent to the Party to whom such notice is required or permitted. Notice may be made via facsimile (if receipt is confirmed), overnight courier, registered mail, or postage prepaid mail. Addresses for notices are as follows:

If to Angiotech:

Angiotech Pharmaceuticals, Inc.
1618 Station Street
Vancouver, BC
Canada V6A 1B6
Attn: Vice President, Business Development
Facsimile: (604) 221-6915

With a copy to:

Angiotech Pharmaceuticals, Inc.
1618 Station Street
Vancouver BC
Canada V6A 1B6
Attn: General Counsel
Facsimile: (604) 221-6915

If to Rex Medical:

Rex Medical, L. P.
1100 East Hector Street, Suite 245
Conshohocken, PA 19428
Attn: Lindsay L. Carter
Facsimile: (610) 940-1590

With a copy to:

Royer & Associates, LLC
681 Moore Road, Suite 321
King of Prussia, PA 19406
Attn: John E. Royer, Jr., Esq.
Facsimile: (610) 354-8896

16. Assignment; Successor and Assigns. This Agreement is not assignable or transferable by either party without the prior written consent of the other; provided, however, that both Rex Medical and Angiotech may assign this Agreement without the consent of the other to an affiliate or to any third party which acquires all or substantially all of either companies assets relating to the subject matter of this Agreement. Subject to the foregoing, this Agreement is binding upon, and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns.

17. Governing Law. This Agreement shall be governed by the laws of the State of New York, without regard to any rules on conflicts of laws.

18. Entire Agreement; Modifications; Waiver. This Agreement, together with all Exhibits hereto, fully expresses the entire understanding between the parties, and supersedes any prior agreements, understandings, or discussions between the parties. It may not be hereafter added to, altered, or modified except by written instrument signed by both parties. No delay, or omission in the exercise of any right, power, or remedy hereunder by either party shall impair such right, power, or remedy or be considered to be a waiver of any default or acquiescence therein by such party.

19. Payment Terms. All undisputed invoices issued hereunder are due and payable in US dollars, no later than thirty (30) days from receipt of invoice. Invoices unpaid after thirty (30) days will accrue interest at a rate of one and one-half percent (1.5%) per month, or the highest rate permitted by law, whichever is less, from the due date thereof until they are paid.

20. Headings. The section headings contained herein are not part of this Agreement and are included solely for the convenience of the parties.

21. Execution in Counterpart. This Agreement may be executed in counterpart by the parties, either through original copies or by facsimile or electronic copies. An executed copy of this Agreement delivered by facsimile or electronically will constitute valid execution and delivery of this Agreement.

22. Survival. Expiration or termination of this Agreement shall not affect the rights or obligations of either party hereto which shall have accrued hereunder prior to such expiration or termination. Without limiting the foregoing sentence, the provisions of Sections 1 and 6 through 22, and the rights and obligations of the parties thereunder, shall survive the expiration or termination of this Agreement for the periods specified in any of the foregoing sections, or if none is specified, for a period of two (2) years.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the Effective Date.

**Angiotech Pharmaceuticals (US), Inc.**

By: /s/ William L. Hunter

Print: William L. Hunter

Title: President & CEO

**Rex Medical, LP**

By: Rex Medical, Inc., its General Partner

By: /s/ Lindsay L. Carter 3/13/08

Print: Lindsay L. Carter

Title: VP Sales/MKTG/NBD

EXHIBIT A

Licensed Technology

[redacted list of patents]

# EXHIBIT B

## Annual Minimum Sales Requirement

### Initial Term

| Term Year | Annual Minimum Sales Requirement | Cumulative Minimum Sales Requirement |
|---|---|---|
| 1* | 14,000 units | 14,000 units |
| 2 | 18,000 units | 32,000 units |
| 3 | 24,000 units | 56,000 units |
| 4 | 24,000 units | 80,000 units |
| 5 | 24,000 units | 104,000 units |

As provided for in Section. 8A of the Agreement, Term Year 1 shall be for 18 full months from the First Sale.

A "unit" shall mean one unit of Packaged Product.

### Renewal Term

Annual Minimum Sales Requirement for Renewal Term to be agreed upon as set forth in Section 6H and added hereto.

