# EXHIBIT C

VANCOUVER
JAN 28 2011
REGISTRY

No. S110587
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF ANGIOTECH PHARMACEUTICALS, INC. AND THE OTHER PETITIONERS LISTED ON SCHEDULE "A"

**PRE-FILING REPORT OF THE PROPOSED MONITOR**
**ALVAREZ & MARSAL CANADA INC.**

**JANUARY 28, 2011**

# TABLE OF CONTENTS


1.0 INTRODUCTION .......... 4

2.0 TERMS OF REFERENCE .......... 5

3.0 A&M'S QUALIFICATION TO ACT AS MONITOR .......... 6

4.0 GENERAL BACKGROUND TO THE PROPOSED CCAA PROCEEDINGS .......... 7

5.0 BUSINESS OVERVIEW .......... 10

6.0 RESTRUCTURING EFFORTS TO DATE .......... 15

7.0 THE RECAPITALIZATION TRANSACTION .......... 16

8.0 CASH MANAGEMENT SYSTEM .......... 18

9.0 CASH FLOW FORECAST FOR THE PERIOD ENDING APRIL 22, 2011 .......... 19

10.0 DEBTOR IN POSSESSION FINANCING .......... 22

11.0 PROPOSED INITIAL ORDER .......... 26

12.0 OTHER MATTERS .......... 31

13.0 PROPOSED MONITOR'S CONCLUSIONS .......... 33

14.0 CCAA RELIEF SOUGHT .......... 37

**INDEX TO SCHEDULES**

**Schedule A – List of the Petitioners**

**Schedule B – Angiotech Corporate Structure**

**Schedule C – Cash Flow Forecast for the 13 Week Period Ending April 22, 2011 and Proposed Monitor's Report on the Cash Flow Statement**

## 1.0 INTRODUCTION

1.1 Alvarez & Marsal Canada Inc. ("**A&M**" or the "**Proposed Monitor**") understands that Angiotech Pharmaceuticals, Inc. ("**Angiotech**" or the "**Company**") and those of its subsidiaries listed in **Schedule "A"** attached to this report (together with Angiotech, the "**Petitioners**") intend to bring an application before this Honourable Court seeking certain relief under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") granting, *inter alia*, a stay of proceedings until February 15, 2011 and appointing A&M as Monitor (the "**Monitor**"). The proceedings to be commenced by the Petitioners under the CCAA will be referred to herein as the "**CCAA Proceedings**".

1.2 The purpose of this pre-filing report is to provide this Honourable Court with information regarding the following:

a) A&M's qualification to act as Monitor (if appointed);

b) General background to the proposed CCAA Proceedings;

c) Business overview of the Petitioners;

d) The Petitioners restructuring efforts to date;

e) The Recapitalization Transaction (as defined further herein);

f) The existing cash management system of the Angiotech Companies;

g) The proposed funding of the CCAA Proceedings, including an overview of the Company's 13-week cash flow forecast;

h) Proposed Debtor-in-Possession ("**DIP**") financing;

i) The proposed Initial Order;

j) Other matters, including proposed management and key employee incentive plans; and

k) The Proposed Monitor's conclusions.

## 2.0 TERMS OF REFERENCE

2.1 In preparing this report, A&M has necessarily relied upon unaudited financial and other information supplied, and representations made, by certain senior management of the Angiotech Companies ("**Senior Management**"). Although this information has been subject to review, A&M has not conducted an audit nor otherwise attempted to verify the accuracy or completeness of any of the information of the Angiotech Companies. Accordingly, A&M expresses no opinion and does not provide any other form of assurance on the accuracy of any information contained in this report, or otherwise used to prepare this report.

2.2 Certain of the information referred to in this report consists of financial forecasts and/or projections. An examination or review of financial forecasts and projections and procedures, in accordance with standards set by the Canadian Institute of Chartered Accountants, has not been performed. Future oriented financial information referred to in this report was prepared based on Senior Management's estimates and assumptions. Readers are cautioned that since financial forecasts and/or projections are based upon assumptions about future events and conditions that are not ascertainable, actual results will vary from the projections, and such variations could be material.

2.3 Capitalized terms not defined in this report are used as defined in the affidavit of K. Thomas Bailey sworn January 28, 2011 (the "**Bailey Affidavit**") filed in support of the Petitioners' application for relief under the CCAA. References herein to the "**Angiotech**

**Companies**" are references to the global enterprise as a whole. The three Petitioners incorporated in Canada are referred to as "**Angiotech Canada**". The fifteen Petitioners incorporated in the United States and other foreign jurisdictions are referred to as "**Angiotech U.S.**". References to Angiotech's direct or indirect subsidiaries located in Europe and other jurisdictions outside of Canada and the United States are referred to as "**Angiotech Europe**".

2.4 Unless otherwise stated, all monetary amounts contained in this report are expressed in United States dollars, which is the Company's common reporting currency.

## 3.0 A&M'S QUALIFICATION TO ACT AS MONITOR

3.1 A&M was engaged by Angiotech on August 17, 2010 to provide consulting services to the Company's Chief Financial Officer and Board of Directors in connection with the Company's restructuring efforts including providing assistance to the Company should it need to prepare for formal proceedings under the CCAA.

3.2 A&M is a trustee within the meaning of subsection 2(1) of the *Bankruptcy and Insolvency Act (Canada)*. Neither A&M nor any of its representatives have been at any time in the two preceding years the auditor, a director, officer or employee of the Petitioners or otherwise related to the Petitioners or to any director or officer of the Petitioners or a trustee (or related to any such trustee) under a trust indenture issued by any of the Petitioners or any person related to the Petitioners.

3.3 A&M is related to Alvarez & Marsal Holdings, LLC, an independent international professional services firm providing amongst other things, bankruptcy, insolvency and restructuring services. The senior A&M professional personnel with carriage of this

matter include experienced insolvency and restructuring practitioners who are Chartered Accountants, Chartered Insolvency and Restructuring Professionals and licensed Trustees in Bankruptcy (Canada), all of whom have acted in cross-border restructurings and CCAA matters of a similar nature and scale in British Columbia and in other provinces in Canada.

3.4 A&M has consented to act as Monitor of the Petitioners should this Honourable Court grant Angiotech's request to commence the CCAA Proceedings.

## 4.0 GENERAL BACKGROUND TO THE PROPOSED CCAA PROCEEDINGS

Identification of the Petitioners

4.1 Relief in the CCAA Proceedings is sought by all of:

a) The Angiotech Canada entities (Angiotech, 0741693 B.C. Ltd. and Angiotech International Holdings Corp.); and

b) The Angiotech U.S. entities (14 entities) comprising the direct and indirect subsidiary corporations of Angiotech in the United States who are guarantors of the both the Subordinated Notes and the Floating Rate Notes (both as subsequently defined and described herein), including:

i. Angiotech Pharmaceuticals (US), Inc.
ii. American Medical Instruments Holdings, Inc.
iii. NeuColl, Inc.
iv. Angiotech BioCoatings Corp.
v. Afmedica, Inc.
vi. Quill Medical, Inc.
vii. Angiotech America, Inc.
viii. Angiotech Florida Holdings, Inc.
ix. B.G. Sulzle, Inc.
x. Surgical Specialties Corporation
xi. Angiotech Delaware, Inc.
xii. Medical Device Technologies, Inc.

xiii. Manan Medical Products, Inc.
xiv. Surgical Specialties Puerto Rico, Inc.

4.2 Angiotech is the ultimate parent company of 41 direct and indirect Canadian and foreign subsidiaries. A chart setting out the corporate structure of the Angiotech Companies is set out in **Schedule "B"** of this report. Schedule "B" indicates which entities are Petitioners and also specifies the general geographical location of each entity.

4.3 As set out in the Bailey Affidavit, the Petitioners are part of a consolidated North American business comprising various research, manufacturing and sales facilities and offices in Canada and the United States. Management oversight and decision making in respect of the Angiotech Companies is centralized in the Vancouver, British Columbia offices of Angiotech. Board meetings are held in British Columbia, head office treasury and finance functions are centralized in British Columbia and the Chief Executive Officer resides in British Columbia. All significant acquisition, divestiture, financing and other related corporate strategic decisions are made in the Angiotech Vancouver, British Columbia offices.

Inclusion of Angiotech US in the CCAA Proceedings

4.4 The Petitioners are proposing that the companies comprising Angiotech U.S. be included in this proceeding because they are guarantors under Angiotech's long-term financial obligations and have pledged their assets as collateral under those guarantees.

4.5 Angiotech's Europe and other foreign subsidiaries and inactive subsidiaries are not included in this filing and are not expected to be seeking insolvency protection in any jurisdiction in the immediate future.

4.6 It is currently anticipated that Angiotech U.S. as well as the non-filing Angiotech Companies will continue to operate on a business as usual basis and will continue to pay their trade creditor and employee obligations in the ordinary course, whether incurred prior to or after the commencement of the CCAA Proceedings.

4.7 As set out in the Bailey Affidavit, it is proposed that the CCAA Proceedings will be the primary restructuring proceeding of the Angiotech Companies with ancillary proceedings in the U.S. under Chapter 15 of title 11 of the United States Bankruptcy Code, to effectuate the Recapitalization Transaction (as subsequently defined) and to facilitate obtaining debtor-in-possession financing (the "**Chapter 15 Proceedings**"). The Company intends to seek the appointment of A&M as Monitor in the CCAA Proceedings (if appointed as such) to be the foreign representative for each Petitioner in the Chapter 15 Proceedings.