## EXHIBIT C

Rex Medical Third Party Contract Manufacturers

1. Nitinol Development Corporation
2. Thomas Medical Products, Inc.
3. Applied Tech Products

EXHIBIT D

[Attach NDC manufacturing contract]

EXHIBIT E

[Attach TMP manufacturing contract]

EXHIBIT F

PRODUCT SPECIFICATIONS

[redacted specifications of product]

**Exhibit 10.2**

1618 Station Street
Vancouver, BC. Canada V6A 1B6
Main: 604.221.7676 Fax: 604.221.2330
www.angiotech.com

Angiotech

August 9, 2009

Rex Medical, LP
1100 East Hector Street, Suite 245
Conshohocken, PA 19428
Attention: Lindsay L. Carter

**Re: Amendment No. 1 to License, Supply, Marketing and Distribution Agreement between Angiotech Pharmaceuticals (US), Inc. ("Angiotech") and Rex Medical, LP ("Rex Medical"), dated March 13, 2008 (the "Agreement")**

Dear Lindsay:

This letter is to confirm our understanding concerning an amendment ("Amendment No.1") to be made to the Agreement to specify that the First Sale is deemed to be September 1, 2009 regardless of the date that Angiotech commences shipment or invoicing of Product. Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Agreement.

Angiotech and Rex Medical hereby agree that the definition of "First Sale" is amended in its entirety as of July 1, 2009 to read as follows:

> "First Sale" shall mean the later of (i) September 1, 2009, and (ii) the earlier of: (a) the date the first Product is shipped by Angiotech to a customer (including end users, distributors, affiliates or related entities) that is not deemed a sample; or (b) the date the first Product is invoiced by Angiotech to a customer (including end users, distributors, affiliates or related entities).

Angiotech and Rex Medical further agree that Angiotech will pay royalties on any Net Sales of Product made prior to the date of First Sale as if such sales were made during the first Term Year and such Net Sales will be included in the Annual Net Sales for the first Term Year.

The remainder of the Agreement will continue in full force and effect, unchanged except as modified by this Amendment No.1. This Amendment No.1 may be executed in counterparts, each of which shall be deemed to be an original and shall constitute the same agreement.

If you agree with the foregoing, please sign the below indication acknowledging and agreeing to the amendments set forth above, effective as of the date of your signature.

Sincerely,

/s/ Jonathan Chen

Jonathan Chen
President
Angiotech Pharmaceuticals (US), Inc.

**Acknowledged and agreed to by:**
**Rex Medical, LP**

Signature: /s/ Lindsay L. Carter  Date: August 9, 2009

Name: Lindsay L. Carter  Title: President

**EXHIBIT 31.1**

**Certification of CEO Pursuant to**
**Securities Exchange Act Rules 13a-14 and 15d-14**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, William L. Hunter, M.D., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Angiotech Pharmaceuticals, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2010

/s/ William L. Hunter

**William L. Hunter, M.D.**
**Chief Executive Officer**

**EXHIBIT 31.2**

**Certification of CFO Pursuant to
Securities Exchange Act Rules 13a-14 and 15d-14
as Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002**

I, K. Thomas Bailey, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Angiotech Pharmaceuticals, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2010

/s/ K. Thomas Bailey
**K. Thomas Bailey**
**Chief Financial Officer**

**EXHIBIT 32.1**

**Certification of CEO and CFO Pursuant to**
**18 U.S.C. Section 1350,**
**as Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Angiotech Pharmaceuticals, Inc. (the "Company"), each hereby certifies that to his knowledge on the date hereof:

(a) The Quarterly Report on Form 10-Q of the Company for the quarter ended September 30, 2010, filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(b) Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 9, 2010

/s/ William L. Hunter
**William L. Hunter, M.D.**
**Chief Executive Officer**

Date: November 9, 2010

/s/ K. Thomas Bailey
**K. Thomas Bailey**
**Chief Financial Officer**

EXHIBIT 99.1

## EARNINGS COVERAGE RATIO

The following consolidated financial earnings coverage ratios, calculated for the year ended December 31, 2009 and the 12-month period ended September 30, 2010, give effect to all long-term financial liabilities of the Company and the repayment, redemption or retirement thereof since such date. The earnings coverage ratios and the amount of earnings and interest expense set forth below do not purport to be indicative of the earnings coverage ratios for any future periods. The deficiency figures and coverage ratio have been calculated based on amounts reported under U.S. GAAP.

| | Year Ended December 31, 2009 | 12-Months Ended September 30, 2010 |
|---|---|---|
| Earnings coverage [(1)] | 0.6 | (0.5) |

(1) Earnings coverage ratio is equal to net loss before interest expense and income taxes divided by interest expense on all debt.

The Company's interest expense requirements amounted to approximately $38.0 million and $36.8 million for the year ended December 31, 2009 and the 12-month period ended September 30, 2010, respectively. The Company's net loss before income taxes and interest expense for the 12-month period ended September 30, 2010 was approximately $17.6 million, which resulted in an interest coverage deficiency of approximately $54.5 million and a negative earnings coverage ratio of 0.5. The Company's net income before income taxes and interest expense for the year ended December 31, 2009 was approximately $21.2 million, which resulted in a positive earnings coverage ratio of 0.6.