Causes of the Petitioners' Financial Difficulties and Insolvency

4.8 The Petitioners are currently facing a number of financial challenges and issues that have contributed to Angiotech's insolvency and need for the protections provided for under the CCAA. These challenges include:

a) Significant declines in liquidity caused primarily by material declines in royalty revenue at Angiotech Canada;

b) The burden of its current and long term debt obligations and the significant interest expenses associated with this debt; and

c) Material litigation in the United States involving certain of Angiotech's corporate partners (some of which have been recently been settled).

The Recapitalization Transaction

4.9 We are advised by Senior Management that following intensive and extended negotiations between the Petitioners and their noteholders during mid to late 2010, the Petitioners have reached an agreement with holders of approximately 84% of the Subordinated Notes (as subsequently defined) and holders of approximately 53% of the Floating Rate Notes (as subsequently defined) on the terms of a recapitalization and exchange transaction. The recapitalization transaction contemplated in the agreement with the holders of the Subordinated Notes is intended to form the basis of a plan of arrangement for the Petitioners under the CCAA (the "**Recapitalization Transaction**").

4.10 As contained in the Bailey Affidavit, Angiotech is insolvent and has exhausted its out-of-court restructuring options and seeks to complete the Recapitalization Transaction under the CCAA on an urgent basis.

## 5.0 BUSINESS OVERVIEW

Business Operations

5.1 Angiotech is a specialty pharmaceutical and medical device company and carries on business through 41 Canadian and foreign direct and indirect subsidiaries.

5.2 The Angiotech Companies currently operate in two business segments: medical products and pharmaceutical technologies. The medical products segment ("**Medical Products**") develops, manufactures and markets a wide range of single-use specialty medical products and medical device components. The pharmaceutical technologies segment ("**Pharmaceutical Technologies**") is engaged primarily in establishing product development and marketing collaborations with major medical device, pharmaceutical or

biomaterials companies and generates its revenues principally through collecting royalties from corporate partners that are responsible for marketing and selling such licensed products to end-users.

5.3 As at December 31, 2010, the Angiotech Companies employed the full-time equivalent ("**FTE**") of approximately 1,400 employees around the world. Of that number, approximately 100 FTE and approximately 1,100 FTE employees are employed by Angiotech Canada and Angiotech U.S., respectively.

5.4 All of Angiotech Canada's revenue is derived from royalties from the Pharmaceutical Technologies segment. Angiotech U.S. has a broader revenue base derived primarily from direct sales in the Medical Products segment. At present, Angiotech Canada is loss making, whereas Angiotech U.S. generates positive cash flow from operations.

5.5 The Common Shares of Angiotech are publicly traded on the Toronto Stock Exchange ("**TSX**") under the trading symbol "ANP". Until January 13, 2011, Angiotech's Common Shares were also listed on the NASDAQ under the symbol "ANPI". Angiotech's stock is now trading over-the-counter on the OTC Bulletin Board (OTCQB) under the symbol ANPI. As at September 30, 2010 Angiotech had 85,176,449 common shares outstanding. As at January 26, 2011 the common shares closed at $0.18 CAD (as quoted on the TSX). Since January 1, 2011 approximately 30 million shares have traded on the OTCQB.

<u>Petitioners' Debt Profile</u>

5.6 As at December 31, 2010, the Angiotech Companies had the following financial debt obligations:

| Angiotech - Schedule of Financial Indebtedness<br>USD (millions) - As at December 31, 2010 | Principal | Unpaid and Accrued Interest | Total Obligation | Note |
|---|---|---|---|---|
| **Unsecured** | | | | |
| Floating Rate Notes (as defined below) | $ 325.0 | $ 1.1 | $ 326.1 | 1 |
| Subordinated Notes (as defined below) | 250.0 | 14.7 | $ 264.7 | 2 |
| | 575.0 | 15.8 | 590.8 | |
| **Secured** | | | | |
| Obligations under Wells Fargo Credit Facility (as defined below) | 12.8 | - | $ 12.8 | 3 |
| Total | $ 587.8 | $ 15.8 | $ 603.6 | |

1. The Floating Rate Notes are due in 2013 and bear interest annually at LIBOR (reset quarterly) plus 3.75%, payable quarterly.
2. The Subordinates Notes are due in 2014 and bear interest annually at 7.75%, payable semi-annually. Unpaid and accrued interest includes a payment of $9.7 million which was due on Oct 10/10 and accrued interest to Dec 31/10 of $4.9 million.
3. The Wells Fargo Credit Facility revolving credit facility bears interest at 5.75% of draws and 4.3% of LCs drawn, payable monthly. There are currently revolving facility draws of approximately $10 million and outstanding letters of credit of approximately $2.8 million.

5.7 In order to finance certain major acquisitions in 2006, Angiotech completed, on March 23, 2006, an offering of $250 million 7.75% senior subordinated notes due 2014 (the "**Subordinated Notes**"). Subsequently, on December 11, 2006, Angiotech issued $325 million of senior floating rate notes due 2013 that bear interest annually at LIBOR plus 3.75% (the "**Floating Rate Notes**"). Pursuant to the terms of the Subordinated Note indenture, the Subordinated Notes are contractually subordinated to the Floating Rate Notes notwithstanding the fact that they are both unsecured obligations of Angiotech and otherwise rank *pari passu* in priority.

5.8 All of the Petitioners guarantee the obligations under both the Subordinated Notes and the Floating Rate Notes.

5.9 Angiotech, as parent, and certain of Angiotech's U.S. subsidiaries, as borrowers, entered into a credit agreement dated February 27, 2009, as subsequently amended with Wells Fargo, as arranger and administrative agent (the "**Wells Fargo Credit Agreement**"). All of the Petitioners are either borrowers under or guarantors of the Wells Fargo Credit Facility, and the Petitioners' present and after-acquired assets and undertakings are

pledged as security for the borrowings thereunder. The Angiotech Canada companies are not borrowers under the Wells Fargo Credit Agreement and, at present, do not have any ability to make draws directly thereunder.

5.10 Fasken Martineau DuMoulin LLP as Canadian counsel to the Proposed Monitor has reviewed the Wells Fargo security and provided an opinion that, subject to customary assumptions and proviso, the security is valid and enforceable in all jurisdictions in Canada where secured assets are located and constitutes a valid charge on those assets. In most instances, it is the only registered charge and where it is not it would be subject only to conditional vendors and lessors that may hold Purchase Money Security Interests. The Proposed Monitor has, through counsel, received preliminary advice from its U.S. Counsel in New York that the Wells Fargo security appears to be regularly obtained and registered. However, Angiotech's assets are located in several states in the United States as well as the United Territory of Puerto Rico (requiring opinions in each of these jurisdictions) and we are awaiting firm opinions with respect to the registration and perfection of the Wells Security in those jurisdictions.

Overview of the Petitioners' financial position and recent operating results

5.11 As at September 30, 2010, Angiotech had total consolidated assets with a net book value of $326.8 million ($109.5 million in current assets, $217.3 million in noncurrent assets) and total consolidated liabilities of $682.5 million ($60.3 million in current liabilities and $622.2 million in non-current liabilities).

5.12 In fiscal 2009, Angiotech reported consolidated gross revenue of $279.7 million and a consolidated net loss of approximately $22.9 million. For the nine months ended September 30, 2010, the Company reported a consolidated net loss of $39.3 million.

5.13 As set out in the Bailey Affidavit, the Angiotech Companies made a number of strategic acquisitions and these acquisitions were financed with significant long-term debt (currently US$575 million). The most significant of these acquisitions included:

a) On March 23, 2006, through its subsidiary Angiotech Pharmaceuticals (US), Inc. "**Angiotech Washington**"), the acquisition of 100% of the equity of American Medical Instruments Holdings, Inc. ("**AMI**") for US$788 million; and

b) On June 26, 2006, through its subsidiary Angiotech Washington, the acquisition of 100% of the equity of Quill Medical, Inc. ("**QMI**") for US$40 million plus potential future contingent payments.

5.14 At the end of fiscal 2006, Angiotech reported consolidated revenues of $315.1 million and net income of $10.7 million. Up until the end of fiscal 2006, Angiotech received significant royalty revenues from its licensing of the "TAXUS" coronary stent which earned (and currently earns) the vast majority of Angiotech's royalty revenues. These more rapid-than-expected declines in royalty revenues have made it increasingly difficult for Angiotech to service its significant debt, and fund other business activities as well as research and development.

<u>Inability of Petitioners' to repay significant debt obligations</u>

5.15 On October 1, 2010 Angiotech announced it would not be making the interest payment obligation of approximately US$9.7 million in respect of the Subordinated Notes which was due on October 1, 2010. Angiotech had a 30-day grace period from October 1, 2010 to make the required interest payment, which has subsequently been extended to January 29, 2011.

5.16 The Petitioners do not have the ability to satisfy the obligations owing in respect of the Subordinated Notes if immediate repayment of the obligations of in excess of US$250 million is demanded (approximately $266 million including unpaid and accrued interest up to January 31, 2011). The Petitioners' inability to satisfy their obligations in respect of the Subordinated Notes also has the potential to cause an acceleration of the Petitioners' other long-term debt obligations under the Floating Rate Notes and the Wells Fargo Credit Agreement. These long-term debt obligations, together with the amounts owing under the Subordinated Notes, presently total in excess of US$603 million.

Current liquidity position

5.17 As at January 27, 2011 the Company has approximately $31.6 million in cash on hand and has drawn $10.0 million on the Wells Fargo Credit Facility. As at November 30, 2010, the Company had further borrowing availability under the Wells Fargo Credit Facility of approximately $15.3 million. Senior Management has advised A&M that it requires a minimum of approximately $15 million to $20 million in cash on a consolidated basis to operate its business in the normal course, including providing for the timing issues that can arise during the course of regular funding of payroll, trade suppliers and other normal operating expenses.

## 6.0 RESTRUCTURING EFFORTS TO DATE

Overview

6.1 In or around May 2010, Senior Management, the Board of Directors and their financial advisor concluded that it was critical that Angiotech identify a definitive and timely restructuring transaction that would alleviate some of the pressure on Angiotech's

liquidity position and de-leverage Angiotech's balance sheet. After significant effort, the Company and the Independent Committee (which was formed by Angiotech's Board of Directors to oversee its restructuring), determined that the Recapitalization Transaction was in the best interests of the Angiotech Companies and their stakeholders.

6.2 In addition, the Angiotech Companies continually pursued select operational restructuring programs (such as product rationalization and overhead cost reduction initiatives) which Senior Management have determined will be necessary to ensure Angiotech's longer term viability.

**7.0 THE RECAPITALIZATION TRANSACTION**

7.1 On October 29, 2010 Angiotech entered into a recapitalization support agreement (the "**RSA**") with certain holders of its Subordinated Notes (the "**Subordinated Noteholders**") representing 84% of the Subordinated Notes (the "**Consenting Noteholders**"). In addition, pursuant to the RSA the Company entered into a support agreement (the "**FRN Support Agreement**") with certain of its holders of the Floating Rate Notes representing 53% of the Floating Rate Notes (the "**Consenting FRN Holders**"). The purpose of the RSA between Angiotech and the Consenting Noteholders, is to implement the Recapitalization Transaction to restructure the Company to allow it to operate on a going concern basis with a sustainable capital structure.

7.2 The Recapitalization Transaction contemplates a compromise of the Subordinated Notes resulting in the exchange of approximately $266 million of debt and unpaid interest for equity in the Company. As outlined in the terms of the RSA, Angiotech agreed to pursue the Recapitalization Transaction through a number of alternative legal processes,

and has determined that a plan of compromise or arrangement under the CCAA is the preferred process.

7.3 The RSA also contemplates, as a condition to implementation of the Recapitalization Transaction, that Angiotech will enter into an exchange transaction (the "**Exchange Transaction**") with the FRN Holders pursuant to which Angiotech will exchange the existing FRN notes for new FRN notes on substantially the same terms but amended to grant second lien security to the FRN Holder and with certain modifications relating to for example, permitted indebtedness.

7.4 We understand the RSA is currently in the process of being amended for a fourth time to address certain matters consistent with the Company's financial position and the relief being sought by the Initial Order. Such amendments will include the addition of certain Canadian creditors as "Affected Creditors" under a CCAA plan of arrangement and other matters that may relate to certain waivers with respect to the timing of the implementation date and the Exchange Transaction. The principal commercial terms of the Recapitalization Transaction as contemplated by the RSA include the following:

a) The Subordinated Noteholders would receive their pro-rata share of 92.5% of the new common shares of a reorganized Angiotech (adjusted for any dilution for the Affected Canadian Creditors as based on an anticipated amendment to the RSA) (the "**Adjusted New Common Shares**");

b) The Subordinated Noteholders who consented to the terms of the RSA by November 30, 2010 (the "**Consent Date Noteholders**") would receive their pro-rata share of an additional 3.5% of the Adjusted New Common Shares and would have their expenses associated with the RSA and the Recapitalization Transaction paid by the Companies;

c) All of Angiotech's existing common shares, rights, options and warrants under Angiotech's existing "Shareholder Rights Plan Agreement" would be cancelled;

d) A management incentive plan ("**MIP**") would be adopted by Angiotech which would include the issuance of 4% of the Adjusted New Common Shares as well as the granting of new options under certain circumstances; and

e) A key employee incentive plan (the "**KEIP**") would be adopted by Angiotech.

7.5 Other material terms of the RSA and the FRN Support Agreement are as summarized in the Bailey Affidavit and are not repeated herein.

## 8.0 CASH MANAGEMENT SYSTEM

8.1 Angiotech maintains a centralized cash management system (the "**Cash Management System**") which is used to monitor and manage cash for all of the Angiotech Companies. The Cash Management System is managed centrally by Angiotech's treasury department (the "**Treasury Department**"), which is located at Angiotech's head office in Vancouver, British Columbia. The Angiotech Companies maintain bank accounts at nine different financial institutions in Canada, the U.S. and Europe.

8.2 The Petitioners' Canadian bank accounts are maintained on a cash management system established at the Royal Bank of Canada. The Petitioners' U.S. bank accounts are maintained on cash management systems established at Wells Fargo and Bank of America. The European bank accounts are maintained on cash management systems primarily at the Royal Bank of Scotland and the Danske Bank Group.

8.3 The Cash Management System is managed by the Treasury Department in conjunction with the local entity financial controllers' departments to facilitate cash forecasting,

reporting and monitoring, and management of intercompany funding requirements. On a daily basis, the Treasury Department reviews account activity, including any inter-entity transfers and bank account balances. Cash requirements in each of the operating entities are assessed by the Treasury Department through the review and monitoring of the accounts payable systems and the weekly cash flow forecasts at the entity level.

## 9.0 CASH FLOW FORECAST FOR THE PERIOD ENDING APRIL 22, 2011

9.1 The Petitioners, with the assistance of the Proposed Monitor, have prepared Angiotech's consolidated cash flow forecast (the "**Cash Flow Forecast**") for the 13-week period ending April 22, 2011 (the "**Cash Flow Period**").

9.2 A copy of the Cash Flow Forecast and a report of the Proposed Monitor regarding the Cash Flow Forecast is attached to this report as **Schedule "C".**

9.3 A summary of the Cash Flow Forecast is set out in the table below and presents regular forecast cash inflows and outflows, as well as sources of funding from the DIP Facility (subsequently defined) and intercompany advances, by the relevant Angiotech geography.

## The Angiotech Companies
## Unaudited Summary of Forecast Cash Flow (Note 1)
## For the 13-Week Period Ending April 22, 2011
## (US$000's)

| | Angiotech Companies (Consolidated) | Angiotech Canada | Angiotech U.S. | Angiotech Europe |
|---|---|---|---|---|
| **Forecast Cash Inflow** | | | | |
| Customer collections | $ 52,618 | $ - | $ 41,328 | $ 11,290 |
| Royalties and other receipts | 6,306 | 5,000 | - | 1,306 |
| **Forecast Total Receipts** | 58,924 | 5,000 | 41,328 | 12,596 |
| **Forecast Cash Outflow** | | | | |
| Raw materials, production, R&D and occupancy | 29,908 | 4,567 | 21,097 | 4,244 |
| Payroll and benefits | 28,964 | 4,514 | 19,316 | 5,134 |
| License fees, insurance and other non-operating costs | 6,038 | 2,556 | 1,439 | 2,043 |
| Capital expenditures | 2,023 | 326 | 1,484 | 213 |
| Tax and other | 1,982 | (121) | 1,130 | 973 |
| Interest and financing fees | 4,347 | 3,597 | 750 | - |
| Professional fees | 7,375 | 7,375 | - | - |
| **Total Forecast Outflow** | 80,637 | 22,814 | 45,216 | 12,607 |
| **Net Cash Flow, prior to DIP financing and intercompany advances** | $ (21,713) | $ (17,814) | $ (3,888) | $ (11) |
| DIP financing - advances | 20,000 | - | 20,000 | - |
| Repayment of Pre-Filing Wells Fargo Credit Facility | (10,000) | | (10,000) | |
| Intercompany advances in (out) | - | 14,576 | (11,295) | (3,281) |
| **Net Cash flow** | (11,713) | (3,238) | (5,183) | (3,292) |
| **Cash, beginning of period (January 22, 2011)** (Note 2) | 31,641 | 8,999 | 15,203 | 7,439 |
| **Cash, end of period (April 22, 2011)** | $ 19,928 | $ 5,761 | $ 10,020 | $ 4,147 |

Note 1 Readers are cautioned to read the Terms of Referenced as set out on previously in this report for information regarding the preparation of the Cash Flow Forecast.

Note 2 The first week of the Cash Flow Forecast includes forecast cash inflows and outflows for a portion of the pre-filing week leading up to the CCAA filing date of January 28, 2011.

9.4 With respect to the Cash Flow Forecast:

a) The Company currently expects to have consolidated cash resources in the order of approximately $31.6 million in the week the CCAA Proceedings are expected to commence. Senior Management advises that it requires minimum cash reserves in the order of $15 million to $20 million in order to manage its payments cycle, including timing differences that can occur in its customer and royalties receipts, and in the funding of major disbursement items such as payroll, occupancy costs and other.

b) Over the course of the Cash Flow Period, the Angiotech Companies are forecast to experience net cash outflow of approximately $21.7 million on a consolidated basis, made up of the following net cash outflow by geographical region:

   i. Angiotech Canada – net cash outflow of $17.8 million;

   ii. Angiotech U.S. – net cash outflow of $3.9 million; and

   iii. Angiotech Europe – net cash outflow of $nil.

c) The Cash Flow Forecast contemplates advances under the DIP of $20 million and a pay down of the Wells Fargo Credit Facility of $10 million in the Cash Flow Period.

d) The following is the general breakdown of the $21.7 million net cash outflow in the Cash Flow Period, by operating and other key funding categories:

   i. Operating net cash outflow - $7.0 million (including the payment of annual employee bonuses of $5.7 million);

   ii. Interest and financing fees - $4.3 million;

   iii. Professional fees - $7.4 million;

   iv. Directors and Officers insurance premiums - $1.8 million;

   v. Capital expenditures - $1.2 million.

e) Management expects to fund the cash flow requirements of the businesses with current cash resources on hand and the DIP Facility. Various inter-jurisdictional funding requirements are forecast to be funded through intercompany advances, as required, to maintain the cash reserves at adequate levels in each of Angiotech's operating jurisdictions.

f) Intercompany advances are expected to be made by Angiotech U.S. and Angiotech Europe to Angiotech Canada in the order of $14.6 million, in aggregate, in the Cash

Flow Period. Angiotech U.S. is expected to provide $11.3 million of this amount and Angiotech Europe is expected to provide $3.3 million of this amount.

g) The intercompany funding to Angiotech Canada from the other Angiotech Companies is forecast to be used in part to fund certain costs which Angiotech Canada pays on behalf of all of the Angiotech Companies including professional fees, interest and finance costs and research and development.

9.5 Assuming the Angiotech Companies have access to the DIP Facility (substantially in the form as described further in this report), and the regular intercompany advances continue uninterrupted, the Cash Flow Forecast indicates that the Petitioners have reasonable liquidity to fund operating and other costs over the course of the Cash Flow Period.

## 10.0 DEBTOR IN POSSESSION FINANCING

Overview

10.1 As discussed previously in this report, the Angiotech Companies currently maintain the Wells Fargo Credit Facility, with current advances thereunder at approximately $10 million (there are also letters of credit advanced in the order of approximately $2.8 million).

10.2 The Cash Flow Forecast contemplates the need for additional financing, over and above the current level of financing drawn under the Wells Fargo Credit Facility in the order of $10 million in the Cash Flow Period, in order to meet the Company's liquidity requirements as set out in the Cash Flow Forecast. The first additional funding requirement is not required until the last week in March, 2011.

10.3 Senior Management, its advisors and the Proposed Monitor are of the view that an additional interim CCAA financing facility is a requirement in the CCAA Proceedings.

10.4 The Company, with the assistance of its financial advisor canvassed the available market for such financing and have solicited terms sheets from a number of financial institutions. This process commenced on January 10, 2011.

10.5 We are advised that the Petitioners' financial advisor contacted 10 third parties, the majority of which are well known financial institutions who are experienced and capable of providing the required financing in this situation. Of the 10 parties contacted, two ultimately provided non-binding term sheets worth consideration, including Wells Fargo (the "**Wells Fargo DIP Term Sheet**").

10.6 After analyzing non-binding term sheets of prospective financiers, the Company and its financial advisor concluded that the Wells Fargo DIP Term Sheet was superior on the basis of its completeness and its favourable carrying costs. The Proposed Monitor was provided with background documentation regarding the solicitation process conducted by the Company's financial advisor and concurs with the assessment of the Company and the financial advisor. As a result, the Company commenced extensive negotiations with Wells Fargo with a view to concluding an agreement for an interim CCAA financing facility (the "**DIP Facility**").

10.7 As at the date of this report, an agreement has not been settled and is still in the process of negotiation between the parties. Wells Fargo is not currently bound to provide any interim financing. However, we are advised that the substance of the DIP Facility that is intended to be concluded over the short term is as described further in this report.

Summary of DIP Facility Terms

10.8 Based on the Proposed Monitor's discussions with Senior Management, the financial advisor and the Company's legal advisors, and after a reviewing the latest draft of the credit agreement under negotiation, we understand the contemplated DIP Facility is intended to contain the following terms.

| Angiotech<br>Summary of DIP Facility Terms (presently under negotiation) | |
|---|---|
| **Stated Amount of Facility** | Post petition loans not to exceed US$25 million plus a sub facility for the issuance of letters of credit |
| **Effective Date** | The Final Facility Effective Date, which is the date the CCAA Initial Order (as further defined) if fully recognized in the U.S. Court through the Company's Ch 15 proceedings. |
| **Borrowers** | Afmedia, Inc., AMI, Angiotech America, Inc., Angiotech Biocoatings Corp., (No Suggestions) Florida Holdings Inc., Angiotech Pharmaceuticals (US), Inc., B.G. Sulzle, Inc., Manan Medical Products, Inc., Neucoll, Inc., QMI, Surgical Specialties Corporation. |
| **Guarantor** | Angiotech |
| **Availability Thresholds** | The least of : (A) The Maximum Revolver Amount (US$25 million) less the sum of: (i) letters of credit issued; plus (ii) pre-petition amounts owing under the Wells Fargo Credit Facility; AND (B) for any week, an amount equal to 20% of the "closing revolver/DIP balance" line item set forth in the Cash Flow Forecast for such week; AND (C) The borrowing base (which is comparable to that in the Wells Fargo Credit Facility, less the sum of (i) letters of credit issues; plus (ii) pre-petition amounts owing under the Wells Fargo Credit Facility. |
| **Uses Proceeds** | Funding of financing costs, general corporate purposes and for other items as set out in a cash flow budget to be agreed by the DIP Lender and the Angiotech borrowers. |
| **Major Conditions Precedent** | Initial Order (as further defined) has to be granted and issued, and a full recognition order is granted in the U.S., such that the DIP Charge (as further defined herein), is granted in Canada and fully recognized in the U.S.<br>The establishment of a cash flow budget which is satisfactory to Wells Fargo (the "DIP Lender")<br>The borrowers under the DIP Facility are in compliance with all CCAA and Ch 15 Court Orders.<br>No prepayments on the DIP Facility are permitted unless the Wells Fargo Credit Facility is paid in full.<br>The DIP Lender shall have received control agreements with respect to the deposit accounts of the borrowers and guarantors which effectively provided for a sweeping of Angiotech Canada's and Angiotech U.S.'s gross receipts, such collections which are to be applied to reduce any amounts owing under the Wells Fargo Credit Facility.<br>Creation of an Intercompany Charges (as further defined herein) to protect the Angiotech borrowers in the U.S. for advances made to Angiotech Canada.<br>Other covenants which appear customary under the circumstances |
| **Financial Covenants** | Maintenance of a Minimum EBITDA, measured on a rolling 12 month base of approximately $15.0 million from December 31, 2010 and to June 30, 2011.<br>Maintenance of a Fixed Charge Coverage Ratio between 0.36:1 to 0.6:10 from December 31, 2010 to June 30, 2010. |
| **Fees** | An initial financing fee of US$750,000<br>Interest on outstanding advances of 3.25% to 3.5%, dependent on levels of availability under the DIP Facility. |
| **Security** | All assets and property of the Angiotech borrowers and guarantors |
| **Administrative Priority** | The DIP Charge (as further defined herein) will have the priority as set out further in this report (it will rank only subordinate to the Administration Charge (as further defined herein) and the Directors' Charge, as further defined herein). |

10.9 The Proposed Monitor is advised by Senior Management that based on its existing estimates, and should an agreement be consummated which provides for the DIP Facility on substantially the same terms as described above, it expects to have borrowing availability under the DIP Facility which will provide it with the ability to draw advances under the DIP Facility to meet the requirements of the Cash Flow Forecast for the Cash Flow Period. Further, the Proposed Monitor is also advised that, based the latest operating forecasts, it expects to maintain the financial covenants of the facility for the term of the contemplated CCAA Proceedings and beyond, if necessary.

## 11.0 PROPOSED INITIAL ORDER

11.1 A&M reviewed the proposed initial CCAA order in these proceedings (the "**Initial Order**") and provides comments on certain paragraphs thereof, below. It is noted that matters relating to the DIP Facility as referenced in the Initial Order are referred to in the previous section of this report.

<u>False Creek Research Park Lease</u>

11.2 The draft Initial Order being sought by Angiotech seeks the following order:

> *"THIS COURT ORDERS that Angiotech Pharmaceuticals, Inc. ("**ANPI**") may, in accordance with the terms of the lease and on prior notice to the landlord, assign the False Creek Research Park lease to a legal entity affiliated or associated with ANPI (including, without limitation a new entity incorporated by any of the Petitioners), as part of or in connection with the corporate reorganization of ANPI's affairs under the CCAA, and the consequences of the release and discharge of ANPI or any assignor in respect of such assignment shall be dealt with in the Plan."*

11.3 We are advised that the False Creek Research Park lease (the "**Lease**") provides that on notice to the landlord, Angiotech, "as part of or in connection with…an internal corporate

reorganization of [its] affairs..." may assign the lease to a legal entity affiliated or associated with Angiotech, without the landlord's consent.

11.4 By this clause in the Initial Order, Angiotech seeks authorization to make an assignment, which may take the lease out of these proceedings by transferring it to a non-petitioner. Such an assignment would be on notice to the landlord.

Intercompany Advances

11.5 Angiotech Canada is currently funded primarily by way of intercompany advances (as set out previously in this report). Further and significant intercompany funding will be required throughout the CCAA Proceedings in order for the Angiotech businesses to continue to operate in the normal course and avoid any disruptions. The aggregate forecast draws under the DIP Facility ($20 million) are expected to be advanced from Angiotech U.S. (the borrowers under the DIP Facility) to Angiotech Canada in the Cash Flow Period.

11.6 In order to protect the Angiotech Companies who are advancing money to Angiotech Canada during the CCAA Proceedings, intercompany payments and advances will be tracked and it is proposed that the Court authorize a charge on the Angiotech Canada property for amounts advanced (the "**Intercompany Charge**"). It is proposed that the Intercompany Charge will secure payments and advances made to Angiotech Canada by Angiotech's other subsidiaries.

Cash Management System

11.7 It is proposed that the Petitioners shall be entitled to continue to utilize the Cash Management System currently in place (as described above) or replace it with another substantially similar central cash management system.

11.8 In the Monitor's view, the maintenance of the existing Cash Management System is important to ensure that payments are made in accordance with established terms to all relevant stakeholder groups who are entitled to receive payments in the CCAA Proceedings.

Pre-Filing Obligations

11.9 In addition to the customary entitlement allowed to the Petitioners to pay certain expenses which may have been incurred prior to the date of any Initial Order, such as employee wages and benefits, professional fees and certain other pre-filing amounts under various circumstances, Angiotech US is permitted to pay its pre-filing obligations in the ordinary course. The details of all proposed pre-filing payments are set out in the Initial Order.

*Proposed Court Ordered Charges Over the Assets of the Petitioners*

*Administration Charge*

11.10 It is proposed that the Monitor, Canadian and U.S. counsel to the Monitor, Canadian and U.S. counsel and the financial advisor to the Petitioners, counsel and the financial advisor to the Consenting Noteholders and counsel and the financial advisor to the Independent Committee shall be entitled to the benefit of a charge (the "**Administration Charge**") on the property or the Petitioners, which charge shall not exceed an aggregate amount of

$2.5 million, as security for their respective fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel and advisors, both before and after the making of the Initial Order which are related to the Petitioners' restructuring.

*Directors and Officers Indemnification and Charge*

11.11 It is proposed that the Petitioners indemnify their directors and officers against obligations and liabilities that they may incur as directors or officers of the Petitioners after the commencement of the within proceedings, except to the extent that, with respect to any director or officer, the obligation or liability was incurred as a result of the director's or officer's gross negligence or willful misconduct.

11.12 It is also proposed that the directors and officers of the Petitioners be entitled to the benefit of a charge (the "**Directors' Charge**") against the assets of the Petitioners, which charge shall not exceed an aggregate amount of $2 million, as security for the indemnity provided.

11.13 We understand the Company has directors and officers insurance (the "**D&O Insurance**"). The Company has indicated that its directors and officers have requested a charge in the event there is any possible exposure. The Proposed Monitor's legal counsel has reviewed the D&O Insurance and while it does appear to insure against statutory liabilities in a monetary amount sufficient to cover any obligations that might arise in the context of this CCAA Proceeding, and it is granted by a reputable insurer, there are large deductibles for claims of non-indemnifiable loss ($250,000 to $500,000, per claim), considerable delay may be expected in the payment of defense costs by the insurer, and the presence of a large number of exclusions creates at least a degree of uncertainty. Given this and the fact that any director's charge will not be accessible until after

attempted recovery on the D&O Insurance, the Proposed Monitor supports a director's charge to back stop the D&O Insurance. We note, however, that under the recent amendments to the CCAA the Court must assess the adequacy of the D&O Insurance prior to granting a charge.

*DIP Lender's Charge*

11.14 It is proposed that the Petitioners be authorized to borrow from the DIP Lenders such amounts from time to time as the Petitioners consider necessary, and the DIP Lender shall be entitled to revolve the DIP Facility and collect interest, fees and costs on the DIP Facility, subject to such amendments as are agreed between the DIP Lender and the Petitioners;

11.15 It is proposed that the DIP Lender be entitled to the benefit of a charge (the "**DIP Lender's Charge**") on the all the property of the Petitioners, which DIP Lender's Charge shall not secure an obligation that exists before any Initial Order.

*Intercompany Charge*

11.16 It is proposed that Angiotech U.S. be authorized to make advances of funds to Angiotech Canada from time to time in accordance with intercompany transaction practices existing as of the Initial Order and that Angiotech U.S. be entitled to the benefits of on intercompany charge (the "**Intercompany Charge**") against the assets of the Petitioners in an amount equal to but not exceeding net advances actually made by Angiotech U.S. to Angiotech Canada.

*Priority of Charges Created by the Initial Order*

11.17 The priorities of the Administration Charge, the Directors' Charge, the DIP Lender's Charge, and the Intercompany Charge, as among them, are proposed to be as follows:

a) First – Administration Charge (to the maximum amount of $1.5 million);

b) Second – Directors' Charge (to the maximum amount of $1 million);

c) Third – Any existing liens, charges, security interests or other encumbrances securing the obligations under the Wells Fargo Credit Agreement;

d) Fourth – DIP Lender's Charge;

e) Fifth – Intercompany Charge;

f) Sixth - Administration Charge (to the maximum amount of $1 million); and

g) Seventh - Directors' Charge (to the maximum amount of $1 million).

11.18 The Proposed Monitor has reviewed the calculations that support the Administration Charge and Director's Charge and believes the amounts are reasonable under the circumstances. The priority ranking of charges, as listed above, also appear reasonable. The Monitor notes the quantum and priority ranking of all proposed charges has also been reviewed by the advisors to the holders of the Consenting Noteholders.

## 12.0 OTHER MATTERS

Employee Information and Proposed Incentive Plans

12.1 Employee related information, including compensation arrangements, are set out in the Bailey Affidavit. In general terms, Angiotech intends to continue its employee arrangements except for its stock option incentive programs. As part of the Recapitalization Transaction, it intends to implement the MIP and the KEIP.

<u>Status of Material Litigation</u>

*Quill Medical, Inc.*

12.2 On October 4, 2010, QSR, as the representative for the former stockholders of QMI (the "**Quill Creditors**"), commenced an arbitration (the "**Quill Arbitration**") in the U.S. naming Angiotech, Angiotech Washington and QMI as respondents (collectively, the "**Angiotech Respondents**"). QSR alleged that the Angiotech Respondents failed to satisfy certain obligations under the Quill Merger Agreement and sought monetary damages or a one-year extension of certain earn-out periods under the merger agreement. Subsequently, on October 5, 2010 Angiotech, Angiotech Washington and QMI (the "**Angiotech Defendants**") were served with a summons and complaint in respect of a related action (the "**QSR Action**" and, together with the Quill Arbitration, the "**Quill Litigation**") commenced by QSR in U.S. federal court in North Carolina.

12.3 On or about January 27 , 2011, Angiotech, Angiotech Washington and QMI reached an agreement with QSR to settle the Quill Litigation. Pursuant to the settlement agreement (the "**QSR Settlement Agreement**"), Angiotech Washington will pay to QSR a settlement amount (the "**Settlement Amount**") in exchange for the dismissal of the QSR Arbitration and the QSR Action.

*Rex Medical LP*

12.4 The Angiotech Companies have also become involved in an arbitration (the "**Rex Arbitration**") with Rex Medical L.P. ("**Rex**") over a license, supply, marketing and distribution agreement (the "**Rex Agreement**") dated March 13, 2008 between Angiotech Washington and Rex. On November 24, 2010, Rex initiated the Rex Arbitration against

Angiotech Washington seeking, among other things, damages relating to an alleged breach of the terms of the Rex Agreement.

## 13.0 PROPOSED MONITOR'S CONCLUSIONS

13.1 The Proposed Monitor's conclusions are summarized below:

Proposed CCAA Proceedings and Cash Flow Forecast

13.2 The Proposed Monitor concurs with Senior Management's view that the Petitioners are insolvent and are facing near term liquidity issues which supports the need to undertake a restructuring of its debt and has an immediate need to implement certain operational improvements. The Proposed Monitor believes that the CCAA Proceedings will facilitate these objectives.

13.3 The Cash Flow Forecast of the Angiotech Companies indicates that it has a reasonable amount of liquidity assuming intercompany advances and DIP financing are available to allow it to continue for the coming 13-week period. The Proposed Monitor notes that Angiotech Canada is forecast to receive advances from Angiotech U.S. and Angiotech Europe of $14.8 million in the Cash Flow Period and expects to draw (in Angiotech U.S.) up to $20 million from the proposed DIP Facility during the Cash Flow Period. The first draw on the proposed DIP Facility is not expected to occur until the last week in March 2011.

Provisions Relating to Compliance with the RSA

13.4 The RSA contemplates a new capital structure which eliminates US$250 million of debt from the balance sheet in exchange for equity. The RSA is supported by the Petitioners and has been approved by the Board of Directors of Angiotech. The RSA and the FRN

Support Agreement represents the culmination of intensive and extended negotiations and discussions among Angiotech and the Consenting Noteholders (84% of Subordinated Notes) and the FRN Holders (53% of the Floating Rate Notes).

13.5 The FRN Support Agreement has been agreed to by 53% of the FRN Holders. However, the Proposed Monitor is not aware of the position of the balance of the FRN Holders that have not provided consent to date.

DIP Facility

13.6 Based on the Company's near term business plan prepared to date and the Cash Flow Forecast, the Proposed Monitor is satisfied that the DIP Facility or other form of interim financing is required in order for Angiotech to continue on an uninterrupted basis through the Cash Flow Period and the projected restructuring period.

13.7 The DIP Facility could provide the necessary funding required by the Petitioners during the restructuring period and addresses the inability to draw under a default on the Wells Fargo Credit Facility on the Petitioner's CCAA filing.

13.8 Although the DIP Facility credit agreement remains under negotiation, we are advised by Senior Management that they anticipate that a definitive agreement will be reached in the near term.

13.9 Given the complex and cross border corporate structure of Angiotech, financing in the conventional sense has presented Angiotech and prospective financiers (including Wells Fargo) with unique credit structuring challenges. A borrower experiencing liquidity issues coupled with the prospect of entering formal restructuring proceedings, presents even more obstacles for an interim or DIP lender. Wells Fargo has experience with these

issues having negotiated prior credit agreements with Angiotech and its DIP financing proposal appears to represent a timely solution for the Company's immediate liquidity needs.

13.10 A condition precedent to the DIP Facility is the issuance of a final order in the U.S. Court which recognizes the Initial Order (and authorizes the DIP Facility and the DIP Charge). The legal advisors to the Petitioners estimate that this process will likely take three to four weeks. Draws under the DIP Facility are not forecast to commence in the Cash Flow Forecast until the last week of March, 2011 but the inability to access the DIP Facility is not expected to have adverse impact on Angiotech working capital requirements during the period.

13.11 Section 11.2(1) of the CCAA provides as follows:

> *"On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, a court may make an order declaring that all or part of the company's property is subject to a security or charge – in an amount that the court considers appropriate – in favour of a person specified in the order who agrees to lend to the company an amount approved by the court as being required by the company, having regard its cash-flow statement.* ***The security or charge may not secure an obligation that exists before the order is made."***

13.12 A condition precedent to the DIP Facility is the requirement of the Petitioners to pay down the pre-filing obligations owing under the Wells Fargo Credit Facility through a sweeping mechanism whereby gross receipts in the Petitioners' Canadian Accounts and the Petitioners' U.S. Accounts will be swept through Wells Fargo control accounts and applied towards the pre-filing Wells Fargo Credit Facility. Post-filing operating and other costs of the Petitioners during the period of the Wells Fargo Credit Facility pay down period (which should occur over the course of approximately two weeks after the

DIP Facility becomes available to the Petitioners), would be funded as required by advances from the DIP Facility (effectively securing all advances by the DIP Charge).

13.13 Our independent counsel advises that similar arrangements were authorized by the Alberta Queen's Bench in the *Cow Harbour Construction Ltd.* case which came after the enactment of Section 11.2(1) of the CCAA. However, the Proposed Monitor does want to draw the Court's attention to the condition precedent to the DIP Facility in the context of Section 11.2(1).

13.14 The Proposed Monitor observes that the above condition and payments toward the pre-filing Wells Fargo Credit Facility obligations may be viewed by certain stakeholders as contrary to the intent of Section 11.2(1).

13.15 Apart from any issues this Honourable Court may find with this interim financing and Section 11.2(1) of the CCAA, the Proposed Monitor is of the view that the DIP Facility, if a final agreement can be concluded, represents necessary financing which affords the Petitioners the opportunity to implement the Recapitalization Transaction and/or otherwise reorganize its affairs and it does not appear that there would be material financial prejudice to other Angiotech stakeholders as a result of this financing.

13.16 As it is expected to take three to four weeks to obtain final recognition order in the Chapter 15 Proceedings, U.S. Court of the Initial Order, a period of time exists for interested and affected parties to object to the proposed DIP Facility.

13.17 The view of the Proposed Monitor is that the DIP Facility, if an agreement can be concluded on the terms substantially in the form as summarized above, represents financing that will further the Company's efforts.

13.18 The Proposed Monitor has been advised by counsel to the Subordinated Noteholders that the Consenting Noteholders may be prepared to fund the Company, as required, pursuant to the Cash Flow Forecast, in order to facilitate the completion of the Recapitalization Transaction in an efficient and effective manner should the DIP Facility not be available to Angiotech.

## 14.0 CCAA RELIEF SOUGHT

14.1 It is the Proposed Monitor's view that the Petitioners are insolvent and the relief sought in the Initial Order is reasonable in the circumstances.

14.2 The Petitioners are also seeking, and the Proposed Monitor supports their request, to continue to operate the Cash Management System (subject to the control accounts which are contemplated to be set up for the purposes of the DIP Facility) in substantially the same manner as before the commencement of the CCAA Proceedings should an Initial Order be granted.

14.3 The Proposed Monitor supports the Petitioners taking such steps as are required to implement the Recapitalization Transaction and the Exchange Transaction in furtherance of the development of a plan or arrangement under the CCAA.

14.4 The Proposed Monitor also supports the Petitioners request for authorization to commence the Chapter 15 Proceedings in the United States, if necessary, and agrees (if appointed Monitor) to act as foreign representative in such proceedings.

14.5 The Proposed Monitor supports the amounts and rankings of the court-ordered charges and the financial thresholds proposed in the draft Initial Order, including:

a) First – Administration Charge (to the maximum amount of $1.5 million);

b) Second – Directors' Charge (to the maximum amount of $1 million);

c) Third – Any existing liens, charges, security interests or other encumbrances securing the obligations under the Wells Fargo Credit Agreement;

a) Fourth – DIP Lender's Charge;

b) Fifth – Intercompany Charge;

c) Sixth – Administration Charge (to the maximum amount of $1 million); and

d) Seventh – Directors' Charge (to the maximum amount of $1 million).

*****

All of which is respectfully submitted to this Honourable Court this 28th day of January, 2011.

**Alvarez & Marsal Canada Inc., in its capacity as Proposed Monitor of Angiotech Pharmaceuticals, Inc. and the other Petitioners listed on Schedule "A".**

Per: Todd M. Martin
Senior Vice President

# SCHEDULE "A"

## Schedule "A"

1. 0741693 B.C. Ltd.
2. Angiotech International Holdings, Corp.
3. Angiotech Pharmaceuticals (US), Inc.
4. American Medical Instruments Holdings, Inc.
5. NeuColl, Inc.
6. Angiotech BioCoatings Corp.
7. Afmedica, Inc.
8. Quill Medical, Inc.
9. Angiotech America, Inc.
10. Angiotech Florida Holdings, Inc.
11. B.G. Sulzle, Inc.
12. Surgical Specialties Corporation
13. Angiotech Delaware, Inc.
14. Medical Device Technologies, Inc.
15. Manan Medical Products, Inc.
16. Surgical Specialties Puerto Rico, Inc.

# SCHEDULE "B"

Angiotech Pharmaceuticals, Inc.
Revised Corporate Organization
as of January 2010

*Privileged & Confidential*
*Attorney Work Product*



# SCHEDULE "C"

**Schedule C**

**IN THE SUPREME COURT OF BRITISH COLUMBIA**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF ANGIOTECH PHARMACEUTICALS, INC. AND THE OTHER PETITIONERS LISTED ON SCHEDULE "A"**

**REPORT OF THE PROPOSED MONITOR, ALVAREZ & MARSAL CANADA INC., ON THE CASH FLOW STATEMENT**

The attached statement of projected cash-flow (the "Cash-Flow Statement") of the Petitioners, (the "Company") as of the 27th day of January, 2011, consisting of the 13 week period from January 28th to April 22nd, 2011, has been prepared by the management of the Company for the purpose described in Note 1, using the Probable and Hypothetical Assumptions set out in Notes 2 to 10.

Our review consisted of inquiries, analytical procedures and discussion related to information supplied to us by certain of the management and employees of the Company. Since Hypothetical Assumptions need not be supported, our procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Cash-Flow Statement. We have also reviewed the support provided by management of the Company for the Probable Assumptions, and the preparation and presentation of the Cash-Flow Statement.

Based on our review, nothing has come to our attention that causes us to believe that, in all material respects:

*a)* the Hypothetical Assumptions are not consistent with the purpose of the Cash-Flow Statement;

*b)* as at the date of this report, the Probable Assumptions developed by management are not Suitably Supported and consistent with the plans of the Company or do not provide a reasonable basis for the Cash-Flow Statement, given the Hypothetical Assumptions; or

*c)* the Cash-Flow Statement does not reflect the Probable and Hypothetical Assumptions.

Since the Cash-Flow Statement is based on Assumptions regarding future events, actual results will vary from the information presented even if the Hypothetical Assumptions occur, and the variations may be material. Accordingly, we express no assurance as to whether the Cash-Flow Statement will be achieved. We express no opinion or other form of assurance with respect to the accuracy of any financial information presented in this report, or relied upon by us in preparing this report.

The Cash-Flow Statement has been prepared solely for the purpose described in Note 1 on the face of the Cash-Flow Statement, and readers are cautioned that it may not be appropriate for other purposes.

Dated at Vancouver, this 28th day of January, 2011.
**Alvarez & Marsal Canada Inc.**
In its capacity as Proposed
Monitor of the Petitioners

Todd M. Martin
Senior Vice President

**Angiotech Pharmaceuticals, Inc.**
**CONSOLIDATED Weekly Cash Flow Forecast**
**For the 13-week period ending April 22, 2011**
**($ USD in 000's)**

| | January | February | | | | March | | | | | April | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Week 1** *Forecast* 28-Jan | **Week 2** *Forecast* 4-Feb | **Week 3** *Forecast* 11-Feb | **Week 4** *Forecast* 18-Feb | **Week 5** *Forecast* 25-Feb | **Week 6** *Forecast* 4-Mar | **Week 7** *Forecast* 11-Mar | **Week 8** *Forecast* 18-Mar | **Week 9** *Forecast* 25-Mar | **Week 10** *Forecast* 1-Apr | **Week 11** *Forecast* 8-Apr | **Week 12** *Forecast* 15-Apr | **Week 13** *Forecast* 22-Apr | **13 Week Total** |
| **Receipts** | | | | | | | | | | | | | | |
| Customer Collections | 4,553 | 4,039 | 4,357 | 3,524 | 3,924 | 3,876 | 3,931 | 3,990 | 3,944 | 4,089 | 4,239 | 4,310 | 3,842 | 52,618 |
| Royalties and Other Receipts | - | - | 453 | - | - | 5,000 | 395 | - | - | - | 395 | 63 | - | 6,306 |
| **Total Receipts** | 4,553 | 4,039 | 4,810 | 3,524 | 3,924 | 8,876 | 4,326 | 3,990 | 3,944 | 4,089 | 4,635 | 4,373 | 3,842 | 58,924 |
| **Disbursements** | | | | | | | | | | | | | | |
| Raw Materials, Production, R&D and Occupancy | (1,719) | (4,651) | (3,209) | (2,972) | (1,800) | (2,014) | (2,259) | (1,973) | (1,593) | (1,929) | (2,233) | (1,697) | (1,858) | (29,908) |
| Payroll, Benefits and Payroll Taxes | (1,954) | (2,533) | (1,423) | (2,132) | (1,605) | (2,499) | (770) | (2,585) | (1,701) | (7,775) | (790) | (2,626) | (570) | (28,964) |
| Licence Fees, Insurance and Other Non-Operating | (2,345) | (234) | (448) | (176) | (544) | (234) | (225) | (178) | (888) | (159) | (184) | (195) | (228) | (6,038) |
| Capital Expenditures | (198) | (255) | (59) | (55) | (275) | (112) | (59) | (55) | (280) | (55) | (59) | (55) | (506) | (2,023) |
| Tax and Other | - | 20 | - | 20 | - | 20 | - | (425) | - | 20 | - | (1,638) | 0 | (1,982) |
| Interest | (50) | - | - | - | (70) | (3,287) | - | - | (90) | - | - | - | (100) | (3,597) |
| Professional Fees | (3,250) | - | - | (425) | (425) | (425) | (425) | (425) | (425) | (400) | (400) | (400) | (375) | (7,375) |
| DIP Financing Fees | (250) | (75) | (75) | (50) | (50) | (250) | - | - | - | - | - | - | - | (750) |
| **Total Disbursements** | (9,766) | (7,729) | (5,214) | (5,790) | (4,770) | (8,802) | (3,738) | (5,640) | (4,978) | (10,298) | (3,666) | (6,611) | (3,637) | (80,637) |
| **Net Cash Flow** | (5,213) | (3,690) | (404) | (2,267) | (846) | 74 | 588 | (1,651) | (1,034) | (6,208) | 969 | (2,238) | 205 | (21,713) |
| DIP Advances | - | - | - | - | - | 8,000 | 2,000 | 5,000 | 5,000 | - | - | - | - | 20,000 |
| Reductions to Pre-filing Revolving Credit Facility | - | - | - | - | - | (8,000) | (2,000) | - | - | - | - | - | - | (10,000) |
| **Net Cash Flow post Revolver/DIP** | (5,213) | (3,690) | (404) | (2,267) | (846) | 74 | 588 | 3,349 | 3,966 | (6,208) | 969 | (2,238) | 205 | (11,713) |
| **Cash & Equivalents Position** | | | | | | | | | | | | | | |
| Opening Cash & Equivalents Position | 31,641 | 26,428 | 22,737 | 22,334 | 20,067 | 19,222 | 19,296 | 19,884 | 23,234 | 27,200 | 20,992 | 21,961 | 19,723 | 31,641 |
| Net Cash Flow incl. DIP | (5,213) | (3,690) | (404) | (2,267) | (846) | 74 | 588 | 3,349 | 3,966 | (6,208) | 969 | (2,238) | 205 | (11,713) |
| **Closing Cash & Equivalents Position** | 26,428 | 22,737 | 22,334 | 20,067 | 19,222 | 19,296 | 19,884 | 23,234 | 27,200 | 20,992 | 21,961 | 19,723 | 19,928 | 19,928 |
| **Wells Fargo Revolver/DIP** | | | | | | | | | | | | | | |
| Revolving Credit Facility Balance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 2,000 | - | - | - | - | - | - | - | - |
| DIP Balance | - | - | - | - | - | 8,000 | 10,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| **Closing Revolver/DIP Balance** | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |

**Notes:**

1. The purpose of these cash flow forecasts is to set out the liquidity requirements of the Angiotech Companies during the CCAA proceedings.
2. Letters of Credit outstanding at Week 1 are in the amount of $2.8M.
3. Receipts have been forecast in the normal course of business based on accounts receivable, Management's historical collections analysis and forecast sales, adjusted for the potential impacts of a CCAA filing.
4. Operating disbursements have been forecast based on the current run-rates of the associated expenses, existing supply contracts/agreements and Management's production, purchasing and operating plan, adjusted for the potential impacts of a CCAA filing.
5. Operating disbursements forecast include an assumption by Management that certain restructuring initiatives shall commence immediately post-filing.
6. Interest disbursements forecast include an assumption by Management that interest due on the Floating Rate Notes for the period ending February 28, 2011, shall be paid in week ending March 4, 2011.
7. Capital expenditure disbursements have been forecast based on planned capital projects in Management's operating plan.
8. Intercompany receipts and disbursements have been forecast based on historical charges for product transactions between the Angiotech Companies and funding to maintain required cash working capital balances on a jurisdictional basis.
9. Professional fee disbursements have been forecast based on projected costs by professional services firms relating to the restructuring.
10. Since projections are based on assumptions regarding future events, actual results will vary from the information presented, and the variations may be material.

Reference is made to the TERMS OF REFERENCE, which appear in the report of the Proposed Monitor dated January 27, 2011, which should be read as an integral part of this document.

**Angiotech Pharmaceuticals, Inc.**
**CANADA Weekly Cash Flow Forecast**
**For the 13-week period ending April 22, 2011**
**($ USD in 000's)**

| | January | February | | | | March | | | | | April | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week 1<br>*Forecast*<br>28-Jan | Week 2<br>*Forecast*<br>4-Feb | Week 3<br>*Forecast*<br>11-Feb | Week 4<br>*Forecast*<br>18-Feb | Week 5<br>*Forecast*<br>25-Feb | Week 6<br>*Forecast*<br>4-Mar | Week 7<br>*Forecast*<br>11-Mar | Week 8<br>*Forecast*<br>18-Mar | Week 9<br>*Forecast*<br>25-Mar | Week 10<br>*Forecast*<br>1-Apr | Week 11<br>*Forecast*<br>8-Apr | Week 12<br>*Forecast*<br>15-Apr | Week 13<br>*Forecast*<br>22-Apr | 13 Week<br>Total |
| **Receipts** | | | | | | | | | | | | | | |
| Customer Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Royalties and Other Receipts | - | - | - | - | - | 5,000 | - | - | - | - | - | - | - | 5,000 |
| **Total Receipts** | - | - | - | - | - | 5,000 | - | - | - | - | - | - | - | 5,000 |
| **Disbursements** | | | | | | | | | | | | | | |
| Raw Materials, Production, R&D and Occupancy | (376) | (319) | (239) | (319) | (239) | (457) | (341) | (422) | (341) | (422) | (392) | (311) | (392) | (4,567) |
| *Payroll, Benefits and Payroll Taxes* | (452) | (172) | (452) | - | (452) | - | 100 | (452) | 100 | (2,380) | - | (352) | - | (4,514) |
| Licence Fees, Insurance and Other Non-Operating | (1,845) | (126) | (45) | (45) | (45) | (126) | (45) | (45) | (45) | (51) | (45) | (45) | (45) | (2,556) |
| Capital Expenditures | - | - | - | - | (120) | (57) | - | - | (43) | - | - | - | (106) | (326) |
| Tax and Other | - | 20 | - | 20 | - | 20 | - | 20 | - | 20 | - | 20 | - | 121 |
| Interest | (50) | - | - | - | (70) | (3,287) | - | - | (90) | - | - | - | (100) | (3,597) |
| Professional Fees | (3,250) | - | - | (425) | (425) | (425) | (425) | (425) | (425) | (400) | (400) | (400) | (375) | (7,375) |
| DIP Financing Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | (5,974) | (597) | (736) | (769) | (1,351) | (4,332) | (711) | (1,324) | (844) | (3,232) | (837) | (1,089) | (1,018) | (22,813) |
| **Net Cash Flow** | (5,974) | (597) | (736) | (769) | (1,351) | 668 | (711) | (1,324) | (844) | (3,232) | (837) | (1,089) | (1,018) | (17,813) |
| **DIP & Intercompany** | | | | | | | | | | | | | | |
| Intercompany inflow/(outflow) | 2,000 | 1,000 | 1,000 | 147 | 1,250 | 238 | - | 5,147 | 3,000 | 647 | - | - | 147 | 14,576 |
| **Net Cash Flow post DIP & Intercompany** | (3,974) | 403 | 264 | (622) | (101) | 906 | (711) | 3,823 | 2,156 | (2,585) | (837) | (1,089) | (871) | (3,237) |
| **Cash & Equivalents Position** | | | | | | | | | | | | | | |
| *Opening Cash & Equivalents Position* | 8,999 | 5,025 | 5,428 | 5,692 | 5,070 | 4,969 | 5,875 | 5,164 | 8,987 | 11,143 | 8,558 | 7,721 | 6,633 | 8,999 |
| Net Cash Flow | (3,974) | 403 | 264 | (622) | (101) | 906 | (711) | 3,823 | 2,156 | (2,585) | (837) | (1,089) | (871) | (3,237) |
| **Closing Cash & Equivalents Position** | 5,025 | 5,428 | 5,692 | 5,070 | 4,969 | 5,875 | 5,164 | 8,987 | 11,143 | 8,558 | 7,721 | 6,633 | 5,762 | 5,762 |

Reference is made to the TERMS OF REFERENCE, which appear in the report of the Proposed Monitor dated January 27, 2011, which should be read as an integral part of this document

**Angiotech Pharmaceuticals, Inc.**
**UNITED STATES Weekly Cash Flow Forecast**
**For the 13-week period ending April 22, 2011**
**($ USD in 000's)**

| | January | February | | | | March | | | | | April | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week 1 *Forecast* 28-Jan | Week 2 *Forecast* 4-Feb | Week 3 *Forecast* 11-Feb | Week 4 *Forecast* 18-Feb | Week 5 *Forecast* 25-Feb | Week 6 *Forecast* 4-Mar | Week 7 *Forecast* 11-Mar | Week 8 *Forecast* 18-Mar | Week 9 *Forecast* 25-Mar | Week 10 *Forecast* 1-Apr | Week 11 *Forecast* 8-Apr | Week 12 *Forecast* 15-Apr | Week 13 *Forecast* 22-Apr | 13 Week Total |
| **Receipts** | | | | | | | | | | | | | | |
| Customer Collections | 3,660 | 3,172 | 3,491 | 2,657 | 3,058 | 3,010 | 3,065 | 3,123 | 3,078 | 3,223 | 3,373 | 3,444 | 2,976 | 41,328 |
| Royalties and Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 3,660 | 3,172 | 3,491 | 2,657 | 3,058 | 3,010 | 3,065 | 3,123 | 3,078 | 3,223 | 3,373 | 3,444 | 2,976 | 41,328 |
| **Disbursements** | | | | | | | | | | | | | | |
| Raw Materials, Production, R&D and Occupancy | (1,057) | (4,013) | (2,526) | (2,317) | (1,226) | (1,289) | (1,553) | (1,246) | (976) | (1,248) | (1,526) | (958) | (1,162) | (21,097) |
| Payroll, Benefits and Payroll Taxes | (1,019) | (1,922) | (638) | (2,043) | (624) | (2,060) | (556) | (2,043) | (1,282) | (4,241) | (790) | (1,616) | (482) | (19,316) |
| Licence Fees, Insurance and Other Non-Operating | (114) | (108) | (113) | (108) | (114) | (108) | (113) | (109) | (113) | (108) | (113) | (108) | (113) | (1,439) |
| *Capital Expenditures* | *(161)* | *(255)* | *(59)* | *(55)* | *(109)* | *(55)* | *(59)* | *(55)* | *(201)* | *(55)* | *(59)* | *(55)* | *(306)* | *(1,484)* |
| Tax and Other | - | - | - | - | - | - | - | (50) | - | - | - | (1,080) | - | (1,130) |
| Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Financing Fees | (250) | (75) | (75) | (50) | (50) | (250) | - | - | - | - | - | - | - | (750) |
| **Total Disbursements** | (2,600) | (6,373) | (3,410) | (4,573) | (2,123) | (3,762) | (2,280) | (3,502) | (2,572) | (5,652) | (2,487) | (3,817) | (2,063) | (45,215) |
| **Net Cash Flow** | 1,059 | (3,201) | 81 | (1,916) | 935 | (752) | 784 | (379) | 506 | (2,429) | 886 | (374) | 912 | (3,887) |
| **Revolver, DIP & Intercompany** | | | | | | | | | | | | | | |
| DIP Advances | - | - | - | - | - | 8,000 | 2,000 | 5,000 | 5,000 | - | - | - | - | 20,000 |
| Reductions to Pre-filing Revolving Credit Facility | - | - | - | - | - | (8,000) | (2,000) | - | - | - | - | - | - | (10,000) |
| Intercompany inflow/(outflow) | (2,000) | (1,000) | (1,000) | 688 | (1,250) | - | - | (4,312) | (3,000) | 500 | - | 80 | - | (11,295) |
| **Net Cash Flow post DIP & Intercompany** | (941) | (4,201) | (919) | (1,228) | (315) | (752) | 784 | 309 | 2,506 | (1,929) | 886 | (294) | 912 | (5,182) |
| **Cash & Equivalents Position** | | | | | | | | | | | | | | |
| Opening Cash & Equivalents Position | 15,203 | 14,262 | 10,061 | 9,142 | 7,914 | 7,599 | 6,847 | 7,631 | 7,940 | 10,446 | 8,517 | 9,402 | 9,109 | 15,203 |
| Net Cash Flow | (941) | (4,201) | (919) | (1,228) | (315) | (752) | 784 | 309 | 2,506 | (1,929) | 886 | (294) | 912 | (5,182) |
| **Closing Cash & Equivalents Position** | 14,262 | 10,061 | 9,142 | 7,914 | 7,599 | 6,847 | 7,631 | 7,940 | 10,446 | 8,517 | 9,402 | 9,109 | 10,021 | 10,021 |
| **Wells Fargo Revolver/DIP** | | | | | | | | | | | | | | |
| Revolving Credit Facility Balance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 2,000 | - | - | - | - | - | - | - | - |
| DIP Balance | - | - | - | - | - | 8,000 | 10,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| ***Closing Revolver/DIP Balance*** | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |

Reference is made to the TERMS OF REFERENCE, which appear in the report of the Proposed Monitor dated January 27, 2011, which should be read as an integral part of this document

**Angiotech Pharmaceuticals, Inc.**
**EUROPE Weekly Cash Flow Forecast**
***For the 13-week period ending April 22, 2011***
**($ USD in 000's)**

| | January | February | | | | March | | | | | April | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Week 1** ***Forecast*** **28-Jan** | **Week 2** ***Forecast*** **4-Feb** | **Week 3** ***Forecast*** **11-Feb** | **Week 4** ***Forecast*** **18-Feb** | **Week 5** ***Forecast*** **25-Feb** | **Week 6** ***Forecast*** **4-Mar** | **Week 7** ***Forecast*** **11-Mar** | **Week 8** ***Forecast*** **18-Mar** | **Week 9** ***Forecast*** **25-Mar** | **Week 10** ***Forecast*** **1-Apr** | **Week 11** ***Forecast*** **8-Apr** | **Week 12** ***Forecast*** **15-Apr** | **Week 13** ***Forecast*** **22-Apr** | **13 Week Total** |
| **Receipts** | | | | | | | | | | | | | | |
| Customer Collections | 893 | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 11,290 |
| Royalties and Other Receipts | - | - | 453 | - | - | - | 395 | - | - | - | 395 | 63 | - | 1,306 |
| **Total Receipts** | 893 | 866 | 1,319 | 866 | 866 | 866 | 1,262 | 866 | 866 | 866 | 1,262 | 930 | 866 | 12,596 |
| **Disbursements** | | | | | | | | | | | | | | |
| Raw Materials, Production, R&D and Occupancy | (286) | (319) | (444) | (336) | (336) | (269) | (365) | (306) | (276) | (260) | (315) | (428) | (304) | (4,244) |
| Payroll, Benefits and Payroll Taxes | (483) | (439) | (332) | (90) | (529) | (439) | (314) | (90) | (519) | (1,154) | - | (657) | (88) | (5,134) |
| Licence Fees, Insurance and Other Non-Operating | (387) | - | (290) | (23) | (385) | - | (67) | (23) | (731) | - | (27) | (42) | (70) | (2,044) |
| Capital Expenditures | (37) | - | - | - | (46) | - | - | - | (36) | - | - | - | (94) | (213) |
| Tax and Other | - | - | - | 0 | - | - | - | (395) | - | 0 | - | (579) | 0 | (973) |
| Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Financing Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | (1,192) | (758) | (1,067) | (448) | (1,295) | (708) | (746) | (814) | (1,561) | (1,414) | (342) | (1,705) | (556) | (12,609) |
| **Net Cash Flow** | (299) | 108 | 252 | 418 | (429) | 158 | 515 | 52 | (695) | (547) | 920 | (775) | 310 | (12) |
| Intercompany inflow/(outflow) | - | - | - | (835) | - | (238) | - | (835) | - | (1,147) | - | (80) | (147) | (3,282) |
| **Net Cash Flow post Intercompany** | (299) | 108 | 252 | (417) | (429) | (80) | 515 | (783) | (695) | (1,695) | 920 | (855) | 163 | (3,294) |
| **Cash & Equivalents Position** | | | | | | | | | | | | | | |
| Opening Cash & Equivalents Position | 7,439 | 7,140 | 7,248 | 7,500 | 7,083 | 6,654 | 6,574 | 7,089 | 6,307 | 5,612 | 3,917 | 4,837 | 3,982 | 7,439 |
| Net Cash Flow | (299) | 108 | 252 | (417) | (429) | (80) | 515 | (783) | (695) | (1,695) | 920 | (855) | 163 | (3,294) |
| **Closing Cash & Equivalents Position** | 7,140 | 7,248 | 7,500 | 7,083 | 6,654 | 6,574 | 7,089 | 6,307 | 5,612 | 3,917 | 4,837 | 3,982 | 4,145 | 4,145 |

Reference is made to the TERMS OF REFERENCE, which appear in the report of the Proposed Monitor dated January 27, 2011, which should be read as an integral part of this document.